Frederick J. Geonetta, SBN 114824
Kenneth Frucht, SBN 178881
Geonetta & Frucht LLP
825 Washington Street, Suite 220
Oakland, CA 94607
Telephone: (510) 254-3777
fred@geonetta-frucht.com
kfrucht@gmail.com

Marc E. Angelucci, SBN 211291
Law Office of Marc E. Angelucci
P.O. Box 6414
Crestline, CA 92325
Telephone: (626) 319-3081
Facsimile: (626) 239-4126
marc.angelucci@yahoo.com

Attorneys for Plaintiff
JERRY COX

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| JERRY COX, an Individual<br><br>        Plaintiff,<br><br>v.<br><br>MARIPOSA COUNTY; MARIPOSA COUNTY SHERIFF'S OFFICE; SHERIFF DEPUTY WILLIAM ATKINSON; SHERIFF DEPUTY WESLEY SMITH; ASHLEY HARRIS; CALIFORNIA RECEIVERSHIP GROUP ("CRG") AND MARK ADAMS IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, AND DOES 1 THROUGH 100, INCLUSIVE.<br><br><br>        Defendants. | CASE NO.:<br><br>**COMPLAINT FOR VIOLATIONS OF:**<br>1. **14TH AMENDMENT DUE PROCESS (42 U.S.C. § 1983)**<br>2. **14TH AMENDMENT EQUAL PROTECTION (42 U.S.C. § 1983)**<br>3. **4TH AMENDMENT (42 U.S.C. § 1983)**<br>4. **5th AMENDMENT (TAKINGS)**<br>5. **SLANDER OF TITLE**<br>6. **BREACH OF FIDUCIARY DUTY**<br>7. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>8. **CONVERSION**<br>9. **B.P.C. § 17200**<br>10. **R.I.C.O. (18 U.S.C. CHAPTER 96)**<br>11. **CONSPIRACY TO VIOLATE CONSITITIONAL RIGHTS**<br>12. **NEGLIGENCE.**<br>13. **NEGLIGENT HIRING, TRAINING AND SUPERVISION**<br>14. **MONELL**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jerry Cox ("Cox") ("Plaintiff"), demanding trial by jury, brings this complaint against Mariposa County, California ("County"), The Mariposa County Sheriff ("MCS"), Mariposa County Sheriff Deputy William Atkinson ("Atkinson"), Mariposa County Sheriff Deputy Wesley Smith ("Smith"), Ashley Harris ("Harris"), California Receivership Group ("CRG"), and Mark Adams ("Adams") (all defendants collectively for any claim for relief "Defendants").

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Defendants, individually and collectively, violated Plaintiff's federal statutory and Constitutional civil rights under 42 U.S.C. § 1983 (deprivation of rights) stemming, *inter alia,* from constitutional and civil rights violations of the 14th Amendment (including, *inter alia*, deprivation of liberty and property without due process), 4th Amendment (including *inter alia,* unlawful arrest, confinement, and unlawful searches and seizures), and 5th Amendment (including *inter alia,* unlawful government taking of property rights), the Racketeering Corruption and Influence Act ("RICO") and Conspiracy.

2.   Section 1983 provides claims for relief against persons acting under color of state law who have violated rights guaranteed by the Constitution. See *Buckley v. City of Redding*, 66 F.3d 188, 190 (9th Cir. 1995); *Demery v. Kupperman*, 735 F.2d 1139, 1146 (9th Cir. 1984). Action taken "under color of" state law includes misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v. Pape* (1961) 365 US 167, 184.  Counties and cities are created by state law under the California Constitution, article XI, and thus any action under color of such a subdivision acts under color of state law under §1983.  See *Lugar v. Edmondson Oil Co*. (1982) 457 US 922, 937, 102 S Ct 2744.

3.   Even a private party may be found to have acted under color of state law when it fulfills a public function, participates in joint action or conspires with governmental actors, or acts under compulsion or coercion by the public entity.  *Sutton v. Providence St. Joseph Med. Ctr*. (9th Cir. 1999) 192 F3d 826, 835.  A private party's joint participation in a conspiracy with the state provides a sufficient nexus to hold the private party responsible as a governmental actor.  See *Lugar*, 457 U.S. at 941, 102 S.Ct. 2744 ("[W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a

'state actor.' "); see also *Dennis v. Sparks*, 449 U.S. 24, 27-28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting . 'under color' of law for purposes of §  1983 actions.");  *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (19663) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."); *Fonda v. Gray*, 707 F.2d 435, 437 (9th Cir.1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights.").

4.   As discussed below, Plaintiff's constitutional and civil rights were violated in a series of events by Defendants beginning in November 2015 and continuing to the present day. County and its law enforcement, conspiring with false accuser, Ashley Harris, arrested, jailed and then prosecuted Cox for nearly two years on false rape and assault charges, only to confirm what they already knew before – that the accuser had a history of false allegations and corroborating evidence supported his innocence.

5.   The county prosecuted the case following discriminatory and selective enforcement policies, practices and protocols that assume that all men accused of domestic violence or sexual assault are guilty despite overwhelming evidence to the contrary.[1]

6.   When the false rape case fell apart, out of sheer malice and without due process, County and defendants Adams, and CRG supported, initiated and prolonged a receivership property action under the color of state law that has enriched Defendants and deprived Plaintiff Cox of his home, livelihood, property, land holdings, and interests in JDC Land Holdings, LLC which was operating as a limited liability company incorporated under California law.

---

[1] These policies have become commonplace in counties of California that depend on funding from the federal government under discriminatory programs funded by the Violence Against Women Act ("VAWA') and similar programs implemented at the state level by California. On information and belief, Mariposa County implemented these discriminatory and selective enforcement policies to increase its budget to hire sexual assault and domestic violence prosecutors and personnel to bring reckless and false charges against individuals like Cox.

7.   Cox is a long-time rancher, entrepreneur, and citizen of Mariposa County, California. County and its law enforcement, acting in concert with false accuser Harris, had Cox arrested and prosecuted in a nearly two-year long criminal investigation and 16-count felony rape and assault case that never should have been brought in the first place.

8.   While that case unnecessarily languished, various County officials and others acting on their behalf or direction, or in concert, then engineered a receivership action, in part based on the same defective search warrant and false allegations from the criminal case to deprive Cox of his 477-acre ranch property near Yosemite Valley.  An additional search warrant affidavit used to enter Cox's property to inspect for alleged building code violations has never been released to Cox or his attorneys.   The alleged code violations were all phony and made up from whole cloth to deny Cox possession of his property and to enrich Defendants. That receivership case continues to this day and has unconstitutionally removed Cox from his home, destroyed his lucrative business and farm, and purports to have indebted him for hundreds of thousands of dollars in favor of Defendants.

9.   The County defendants arrested, jailed and attempted to prosecute Plaintiff without probable cause, failed to gather and intentionally ignored determinative exculpatory evidence, and used the fabricated statements of an unreliable witness, Harris, who is known to fabricate both criminal and civil claims. Various county officials and others acting in concert or at their direction were keenly aware that the allegations against Cox had no merit, yet their own policies and practices allowed for and facilitated this egregious abuse of civil rights.  Recently, another court ruled that no reasonable person could find Harris' allegations of rape, sodomy and kidnapping credible. Yet, County, MCS, and the individual Sheriff Defendants, knowing of the falsity, used these allegations to charge Cox in bad faith with 16-felonies and enhancements.

10. As it turns out, Harris was never raped, sodomized or assaulted as she reported to law enforcement personnel, including Deputy Sheriff Atkinson, while inebriated.  An initial and preliminary review of Harris' cellular phone undertaken by Brian Casey, an officer of the California Highway Patrol, within minutes of her original claims, digitally revealed that her claims were debunked by over 160 text messages and phone calls.  Those text messages were subsequently ignored by MCS's officials and a deputy district attorney, who then intentionally allowed the

1   deterioration of perishable electronic evidence or may have intentionally destroyed exculpatory

2   electronic evidence to cover up their misdeeds.

3          11. In truth, Harris' text messages revealed that she was merely a former lover seeking

4   revenge.  Harris' story that she was raped, kidnapped and sodomized over the course of three days,

5   was negated by numerous text messages including nude and suggestive photos of herself, she sent to

6   Cox. Moreover, Harris' fabricated story obviously did not line up with eyewitness testimony of

7   other witnesses at the ranch, and was inconsistent with her appearance and consumption of several

8   alcoholic beverages at a Mexican restaurant during the alleged kidnapping, and within minutes of

9   her initial claims to the CHP.

10          12. Even though MCS deputies and other law enforcement personnel had seen and even

11   commentated on the exculpatory text messages and records of cellular phone calls that

12   unequivocally disproved her allegations of a sexual assault, when leaving the MCS's Department

13   where she made her false claims, Harris, still in a state of alcohol intoxication, was allowed by MCS

14   law enforcement to keep her cellular phone with the only record of this exculpatory evidence on it.

15          13. In contrast, Cox was held in jail for three weeks.  Unlike Harris, Cox's cell phone was

16   seized and searched, and Cox was only released after being forced to post a $500,000 bail to a

17   company that is owned by Marshall Long, a member of the Mariposa County Board of Supervisors.

18          14. Importantly, dispositive exculpatory evidence, including records from Cox, such as text

19   message communications with Harris, were available to the MCS from the first day of Cox's arrest.

20   This extensive and dispositive digital evidence contradicted major events in the timeline of Harris'

21   alleged rape which were disclosed during her entirely incoherent and inebriated interview with the

22   California Highway Patrol with another witness present who contemporaneously contradicted

23   Harris' version of events.

24          15. However, rather than properly gathering and reviewing this evidence, which would be

25   customary police and investigative protocol, the MCS intentionally, willfully, and recklessly

26   disregarded this dispositive exculpatory evidence, and instead manufactured false police reports

27   based on nothing more than Harris' uncorroborated false statements.

28          16. These false and misleading official reports, which ignored or disregarded known and

4

1   available dispositive exculpatory electronic evidence, were sent to the district attorneys' office

2   which continued to ignore or disregard dispositive exculpatory evidence, and did no independent

3   analysis nor conducted any reasonable legal assessment before bringing a baseless 16-count felony

4   (plus enhancements) complaint against Cox, exposing him to multiple life sentences in prison.   In

5   fact, a preliminary hearing, which is mandatory in felony cases, never occurred because there was

6   no probable cause to prosecute the case. Instead, the Defendants County and MCS, including

7   County 's law enforcement officers (Atkinson and Smith) and its district attorneys, acting in concert

8   with false accuser, Harris, continued with the malicious prosecution when they had key exculpatory

9   evidence in their possession for nearly two years.

10      17. Deputy District Attorney Florick and District Attorney Thomas Cooke directed key

11  evidence not be examined by the MCS Office and other County or Department of Justice forensic

12  and laboratory officials.  They just wanted Cox locked away so they could assist the County counsel

13  in seizing his property.

14      18. Meanwhile, Cox's property, the Bison Creek Ranch, was subjected to destructive

15  searches and seizures.

16      19. During these searches and seizures, the Defendants, including Adams and CRG, who

17  were later appointed as receivers, destroyed or caused the destruction of Cox's personal property,

18  the death of his two dogs, the improper use and damage of his ranch equipment, the use of his ATVs

19  for "fun", and otherwise caused irreparable harm to his ranch which is home to a number of animals

20  such as bison, horses, and chickens.

21      20. These reckless searches were based on search warrant affidavits of MCS that used

22  Harris' false and unsupported report of a crime as a basis for investigation and unconstitutional

23  searches and seizures. Through a series of events, starting with multiple and destructive searches

24  and seizures of Plaintiff's property, the County used the false rape case as a basis for unlawful

25  searches that would lay the predicate of an unconstitutional receivership action and land grab.

26      21. While Cox was in custody, the MCS seized Cox's phone.  His text messages with the

27  alleged victim, Harris, clearly showed a consensual relationship over the course of several weeks.

28      22. Harris was seen smiling and riding around on animals and RV's at the Bison Creek

Ranch.  With Cox, she attended a wedding, a Halloween party and ate and drank at a Mexican restaurant with him over the course of several weeks.  However, Harris falsely told Deputy Sheriffs' Atkinson and Smith that she had only met Cox for the three days when she alleged Cox raped and kidnapped her at Bison Creek Ranch.  Harris' story was obviously false.  Analysis of her cell phone records, which were readily available to the investigators, showed a history of communications and text messages between Harris and Cox showing that Harris had known and met Cox much earlier.

23. Harris' phone records showed that she sent nude or semi-nude pictures to Cox and corresponded with him regularly by text and phone over the course of several weeks and even on the days she claims she was held captive at the Bison Creek Ranch.

24. This evidence was ignored, suppressed, and never made its way into any of Defendants County and MCS' official police reports or papers filed by the County's district attorneys.

25. Through several discovery motions, Cox's defense team was eventually able to get Cox's cell phone so they could review the evidence themselves.  His cell phone records clearly showed blatant inconsistencies with Harris' version of events.

26. Witnesses at the Bison Creek Ranch also submitted several eyewitness statements corroborating Cox's version of events.  Yet, Atkinson and Smith covered up key evidence from these witnesses and misrepresented the substance of statements made by key witnesses such as Darlene Windham who corroborated Cox's version of events.  Atkinson and Smith showed blatant disregard for the truth and facts and investigated the case with only an eye towards framing Cox through the false rape allegations of a known liar.

27. Eventually Cox's attorneys forced the County's district attorneys to procure Harris' phone and send it for forensic analysis.  When messages and records were recovered from the alleged victim's own phone, they revealed inconsistencies with almost every statement made by Ashley Harris.  Additionally, the forensic evidence revealed that Harris had deleted many of the exculpatory text messages and in many cases, only portions of those messages were able to be recovered.  Had this evidence been properly handled and examined, Cox should have never been arrested, let alone charged.

28. Cox should never have been the subject to a malicious and false criminal investigation

and prosecution that had the effect of taking his liberty and destroying his property, reputation and livelihood.

29. Through individual malice and reckless disregard for Cox's rights, the Defendants County and MCS hid exculpatory evidence from the defense, failed to gather key exonerating evidence from Harris' phone, and allowed for the spoliation and destruction of important digital evidence which would have exonerated Cox from his first encounter with the County Sheriffs.

30. Cox's constitutional violations were caused in part by a failure to train County's municipal employees adequately. See *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-91 (1989); *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008); *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007); *Long v. County of Los Angeles*, 442 F.3d 1178, 1186-87 (9th Cir. 2006); *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004); *Miranda v. Clark County, Nev.*, 319 F.3d 465, 471 (9th Cir. 2003) (en banc); *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam); see especially *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409-10 (1997).

31. For example, on information and belief, the County's domestic violence/sexual assault vertical prosecution unit and MCS personnel, which receive substantial state and federal funding, engage in reckless investigatory tactics, evidentiary collection standards and charging tactics that fall far short of standard criminal investigatory methods and prosecution standards. As has become commonplace throughout counties in California, County takes a "must believe the victim" at all cost approach when it comes to investigating and prosecuting DV/sexual assault crimes against men, as it did against Cox, but does not employ these policies, customs and practices when it comes to other types of crimes.

32. This unconstitutional standard of investigating and prosecuting this classification of crimes constitutes selective enforcement deploying bad faith and reckless investigatory and charging tactics. Municipalities and other local government units . . . [are] among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A county's customs, policies and practices may be subject to § 1983 scrutiny when such practices are likely to lead to constitutional violations. *Id.* The County operated under the color of law, using the domestic

violence and sexual assault laws and protocols to destroy and humiliate Cox, although they were well aware of the falsity of Harris' allegations.

33. In addition, the County and MCS Sheriffs, Atkinson and Smith, through their own individual actions, also each independently violated Plaintiff's constitutional rights. State officials sued in their personal capacity are persons for purposes of § 1983. See *Hafer v. Melo*, 502 U.S. 21, 31 (1991); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003); *DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992).

34. Plaintiff seek damages against each of the County, MCS Defendants, Harris, Adams and CRG from past and current violations of Plaintiff's constitutional rights and civil liberties stemming from his unlawful arrest, confinement, prosecution, and the searches and seizures of his properties without due process, stemming from Defendants actions that occurred between November 2015 and that are continuing to this day ("Relevant Period").

## II.    THE PARTIES

35.    Plaintiff Jerry Cox is a 50-year old farmer and rancher who is a resident of Mariposa County.  He has a bachelor's degree and MBA from California Polytechnic State University.  Cox is the rightful owner and ultimate beneficiary in interest of Bison Creek Ranch in Mariposa County and the Properties subject to the receivership action.  Bison Creek Ranch comprises approximately a 477-plus acre property located south west of Yosemite National Park.  Bison Creek Ranch includes Cox's properties at 5873, 6071 and 6133 CYA Road, Mariposa, California 95338 (referred to collectively herein as "Bison Creek Ranch" or "Property").  The Bison Creek Ranch operates as a farm, ranch and agritourism business zoned under the California Williamson Act.  During the Relevant Period, the Bison Creek Ranch was seized by County and their agents.

36.    Defendant Mariposa County ("County") is a California county operating under its municipal charter and the laws of the State of California.  Defendant County is responsible for *inter alia,* for supervising and directing the actions of its individual departments and offices, including its law enforcement offices and officers, and promulgates policies, practices and customs for its agencies and its officers and agents, including its law enforcement offices and officers.  Plaintiff is informed and believes that County  is responsible *inter alia,* for promulgating policies, customs and

practices as it pertains to land disputes, zoning disputes and civil actions against property owners in the County, directing and supervising the actions of agents and subordinates under his control, advising the County and taking legal action as it pertains to land disputes, zoning issues, County health, safety and building code violation issues, and advising the Board of Supervisors as it pertains to issues concerning land owners, property disputes and code violation disputes.

37.    Defendant Mariposa County Sheriff's Office ("MCS") is a local government entity and unit created under the laws of the State of California. MCS are responsible for, *inter alia,* law enforcement in the County, training officers, making arrests, booking arrestees, interviewing witnesses, investigating alleged crimes, obtaining, preserving and documenting evidence, writing search warrants, creating law enforcement reports, promulgating policies and procedures for the handling of rape and sexual assault cases, and working with the County District Attorney's office in the investigation and prosecution of alleged crimes.  References to MCS in this complaint also include allegations against Defendants Atkinson and Smith.

38.    Additionally, County is responsible for *inter alia,* promulgating policies, customs and practices for the enforcement and prosecution of sexual assault and rape cases, supervising deputy district attorneys and sheriffs under their command, training supervising deputy district attorneys, implementing policies, customs and practices for the prosecution of rape and sexual assault cases, working with law enforcement officers, including the MCS, to ensure that law enforcement officers on assigned cases are properly collecting, documenting and preserving evidence, including exculpatory and exonerating evidence, supervising cases and ensuring the district attorneys under the County's supervision are abiding by *Brady* principles, constitutional laws, and ethics rules which apply specially to government prosecutors in California, including but not limited to California Professional Rules of Conduct, 5-110 and 5-220 et seq.

39. Plaintiff is informed and believes that County have applied for federal and state grants to create a vertical prosecution unit to handle rape, sexual assault, and domestic violence cases in County and have promulgated policies, customs and practices for the prosecution of such cases. Plaintiff Cox is informed and believes that County decided to prosecute the Cox Criminal Case and supervised and maintained the case for nearly two years without probable cause. Plaintiff Cox is

informed and believes that Defendants County and MCS directly participated in and/or supervised the suppression and/or destruction of exculpatory and exonerating evidence in the Cox Criminal Case, that the MCS and its agents ignored, suppressed, or destroyed exculpatory evidence favorable to Cox, and continued their criminal investigation of Cox without probable cause, thus depriving him of his liberty and property.

40. Defendant MCS Deputy William Atkinson at all times during the Relevant Period, has been and is currently is a deputy sheriff employee of the Defendant MSC. Atkinson was responsible for *inter alia,* the investigation, collection and preservation of evidence, interviewing witnesses, drafting law enforcement reports, and drafting search warrants in the Cox Criminal Case. Plaintiff is informed and believes that Atkinson acted in bad faith and with reckless disregard for Cox's constitutional rights. Plaintiff is informed and believes that Atkinson resides in Mariposa County, California.

41. Defendant Sheriff Deputy Wesley Smith at all times during the Relevant Period, is a deputy sheriff employee of the MCS. Atkinson was responsible for *inter alia,* the investigation, collection and preservation of evidence, interviewing witnesses, drafting law enforcement reports, and drafting search warrants in the Cox Criminal Case. Smith acted in bad faith and with reckless disregard for Cox's constitutional rights. Plaintiff are informed and believe that Smith resides in Mariposa County, California.

42. Defendant Harris is an individual residing in or about San Luis Obispo County, California. Harris has a history of making false accusations, bringing fabricated retraining orders against individuals and false civil claims, including fraudulent workers' compensation claims. Harris made false accusations of sexual assault, kidnapping and domestic violence against Plaintiff Cox in this judicial district. Such accusations have been proven to be false. Harris conspired with County officials to deprive Plaintiff Cox of his constitutional rights during the Relevant Period.

43. Defendant CRG is a California organization whose corporate office is at Ocean Park Blvd in Santa Monica California, and additional office on Harrison Street in Oakland, California, and East Carnegie Drive, San Bernardino, California. CRG does business throughout the State of California, including in Mariposa County. In engaging in the acts alleged herein, CRG acted within

Mariposa County. CRG purports to specialize in receiverships to bring non-code compliant properties up to code, but in reality, utilizes alleged code violations as a pretext to seize properties from law abiding citizens, run up inflated and phony receivership bills, and uses the receivership bills and certificates to foreclose on the subject properties and sell the properties, leaving the former property owners homeless or otherwise bereft of their property and in financial ruin.

44. Defendant Adams, an attorney, is the owner, President and CEO of Defendant CRG. Adams resides in the State of California and in his capacity as President and CEO of Defendant CRG, does business throughout the State of California including in Mariposa County. Adams directs the actions of the CRG Group and in engaging in the acts alleged herein, Adams acted within Mariposa County.

45. County Counsel Steven Dahlem ("Dahlem") at all times during the Relevant Period, has been and currently is the Defendant County's attorney employee and counsel to Mariposa County. Dahlem is an agent of County. Plaintiff is informed and believes that County Counsel Dahlem, under the county's supervision, initiated the Cox Receivership Case in the midst of the Cox Criminal Case, authorized property inspection warrants based on falsified evidence, directed County agents to make false statements, directed County officials to enter Plaintiff's property based on falsified inspection warrants, and did so with the intent to deprive Plaintiff Cox of his property and take Plaintiff's property and its equity for the benefit of himself, the County, the receivership and its agents. Plaintiff is informed and believes that Dahlem resides in Mariposa County, California. Dahlem acted in bad faith and with reckless disregard for Cox's constitutional rights.

46. Defendants Does 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named defendants is the agent, servant, employee, representative, partner, and joint-venturer of their co-defendants, and in doing the things herein alleged was acting within the course and scope of such agency, employment, representation, partnership, and joint venture with the knowledge, permission and consent of their co-defendants, and so ratified all of their acts and conduct. The County is also

liable for the state law claims asserted here under a theory of *respondent superior* for the actions of its employees and agents. Therefore, each Doe Defendant is responsible in some manner for the occurrences herein alleged, and the damages as herein alleged were proximately caused by said defendants.

### III.    JURISDICTION AND VENUE

47. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983 and the U.S. Constitution because the causes of action involve federal questions and constitutional claims.  This Court also has jurisdiction over the supplemental California law claims pursuant to 28 U.S.C. § 1367.

48. This Court has personal jurisdiction over each of the Defendants by virtue of their contacts in this district and their business and activities in the Eastern District of California.  The events giving rise to Plaintiff's claims and damages occurred in this district.

49. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1)-(2).  The Mariposa County Defendants reside in this district and the events, occurrences and omissions giving rise this action occurred in this district.

50. Plaintiff has exhausted his administrative remedies against the County with respect to any State law tort claims under Cal. Govt Code §910.

51. Plaintiff has also exhausted his ability to the sue the receiver per requests he has made in *County of Mariposa v. JDC Land Company, LLC* (Superior Court of CA, Case No. 10887).  Under settled law it is an abuse of discretion to deny a party the right to sue the receiver and receive a jury trial.  *Chiesur v. Superior Court* (1946) 76 Cal.App.2d 198, 202-203; *Vitug v. Griffin* (1989) 214 Cal. App. 3d 488, 492-493; *Jun v. Myers* (2001) 88 Cal. App. 4th 117.  Further efforts by Plaintiff to seek permission to sue the receiver would be futile as the court threatened to sanction Plaintiff's attorney for making such a request.

### IV.    FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

52. Plaintiff Cox is self-made entrepreneur, farmer. He and is uncle built the Bison Creek

COMPLAINT BY PLAINTIFF JERRY COX

Ranch in 2000.[2]  His father died when he was young and his mother has suffered health problems since his childhood, so Cox has been self-reliant from an early age.  Plaintiff Cox operated a farm, ranch and agritourism business at Bison Creek Ranch since at least 2012.  Agritourism or agrotourism involves an agriculturally based operation or activity that brings visitors to a farm or ranch. Cox applied for, paid for and obtained permits and zoning approval from Mariposa County to operate Bison Creek Ranch as an agritourism business.  Cox has had thousands of people visit the ranch over the years.  People who do not normally get to experience life on a farm and ranch have appreciated the services Cox has offered to the public. Cox runs the business alone with the help of several ranch hands and friends who often stay at his property.   Given his demanding schedule in running a busy ranch and agritourism business, Cox put his profile up on a dating website called FarmersOnly.com looking for a suitable partner to help him with his ranch.

### A.    ASHLEY HARRIS' FALSE ACCUSATIONS

53. On or about mid-October of 2015, Harris, a 30-yr old woman at that time, contacted Cox on FarmersOnly.com and represented to Cox that she grew up on a farm and worked as an animal scientist or veterinary assistant.  Harris and Cox exchanged electronic messages over the FarmersOnly.com platform in October 2015, spoke over the phone and sent each other text and SMS messages by cell phone, agreeing to meet in person later that month.  Cox believed that Harris had experience working with animals on a farm and held hopes that she might be a suitable partner. On or about the last week of October 2015, Harris drove herself to the Bison Creek Ranch, brought a packed bag of clothing and joined Cox at the Bison Creek Ranch.  Harris decided to stay at Cox's property and a friendship or dating relationship ensued between the two.

54. On information and belief, unknown to Cox, Harris had a history of making false rape claims, and it is believed that Harris has made at least one and perhaps two false rape claims with officials at Cal Poly, San Luis Obispo.  She is a plaintiff in a "slip and fall" worker's compensation case initiated on or about November 2014 in California Worker's Compensation Appeals Board.

---

[2] The ranch was operated under JDC Land Holdings, LLC until the property was put into receivership as outlined in this complaint.

Based on testimony obtained pursuant to a subpoena in a deposition of Harris in the worker's compensation case, Harris suffers from various psychological or psychiatric conditions for which she is seeking medical treatment.   Harris claimed she suffered traumatic brain injuries from a slip and fall at a CVS Pharmacy on November 6, 2014.  Harris regularly consumes a mixture of psychiatric prescription medications, pain killers, anti-depressants, anxiety medications and combines these medications with copious amounts of alcohol.  She has been described as a "grifter" and "con artist" on various websites, presumably by victims of past scams.  Cox did not know of Harris' reputation and background before he invited her to Bison Creek Ranch.

55. Between early October 2015 and November 13, 2015, Harris was seen and photographed on Cox's property, riding his horses, attending Halloween parties, weddings, eating out at restaurants and bars with Cox and otherwise seen and photographed in a friendly and consensual relationship with Cox.  During this period Harris exchanged extensive text messages or SMS messages with Cox, often referring to him as her "boyfriend" sending him semi-nude photographs of herself with messages such as "I'm horny."  Harris also sent several messages to Cox referring to consensual sex acts and described these consensual sexual acts to Cox's friends and ranch hands, including with witnesses Darlene Windham ("Windham") who reported to the County Sheriffs that Harris enjoyed rough sex and anal sex, and proudly proclaimed that she was a member of "the butt club."

56. Between late October to November 13, 2015, Harris was also seen and observed by witnesses Aaron Rivera and Armando Hernandez in a consensual relationship with Cox.  These witnesses described seeing Harris using Cox's property, having dinner with him, freely entering and leaving the ranch in her own vehicle and staying at the Bison Creek Ranch cabins.  Harris was also witnessed enjoying herself with Cox at a restaurant in downtown Mariposa on or about November 12, 2016.

57. Between November 8-13, 2015, Harris began to exhibit emotionally unstable behavior. She was drinking heavily and making unusual demands of Cox, who was often out during the daytime running errands offsite while the ranch hands looked after Bison Creek Ranch.  While he allowed Harris to remain at the ranch, Harris was not content unless Cox was with her.  She often

1   complained about being sick, needing more comfort, and wanting to spend more time with Cox who

2   was busy working offsite and attending to business matters.  In electronic messages to Cox during

3   this period, she began referring to him as her "boyfriend" and commented on the sex they were

4   having together.  On information and belief, during this time, Harris also left the ranch in her own

5   car to attend medical appointments, check on her apartment, and run shopping errands to purchase

6   alcohol.

7         58. On November 13, 2015, Cox informed Windham, Aaron, Armando and Harris that he

8   was expecting customers to visit Bison Creek Ranch that afternoon and that he needed help from

9   them to clean the guest cabin before they arrived.  When Cox arrived at the ranch to inspect the

10  guest cabin, he found it in a filthy condition and had to clean it himself.  Because Harris was using

11  his guest cabin and that cabin was reserved for the use and enjoyment of his customers, Cox asked

12  Harris to vacate that cabin so he could clean it himself.  Harris become upset with Cox and she and

13  Windham left the ranch to drink several alcoholic beverages at the Airport Inn.  While consuming

14  alcohol with Windham, Harris began fabricating a tale of abuse and rape by Cox.

15        59. After consuming alcohol, the afternoon of November 13, 2015, Harris went to the

16  Mariposa California Highway Patrol ("CHP") station to report an alleged rape to CHP officer Brian

17  Casey.  Once there Ashley relayed to CHP Officer Brian Casey that she had been raped and held

18  captive by Cox whom she stated she recently met on Farmersonly.com, a dating website marketed

19  mainly at those who share a fondness for the country and agricultural lifestyle.  Harris also stated

20  falsely that she lived outside the county, was invited to the ranch by Cox and had only known him a

21  few days.

22        60. Officer Casey, a state employee, knew something was not adding up with Harris' story.

23  Not only did Harris have what appeared to be makeup above her left eye made to look like a bruise,

24  but when he asked her if she'd been drinking due to her mannerisms, and the smell of alcohol on her

25  breath, she at first replied, "no."  Windham, who was standing nearby and overheard her answer

26  corrected Harris's statement to Officer Casey, and Windham stated that they had been drinking.  As

27  Officer Casey questioned Harris further, he began to suspect her statements might not be truthful.

28  Officer Casey then asked to look at Harris' cell phone.  Harris complied, and after reading the text

message communications between Harris and Cox, Officer Casey's investigation quickly revealed that Harris was not a victim at all, but rather a heartbroken lover who was intoxicated, angry and bent on revenge for being told to leave the ranch by Cox.  Officer Casey found there no mention of Harris being kidnapped or raped in any of her text messages to Cox or others.  Instead Officer Casey found that many of the text messages contained normal correspondence between two people dating.  Officer Casey also noted that the times the victim said she had been kidnapped, raped and held against her will, correlated with times that she had been texting Cox and asking when he would be returning to the ranch to see her.

61. Since the allegations had occurred in the County of Mariposa and not on state property, the MCS was called by the CHP.  MCS Deputy Atkinson was then dispatched and arrived at the Mariposa CHP location at 3:45 pm that same afternoon.  Officer Casey debriefed Deputy Atkinson who then escorted Harris, to a private "break room," where Harris re-stated that on the evening of Wednesday, November 11th, 2015, Cox had forcibly raped her at the ranch and had held her captive until she "escaped" that afternoon, Friday the 13th.  Harris was then escorted to the MCS office where deputy Detective Smith was waiting.

62. Sheriff Deputy Atkinson and Detective Smith then proceeded to interview Harris with a victim's advocate present.  During this interview, Harris advised the officers that she had met Cox through a series of messages sent through her FarmersOnly.com account, and provided her handle on that site as "FarmerGirl061985".  She also referred to having these emails on her phone, and to sending text messages between herself and Cox on her cell phone.  Harris also expressed that she had sent messages regarding Defendant to her mother, and that the two of them made inquiries into Cox's background.  Harris had her i-phone with her during this interview the entire time.

63. During the initial recorded interview with officers Atkinson and Smith, Harris fabricated several lies.  She falsely claimed she met Cox for the first time on the evening of November 11, 2015.  She claimed that although the two of them had been in contact for several weeks by cell phone, text messaging, e-mails and through the FarmersOnly.com website communications portal, the first time she met with Cox was on November 11, 2015.  After lying about the true date and circumstances surrounding their meeting, Harris then fabricated a story that Cox continuously raped,

1  sodomized, and held against her will at a guest cabin at Bison Creek Ranch between November 11-

2  13, 2015.  Harris claimed falsely that the cabin's doors were all locked from the outside and that she

3  could not find her car keys and believed that Cox had taken them.  A basic and proper investigation

4  would have shown that the doors could not be secured from the outside, and that there are windows

5  that can be opened from the inside. The failure to check these facts is another example

6  demonstrating how MCS arrested Cox without even bothering to make even the most rudimentary

7  investigation, which would have disproven Harris' claims.

8      64. Harris also told the officers that Cox came back and forth to the cabin throughout that

9  next day (Thursday) and that he would randomly grab her and threaten her while moving her

10 throughout the house and into other rooms of the cabin against her will wherever he wanted her to

11 be.  Harris further alleged, falsely, that she was locked against her will in the guest cabin, unable to

12 leave, and unable to use her phone to make calls for help during that three-day period. A basic test

13 of Verizon cell phones on the ranch would have easily shown this allegation to be false.

14     65. Harris claimed that Friday morning, while Cox was away, Harris was able to summon

15 Windham.  Windham arrived at the cabin that morning to prepare it for guests who would be

16 arriving later that afternoon.  Harris stated that she then found her car keys and drove her car to her

17 friend Katy's house located in Mt. Bullion, but did not recall where exactly that was.  She stated that

18 Windham then gave her a ride to the CHP Office where she made her first report because she was

19 too emotionally distraught to drive.  Incredibly, Harris made no mention that she first stopped at a

20 bar to have drinks with Windham before reporting to the CHP Office.

21     66. All of the aforementioned allegations have been proven to be false in a separate

22 restraining order trial where a San Luis Obispo judge, Erin M. Childs ruled that Harris was not

23 credible and that the county's allegations made to support the rape case against Cox were also not

24 credible. The court made credibility rulings against Harris and found that Harris could not meet the

25 burden to justify a restraining order based on the same set of allegations she made to encourage the

26 County to file false rape, kidnapping and domestic violence charges against Cox.  (California

27 Superior Court, San Luis Obispo, Case No. 18FK0715).  Indeed, the court stated in its ruling,

28 "Harris lacked credibility. Her testimony just could not hold water. *Any reasonable person could*

17

*not conclude her story was straight.*" Apparently any reasonable person did not include the County Defendants who brought and maintained a 16-felony criminal case against Cox based on the implausible testimony of Harris.

67. Despite learning that Harris claimed she had communicated with Cox by electronic means, officers Atkinson and Smith failed to observe even the most basic investigative protocols. They did not obtain Harris' password to her FarmersOnly.com account, did not obtain any of her Facebook information, did not view or preserve any messages transmitted through those accounts to Cox, and they did not seek consent from Harris to obtain these messages. Most importantly, they did not retain and download information from Harris' phone which was in her possession. They did not ask to view her phone nor did they attempt to corroborate any fact in her story. Instead, officer Atkinson turned Harris over to a "Victim's Advocate" and sent her to Fresno Regional Hospital for a SART exam, leaving Harris in possession of critically important evidence, her phone, which had they simply asked to review at their initial meeting with Harris, would have revealed numerous glaring inconsistencies and fabrications regarding the actual facts and sequence of events.

68. On information and belief, officer Atkinson made statements in police reports or other county documents misrepresenting the substance of statements made by Darlene Windham in an effort to force her to make statements that would be helpful to the prosecution. In fact, Windham was extremely skeptical of Harris' story from the very beginning and informed Atkinson and/or Smith that Harris was lying about her alcohol intake and that her sexual relations with Cox were purely consensual. Windham also informed the MCS that Harris' was free to come and go from the ranch at any time and that she was never locked up against her will. Neither Smith nor Atkinson were interested in an unbiased or objective investigation and disregarded the eyewitness testimony of Windham in order to continue building a false and reckless narrative implicating Cox in over 11 felonies as charged in the first complaint.

**B.    COX IS ARRESTED AND JAILED BASED ON THE FALSE ACCUSATIONS OF HARRIS**

69. On November 13, 2015, officers Atkinson and Smith sent another sheriff from Defendant MCS's office to CYA road with instructions that Cox be placed under arrest. No arrest

COMPLAINT BY PLAINTIFF JERRY COX

warrant was issued, and the arrest was based singularly on the fabricated and uncorroborated story of Harris. Neither Atkinson or Smith sought to corroborate Harris' story in any way, including by interviewing Windham who would later provide a much different account of events. Instead, based on Harris' implausible account which filled with obvious holes, Atkinson and Smith instructed that Plaintiff Cox be placed under arrest. Upon returning to his home in his truck, Cox was pulled over by a deputy from the MCS's Office and placed under arrest. Cox was then placed into custody and booked into the county jail at the Mariposa County Correctional Facility. Cox was arrested for the following alleged felony offenses without an arrest warrant: PC 261 (Rape), PC 207 (Kidnapping), PC 236 (False Imprisonment), PC 288a (oral copulation), PC 286 (Sodomy), PC 136.1 (Intimidating a Witness), PC 422 (Criminal Threats). Defendant Atkinson then proceeded to interview Cox at the Mariposa County Jail. In this interview with Defendant Atkinson, Plaintiff Cox denied any allegations of rape, kidnapping, assault or criminal threats. He stated that he had met Harris weeks before she claimed she had first met him on November 11, 2015, facts that were supported by the electronic communications and messages between Harris and Cox. He also provided the names of witnesses who were at the ranch during the period in question who would go on to corroborate his version of the events.

70. On information and belief, during the initial MCS's interview with Cox, Cox's Samsung cell phone was seized by the MCS's Office. Without bothering to follow-up on the inconsistencies in the timeline provided by Harris that are revealed by the electronic messages on Cox's phone which would have corroborated his version of the events, without interviewing witness Cox identified who would corroborate his claims, without investigating whether the doors on the ranch cabin could even be locked from the outside as she claimed, Atkinson instead, maliciously and without probable cause, filed a motion to increase Cox's bail to $500,000. As a result of this enormous bail, Cox spent two weeks in Mariposa County Jail until his attorney could obtain financing by a bail bondsman by attaching a lien to Bison Creek Ranch for the unreasonable bail amount. The bail bonds company is owned by the same County Supervisor who later mocked Cox for being homeless.

71. As a result of the malicious and reckless lack of investigation by the MCS, Plaintiff Cox

COMPLAINT BY PLAINTIFF JERRY COX

was jailed and held on $500,000 bail.  On information and belief, Defendants then released Cox's mug shot and police reports to the media which repeated the false narrative of Harris' allegations in news stories which were plastered over the Internet, resulting in irreparable damages and harm to Plaintiff's reputation and business.

72. On November 14, 2015, Atkinson signed a sworn affidavit stating that there was probable cause to for a search warrant against Cox's person and Bison Creek Ranch.   In the probable cause affidavit, Atkinson repeated the false narrative provided to him by false accuser Harris.  In his affidavit, Atkinson intentionally omitted references to the fact that Cox denied the allegations.  He also omitted references to the fact that Windham had made statements to Atkinson that she had not witnessed or heard anything unusual between Cox and Harris when she was staying the same guest cabin as them during the period Harris claimed she was continuously raped and assaulted over three days.

73. On information and belief, on or about November 14, 2015, MCS conducted a search of Bison Creek Ranch, seizing Cox's laptop computer, bedsheets, clothing items, and other items found in the guest cabin that was the site of the alleged crime.  Pictures of the cabin from the inspection reveal that there were multiple windows in the cabin that could be opened from the inside.  The inspection also revealed that the door to the cabin would be unlocked from the inside and that there was no physical obstruction preventing a person from leaving the guest cabin.  The cabin also had a functioning land line telephone and cell phone service on the wall. The MCS intentionally failed to document evidence related to fact that an alleged victim could not possibly have been trapped and kidnapped in the guest cabin given the multiple exit points and had multiple means of calling for assistance if it were needed.  The Defendants also failed to document the fact that the guest cabin had a working land line phone and that cell phone signals were available on the ranch.

**C.    MARIPOSA COUNTY DISTRICT ATTORNEYS' OFFICE CHARGE COX WITH 16-FELONIES AND ENHANCEMENTS BASED ON FALSE AND UNCORROBORATED ALLEGATIONS**

74. On or about November 16, 2015, County head district attorney Thomas Cooke and

COMPLAINT BY PLAINTIFF JERRY COX

deputy district attorney Gina Florick brought an 11-Count Felony Criminal Complaint against Plaintiff Cox.   On February 22, 2016, despite being in possession of exonerating and exculpatory evidence, deputy district attorney Florick and Cooke amended the Criminal Complaint against Cox to allege 16 separate felonies with enhancements:

1. Felony forcible rape in violation of Pen. Code § 261(a)(2), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
2. Felony sodomy by use of force in violation of Pen. Code § 286(c)(2)(A), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
3. Felony forcible oral copulation in violation of Pen. Code § 288a(c)(2)(A), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
4. Felony kidnapping in violation of Pen. Code § 207(a);
5. Felony forcible oral copulation in violation of Pen. Code § 288a(c)(2)(A);
6. Felony battery with serious bodily injury in violation of Pen. Code § 243(d), with a special allegation of great bodily injury pursuant to Pen. Code § 12022.7(a);
7. Felony dissuading a witness by force or threat in violation of Pen. Code § 136.1, with a serious felony enhancement pursuant to Pen. Code § 1192.7(c)(37);
8. Felony assault with intent to commit a felony in violation of Pen. Code § 220(a)(1), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
9. Felony assault with intent to commit a felony in violation of Pen. Code § 220(a)(1), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
10. Felony assault with intent to commit a felony in violation of Pen. Code § 220(a)(1), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code §12022.8; and
11. Felony assault with intent to commit a felony in violation of Pen. Code § 220(a)(1).
12. Felony forcible rape in violation of Pen. Code § 261(a)(2), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
13. Felony forcible oral copulation in violation of Pen. Code § 288a(c)(2)(A), with a special allegation of great bodily injury-sex offense pursuant to Pen. Code § 12022.8;
14. Felony dissuading a witness by force or threat in violation of Pen. Code § 136.1, with a serious felony enhancement pursuant to Pen. Code § 1192.7(c)(37)
15. Felony criminal threats in violation of Pen. Code § 422(a)
16. Assault with intent to commit a Felony in violation of Penal Code § 220(a)(1)

75. The County brought a 16-Count felony complaint for forcible rape and kidnapping based on a two-day investigation where the only "evidence" was the implausible and falsified story of Harris who had an obvious motive to lie and fabricate the events, when Harris' story is disproved by all the obvious and objective evidence.

76. On information and belief, the County knew that Harris had her cell phone in her

COMPLAINT BY PLAINTIFF JERRY COX

possession, knew of the existence of Harris' text messages, FarmersOnly.com account messages and Facebook messages, knew the ranch cabin where Harris claimed to be imprisoned could not be secured from the outside, had windows that opened from the inside, had cell phone service, and had a working land line telephone. Acting for the County, district attorneys Cooke and Florick intentionally and/or recklessly disregarded this evidence and instead elected to maliciously and recklessly file a lengthy criminal complaint against Cox, without probable cause, when they knew or should have known that the allegations had no physical or corroborating support.

### D. DEFENDANTS FAIL TO PRESERVE AND COLLECT EXCULPATORY AND EXONERATING EVIDENCE AND INTENTIONALLY CONCEAL THIS EVIDENCE FROM THE DEFENSE

77. On November 14, 2015, officer Atkinson interviewed Harris a second time. At this interview, Atkinson obtained Harris' cell phone number. Atkinson also informed Harris that he needed her cell phone to download her conversations with Cox. However, Atkinson did not retain, nor did he download the contents of, Harris' cell phone. Harris' cell phone included dozens of text messages between herself and Plaintiff Cox, including nude pictures of Harris she had sent to Cox. These messages included references to consensual sexual activity and a history of a relationship between Cox and Harris that contradicted the version of events provided by Harris.

78. On November 25, 2015, Harris was interviewed a third time by County office personnel, detective Smith, and County deputy district attorney Gina Florick. During this interview, Harris made reference to exchanging messages with Defendant on FarmersOnly.com and her cell phone, and to contacting witnesses in this case through her Facebook account. During this interview, and now acting in a capacity of a law enforcement officer rather than an independent and unbiased prosecutor, Deputy District Attorney Florick photographed a selection of text messages between Harris and Cox, but Harris' phone was not retained and was not downloaded. Notably, Florick's photographs do not depict any of the exculpatory text messages between Harris and Cox, including the semi-nude pictures of herself that Harris had sent to Cox, which were much later revealed through a download of the contents of Cox's phone.

79. On March 10, 2016, Cox's defense counsel submitted a letter to the prosecution entitled "Notice of Substitution of Counsel and Informal request for discovery." That letter requested

COMPLAINT BY PLAINTIFF JERRY COX

relevant discovery in the criminal proceeding, pursuant to Penal Code sections 866(a) and 1054.5(b).

80.  On information and belief, the defense sought access to Harris so they could interview her and gather evidence.  The County concealed Harris' whereabouts from the defense, with the County District Attorneys representing that Harris was in protective custody.

81. On April 4, 2016, the Cox defense specifically requested from the County District Attorneys informal discovery request, "A copy of all messages between Ashley Harris and  Cox in the prosecution's possession, be they text/SMS messages, Facebook messages, messages transmitted through FarmersOnly.com, or otherwise." On April 15, 2015, while serving a subpoena upon Harris' doctor, an investigator for the defense happened upon Harris and served her with a subpoena to attend the preliminary hearing, at that time set for May 17, 2016.

82. On or about April 19, 2016, Defendant moved for an order compelling the prosecution to produce "A copy of all messages between Ashley Harris and Cox, or any other person where facts relevant to this case were discussed, in the prosecution's possession, be they text/SMS messages, Facebook messages, messages transmitted through FarmersOnly.com, or otherwise," pursuant to Penal Code sections 1050, 1054.1, and 1054.5(b).

83. Notwithstanding these disclosure obligations, Defendants County and MCS intentionally suppressed and concealed Harris' phone records from the defense.  On April 21, 2016, the County district attorneys filed a "response to informal discovery requests," therein claiming that, "This information is not currently available as the Department of Justice is still analyzing the defendant's phone and computer.  Once that report becomes available the prosecution will discover [*sic*] it to the defense." No mention was made of Harris' phone and the records that the County's District Attorneys had in their possession revealing the glaring inconsistencies in Harris' story.  Instead, in order to further conceal the exculpatory evidence, on May 4, 2016, the County District Attorneys filed a motion to quash Defendant's subpoena of Harris to attend the preliminary hearing.

84. On May 13, 2016, the Court endorsed a defense subpoena for Krystal McElree, Harris' mother, for "All messages in your possession, in whatever form, be it written audio or electronic, relating to Ashley Harris, Cox, Bronze, Bronsius, Bison Creek Ranch, or internet dating sites

23

between 2014 and the present, and any device used to communicate those messages." Despite multiple attempts by defense investigators, this witness avoided service of the subpoena. Defendants made no efforts to obtain exculpatory evidence from this important witness who had engaged in several phone calls with Harris during the period she claimed she was held hostage and raped on the ranch property and not able to call for help. Records later obtained by the defense showed that Harris lied about not being able to call for help using her cell phone from the ranch because she was in regular communication with her mother and friends using her cell phone during the same period of time.

85. On May 25, 2016, the issue of Harris' messages had still not been resolved, so the preliminary hearing was continued to July 20, 2016, with instructions given to the prosecution to obtain Harris messages before then.

86. Finally, on June 20, 2016, the forensic download of Plaintiff Cox's cell phone was provided to Cox defense team. The County failed to explain this delay and failure by the County to produce this important and exculpatory evidence earlier in the case. This download contained no less than 22 SMS messages between Harris and Cox during times that Harris claimed to be held against her will, without access to her phone and/or without reception on her phone. Additionally, there are numerous messages in the download evidencing an ongoing consensual sexual relationship between Harris and Cox. Harris refers to Cox as her boyfriend, says she wants to spend more time with him, discusses purchasing food and supplies for the cabin, refers to cleaning the cabin and working with the ranch hands, and makes reference to consensual rough sex on November 10, 2015; a point in time where Harris had claimed to have not been sexually active with Cox or anyone else. The Cox phone records provided by the county were not properly preserved, as the messages were not complete, in that they seem to only contain the first few words of any given message.

87. However, as of the July 20th preliminary hearing date, there had been no progress from the County officials on obtaining the relevant exculpatory messages that were either intentionally or recklessly deleted or mishandled, despite multiple requests from Cox's defense team that the County obtain and produce these messages to the defense. Thus, the preliminary hearing was again continued to October 5, 2016, and the prosecution indicated that it would be interviewing Harris for

COMPLAINT BY PLAINTIFF JERRY COX

a fourth time in light of messages contained in the download of Cox's phone.  The prosecution also indicated that it would attempt to download Harris cell phone at that interview.  At this juncture in the case, it appears that County district attorney Florick was taken off the case and a new County prosecutor was assigned to the prosecution.

88. On August 8, 2016, the Court issued an order on Cox's discovery motion, authorizing his attorneys to issue subpoenas to Verizon Communications (wireless), Facebook, Inc., and FarmersOnly.com, seeking the production of the messages at issue.  Despite knowing full well that Harris had communicated over these platforms, the Defendants County and MCS never sought to obtain Harris' messages or communications from these providers.  These subpoenas were issued and served between August 15 and 22, 2016.

89. Important communications in the possession custody and control of the Defendants should have been preserved in several manners: (1) they are preserved on each device used to communicate them; and (2) the cellular carrier will keep a record of them for a short time.  However, the Defendants County and MCS willful or reckless preservation of these messages has failed in several respects.  First, the Department of Justice download of Plaintiff Cox's phone failed to preserve the entirety of several messages in question, cutting off extensive portions of exculpatory messages.  In total, the download of Cox's cell phone evidenced 22 SMS messages between Harris and Defendant during times that Harris claimed to be held against her will, and unable to call 911 because she claimed that Cox hid her cell phone, or alternatively that her phone did not get reception.  Notably, one message sent on November 11, 2015 makes reference to "rough sex" occurring the night before, November 10.  It should also be noted that Harris had claimed originally that she had not been sexually active for months prior to the alleged rape, which she alleges occurred on November 11, 2015.  The Defendants failed to investigate these discrepancies.  Harris said only that she should have used the word "rape" instead of "rough sex," but has offered no explanation for the disparity in her timeline.  Additionally, after that message, there were other text messages between the two that indicated a normal and consensual male-female relationship.

90. The forensic download of Cox's phone was completed on December 23, 2015, a full six months before it was disclosed to the defense on June 20, 2016, despite multiple requests from the

1  defense for the download which were either intentionally or maliciously ignored by the County

2  district attorneys.  Failure to take a full and complete forensic download and review of Cox's phone

3  at the time it was obtained after his arrest led to the loss of important exculpatory evidence. Failure

4  to download and preserve records on Harris' phone also led to the loss of important exculpatory

5  evidence.

6      91.  Responsive records received from Verizon indicate that the content of messages

7  transmitted through their network is destroyed 3-5 days after transmission. Thus, the content of the

8  messages sent and received between Plaintiff Cox and Harris could not be obtained from Verizon,

9  although the prosecution could have obtained them had they issued a warrant for cell records at the

10 inception of this case on November 13, 2015.  Nonetheless, Verizon did produce call and text logs

11 which document the fact of transmissions between Cox and Harris' phones during the times in

12 question, directly contradicting Harris' reports to law enforcement.  Harris' phone records reveal

13 166 text messages sent and received by Harris between November 10 and 13, 2015.  This is during

14 the time that Harris claims she was unable to use her cell phone from the Bison Creek Ranch.

15     92. Inexplicably, the Defendants failed to download Harris' phone until December 2016,

16 despite having the phone in their possession on multiple occasions, and the recorded statements of

17 the prosecution team evidencing knowledge that Harris' phone needed to be downloaded to preserve

18 material evidence.  On March 7, 2017, Cox defense received discovery from the County district

19 attorneys containing the Department of Justice forensic download of Harris's cell phone.  Review of

20 this report establishes that the download was conducted on December 8, 2016—more than a year

21 after Harris reported the alleged crimes in this case, and more than a year after former deputy district

22 attorney Gina Florick personally photographed select messages appearing on Harris' phone, but not

23 certain exculpatory messages evidenced by the December 23, 2015 download of Cox's cell phone.

24     93. Undoubtedly, the integrity of evidence contained on Harris' phone was compromised as

25 she maintained possession of the phone for a year prior to its download and had ample opportunity

26 to destroy or alter evidence contained therein.  To this point, it should be noted that, despite Harris'

27 claims to law enforcement that she needed her phone for personal use, there is no information

28 contained therein after November 13, 2015, which leads to the logical inference that Harris' was

COMPLAINT BY PLAINTIFF JERRY COX

destroying evidence. Moreover, the cost of providing a replacement cell phone to Harris (a couple hundred dollars) would have been minimal given the cost of the prosecution and law enforcement efforts expended in this malicious prosecution of an innocent man.

94. The Cox defense used Harris' cell phone data in conjunction with Cox's cell phone data and Harris' cell phone records from Verizon to construct a comprehensive evaluation of the messages and information that had been lost. This evaluation establishes that there are at least 49 messages that can be found on Cox's cell phone, but not Harris'. On information and belief, the Defendants intentionally or recklessly allowed Harris to destroy the messages on her phone. Because the evidence of these messages comes from Cox's cell phone download, significant portions of the message content are not preserved. Notably, these messages for which the underlying data can no longer be retrieved include the November 11, 2015 message sent from Harris to Cox, stating, "It's kind of a trigger and last night's rough sex k". The remainder of this message will forever be unrecoverable because the Defendants intentionally or recklessly failed to preserve the evidence. There are many examples of such messages that were not recoverable from Harris' phone because of the reckless investigation by Defendants.

95. Thus, Cox's constitutional rights to due process, confrontation, effective assistance of counsel, and a fair trial were all violated by the Defendants' bad-faith failure to timely preserve evidence known by Defendants County and MCS to be material and exculpatory.

96. The destroyed message content could have and should have easily been preserved if the prosecution team had timely downloaded Harris' cell phone, and had they timely issued a warrant to Verizon Wireless for all communications between Cox and Harris.

97. Harris was proven to be liar when she admitted during a deposition on or about June 2, 2017 during a worker's compensation case that she was never a victim of sexual assault or abuse.

98. Harris also brought a fraudulent restraining order against Cox based on the same false allegations discussed herein, which restraining order request was dismissed on or about July 26, 2019 after a full day trial.

COMPLAINT BY PLAINTIFF JERRY COX

### E.    DEFENDANTS INITIATE A BUILDING CODE VIOLATION CASE AGAINST PLAINTIFF TO SEIZE HIS PROPERTY, HOME AND BUSINESS

99. Realizing the fraudulent criminal action against Cox was falling apart, the Defendants were not done attempting to destroy Cox.  On October 14, 2016, the County and the MCS executed a civil search warrant against Cox's properties located at 5873, 6071, and 6133 CYA Road, Mariposa, California 95338.  On information and belief, the civil search warrant is based on an affidavit filled with false claims by Harris (or others) based on false allegations concerning Cox from the criminal case.

100.    On or about February or March 2016, a woman named Rachel Lichau who was planning to visit Cox's ranch in connection with possible wedding plans complained to the county that Cox had ruined her wedding by getting charged with rape.  On information and belief, Ms. Lichau went on to make public and defamatory posts on social media sites and in text messages, stating that Cox had ruined her wedding by getting charged rape and that she would make sure that he would never host another wedding again. On information and belief, the County, fully aware that it was supporting and encouraging a false rape case against Cox, worked with Ms. Lichau to formulate false and defamatory material for use in affidavit(s) or other local government documents, to support an unlawful search and seizure of Plaintiff's properties.

101.    The County has sealed the search warrant affidavit, refused to provide it to Cox's attorneys or open it to the public, and have provided no valid reason for the necessity or legal justification for the sealing of this civil search warrant affidavit.

102.    On information and belief, the County executed the search warrant in order to bring false building and health and safety code violations against Cox's properties in retaliation for Cox exposing the malicious prosecution in the criminal action, and with the intent to take Cox's ranch and residence, make him homeless, and drive him away from MC. Thus, for example, at 6:25 pm, on November 1, 2018, Defendant Marshall Long, duly elected county supervisor for the County's Third District, taunted Plaintiff Cox with an email "How's that homelessness working for you." Cox ran for Supervisor Long's seat while the false rape charges were pending against him, and Long won the election by defaming Cox by announcing at a public event that Plaintiff Cox was a rapist.

103.     Cox is the rightful owner of the subject properties under receivership, which is his only home located at 5873, 6071, and 6133 CYA Road, Mariposa, California 95338 (the "Ranch" or "Bison Creek Ranch")). While Cox was away from the Ranch, in brutish acts reminiscent of third world country dictatorships, rather than a local government in the United States of America, Defendants County and MCS dispatched a small army of 8-12 heavily armed law enforcement personnel, including at least one officer armed with an assault rifle, who stormed the Ranch, breaking down doors to Cox's residence, ransacking his home, breaking furniture, breaking fences, locking him out of his property and stationing armed guards to prevent him from entering his own home.

104.     The County filed its Verified Complaint for Nuisance Abatement and Receivership on March 13, 2017 against the subject property claiming approximately 101 building and health and safety code violations that have now been shown to be completely false and/or exaggerated. (Mariposa County Superior Court Case, No. 10877, County of Mariposa v. JDC Land Company, LLC) (the "Receivership Action").  Except for minor issues which could have easily and cheaply been resolved without evicting Cox from his home, the vast majority of the 101 alleged code violations were phony and simply made up or grossly exaggerated; in short, the receivership action is a fraud.  By way of example, County, Adams and CRG falsely claimed that Cox's livestock was not being fed or watered, and was in danger of starvation and dehydration. In reality, Cox's livestock was free range fed, and watered by a year round fresh flowing creek on the property less than 100 yards from the outbuildings. In another example, the County alleged that the interior of one of the residence building's floor was torn up, buckling and dangerous. In reality, one plank in one room of one of the building's hardwood floor was missing one screw and thus was loose in one part of the floor. Defendants Adams and CRG have posted business marketing videos on their website, falsely disparaging Cox and stating falsely that when Adams took over the receivership Cox had abandoned the ranch property, that it was in a dangerous state of disrepair, that farm animals were starving and dehydrated, that Cox had endangered tourists by allowing the property to fall into a dangerous condition, and falsely stating that Adams and CRG remedied the alleged defects, when in fact they did nothing but run up a three quarter of a million dollars bill while remediating nothing in

COMPLAINT BY PLAINTIFF JERRY COX

1  order to force the property into foreclosure to pay off this huge bill.

2      105.    The following is a partial list of the Receiver's violations of receivership and

3  fiduciary duties that occurred during the County's malicious and reckless supervision of the

4  receivership case:

5      **Failure to Obtain Rehabilitation Estimates.**

6      106.    On July 17, 2017, the Court ordered the Receiver to obtain three rehabilitation

7  estimates for repairs.  The Receiver never complied with this order.  Instead, the Receiver claimed

8  that it would cost approximately $250,000 to make repairs and that Cox could not afford that so the

9  court should order the sale of the property. In response, although under no obligation to do so, Cox

10  obtained two competitive bids from Building Design Group (License # C28303) and JM Wilson

11  Construction (License # 886445).  Both estimates offered to repair all alleged violations for

12  approximately $8000.  This was a clear breach of the Receiver's duties under the Receivership

13  Order and his fiduciary duties to Cox to obtain proper estimates.

14      <u>**Failure to Develop a Rehabilitation Plan.**</u>

15      107.    On July 17, 2017, the Court ordered the Receiver to develop a rehabilitation plan.

16  The Receiver never complied with this order.   This failure not only violated the Court's

17  Receivership Order but also breached the Receiver's fiduciary duty to Cox.  A reasonable time to

18  develop a rehabilitation plan would be approximately 90 days.  Therefore, any of the Receiver's fees

19  and costs subsequent to October 17, 2017 should be deemed incurred due to the Receiver's violation

20  of the Receivership Order and due to the Receiver's violation of the fiduciary duty to Cox.

21      <u>**Exaggerating Repair Costs.**</u>

22      108.    On or about September 2017, the Receiver requested $257,000 to fix the alleged

23  violations on the property.  The Receiver failed to obtain competitive estimates as ordered by the

24  state court.  In response, Cox hired Aaron Calvalaro Construction, who estimated the cost to be only

25  $7,900.00.  The difference is so enormous that it creates a *res ipsa loquitur* presumption of

26  negligence, if not outright exaggeration and fraud, on the part of the Receiver.  This was a breach of

27  the Receiver's fiduciary duty to Cox.

28

**Failure to Use Receivership Funds for Repairs, Taxes, etc.**

109.    Paragraph three of the Receivership Order required the Receiver to use receivership funds to "pay for costs of operating, managing, maintaining, and rehabilitating the Subject Property." But the Receiver did not use any of the funds on repairs, property taxes, business taxes, utilities, or others costs per the Receivership Order that remain unpaid. Instead, the Receiver petitioned to the court for hundreds of thousands "receivership certificates" to use as liens against Plaintiff's Property in order to pay his own fees, which is the only thing the Receiver was interested in. This violated the Receivership Order and breached the Receiver's fiduciary duty to Cox. The Receiver failed to pay the Property's utilities and taxes, leaving the utility bills in collection. The receiver failed to alert Cox or inform him that his business, JDC Land Holdings LLC had elapsed as a result of Adams and CRG's failure to maintain the ranch and business under the receivership.

**Falsifying the Need for Security.**

110.    There was no need to eject Cox and place armed guards at the property. And there was no basis to assume Cox would violate the Receivership order or prevent repairs from being made. County used the pending phony criminal charges in its receivership motion to justify armed guards and removing Cox from his home, despite extensive exculpatory evidence, including hundreds text messages that were deleted from the alleged victim's cell phone while the phone was in the possession of law enforcement or Harris, exculpatory postings that were deleted from the alleged victim's Facebook and/or other social media pages while the pages were in the control of law enforcement, and the alleged victim's own admission in her Worker's Compensation deposition that she was not raped. If the Property was such a safety hazard, the guards would not have brought their children onto the Property. The safety violations were exaggerated and falsified for the sole purpose of kicking Cox off his Property, racking up receivership costs, and foreclosing on the Property.  The Receiver left the Property uninhabited for over six months or more while actively keeping Cox out of his home.

**Failure to List Permits.**

111.    On July 17, 2017, the day the receivership was granted, the Receiver claimed the property had only one permitted structure and 7 unpermitted structures. There were in fact

numerous permits on the property. Before the receivership there were two fully permitted structures (the guest cabin/upper residential cabin structure permitted and finalized in 2006, and the lodge/storage cabin permitted and finaled in 2007), and six permits for improvements (two for septics, two for wells, two for electrical). The property had only three unpermitted structures at most. Cox demolished two of those itself which were the log barn and the office structure. The metal carport shop is permitted (permit #29746). The other "unpermitted structures" were: (1) A small RV deck that remains legal as it was under 120 square feet; (2) A gazebo, which was removed before the county brought the lawsuit; and, (3) A raised platform, which was removed before the lawsuit. These were minor issues and in good faith Cox complied with the Notice to Abate on these minor issues before the County filed its bad faith receivership case. There are other permits on the Property as well. The County Building Department conveniently lost the following permit but it was retained by the County Recorder Assessor's office and confirms the electrical stanchion that Defendant County demanded to be removed by November 2, 2018 was in fact permitted in February 2012 (permit #29757) and no longer needed to be renewed or addressed. Thus, overall, the Defendants Adams and CRG failed to list numerous permits existing for the property, including for example:

| Permit 9216: Electrical Service for Well | APN 008-140-021 | Finaled 9/19/89 |
| Permit 20051: Electrical Blue Tag (Well) | APN 008-140-021 | Finaled 5/16/03 |
| Permit 21615: Ag Building/Storage with Bathrooms (1,344 sq. ft. with 1,440 sq. ft. porch) | APN 008-140-022 | Finaled 7/9/07 |
| Permit 20747: Septic System (new) for 2 bedroom/1 bath dwelling | APN 008-140-021 | Finaled 4/25/06 |
| Permit 21519: Dwelling, single family detached (844 sq. ft with 1,064 sq. ft. porch) | APN 008-140-021 | Finaled 7/24/06 |

### False Claim About "Neglected Animals."

112.    The Receiver claimed it needed money to tend animals who were hungry and dehydrated. However, Cox's friends took all the livestock (pigs, chickens, and the dog). The remaining animals were "free range" or "free grazing" and did not need feed, as they free graze 12 months out of the year, a method known as "hands-off management" that Cox learned at Cal Poly

San Luis Obispo.    Cox saw the guards feeding the horses moldy hay, which can cause them to colic and die.  Cox saw them place hay next to the corral, which is harmful because the animals are used to free grazing.  Feeding them hay can make them dependent upon hand-feeding.  As far as water, there is a year-round water source on the ranch - one of the largest natural water springs in the county – which the animals drink from and swim in.  The State of California has an easement with a state bridge on the property with a H2O pump house that sources water from the creek on the property to be used for the fire camp next door.  The ranch animals have access to the creek water year-round.

**Receiver's Neglect and Abuse Toward Ranch Animals.**

113.    The Receiver was negligent toward the animals on the ranch.  The Receiver claimed the animals were escaping from the ranch despite his having the property secured.  Animals did escape, but they escaped because contrary to his representations, the Receiver failed to secure the property. Instead of securing the property, the Receiver left the back gate off the hinges and chained on both sides. As a result of Defendants Adams and CRG's failure to properly secure the property, two of Cox's horses however disappeared while Defendants Adams and CRG controlled the ranch. As a result of Defendant Adams and CRG's incompetence one of Cox's quarter horse mares named "Drifty," and another mare, are missing to this date.  Another horse was found lame and cut up.

**False Bridge Violation.**

114.    The Receiver's Motion for Appointment of Receiver listed as violation number 94: "A bridge on the Subject Property is inadequately constructed, cannot hold a sufficient load for firefighting vehicles and apparatus, and is otherwise not built in compliance with the law.  (HSC, § 17920.3(c); CBS § 116.1; CPRC, § 4290; California Code of Regulations Title 14, §1273.07; MCC, §§ 15.10.040, 15.30.010.)"  The Receiver was referring to the bridge over the creek.  That bridge is owned by the State of California with an easement over the property, primarily for purposes of fires. The State of California performs yearly inspections on the bridge to ensure its adequacy for use and regularly uses the bridge.  On June 7, 2017, the State of California Department of Forestry and Fire Protection found no violations on the Property, including an inspection of the State-owned bridge over the creek, and issued a Notice of Defensible Space Inspection.  There is a post-receivership

COMPLAINT BY PLAINTIFF JERRY COX

video of fire trucks going over the bridge.  (*Ibid.*; see www.youtube.com/watch?v=AUxdb6lxb2Q.)  Contrary to the Defendant Adams and CRG's false representations, there was no basis to find the bridge inadequate.  This was yet another falsified violation made to take control over the Property.

**False "Hazardous Septic System" Violation.**

115.    The Receiver's violation number 24 alleged that the Upper Residential Unit septic system was not authorized to support a three-bedroom dwelling.  However, the septic was permitted for a two-bedroom structure (Permit No. 20747 in 2006), and the Receiver falsely considered the unit a three-bedroom structure.  Even with the loft this cabin is only a two-bedroom structure.  The legal requirements for a room are to have an eight-foot ceiling and a closet, neither of which the loft had, so the loft does not qualify as a bedroom.  There has never been any problem with the septic system.

**The Vacant 120-Acre Parcel 008-140-0230 Should Never Have Been Included**

116.    As the County Map indicates, Parcel No. 008-140-0230 is a vacant 120-acre piece of land with no violations, and yet the County and Receiver included it in the Property subject to receivership.   This parcel should never have been included in the receivership.

**False "Jacks" Violation.**

117.    The Receiver's violation number 44 alleged that the ceiling and roof of the lower storage/residential structure had defects including jacks that supposedly were placed haphazardly to support cross beams.  This was untrue.  There were no jacks supporting cross beams, but only jacks under the porch for maintenance once per year because the porch needs an annual adjustment to the rain flows away from the wood structure.

**Illegally Recording Notice of Foreclosure Without Court Permission.**

118.    On July 12, 2018, without Court permission, the Receiver recorded a Notice of Default and Election to Sell Under Deed of Trust on the Property.  This bad faith action violated the Receivership Order requiring that no foreclosure can commence until the Receivership terminates.  Therefore, any receivership fees and costs subsequent to July 12, 2018 should be denied.

**Other False or Exaggerated Violations.**

119.    There are numerous other alleged violations listed by the Receiver in the Motion for

34

1  Appointment of Receiver that were either false or exaggerated.  Violation number 21 alleged that

2  the Upper Residential Unit patio had "uneven surfaces and sagging or damages wooden planks."

3  This was false.  The patio floor was in perfect condition.  Violation number 22 alleged that the

4  Upper Residential Unit roof had split supports.  However, like many log cabins built with full whole

5  logs, there are check marks in the logs. This does not affect the integrity or the structural of the logs.

6  Violation number 23 alleged that the Upper Residential Unit loft was unpermitted.  This is false.

7  The loft was part of the original design and had been permitted (Permit No. 21519).

8  **Numerous Other Abuses and Breaches of Duty by the Receiver.**

9  120.    There are also numerous other abuses and breaches of fiduciary and other

10  receivership duties that the Receiver committed.  For example, the Receiver's guards used Cox's

11  off-road Honda Pioneer for several months and damaged the machine steering and suspension.  The

12  guards' children and grandchildren were seen vacationing at the house and on the property (despite

13  all the alleged health violations that kept Cox from living on his own property).  (https://youtu.be/7-

14  Nof8oewug.)   The Receiver and or his agents broke into the adjacent 6108 Mosher Road property,

15  vandalized it, and seized that property for two weeks even though it was not subject to the

16  receivership.

17  **Numerous Other Breaches.**

18  121.    Dahlem, the MC's County attorney, an agent of the County, was one the chief

19  architects behind the initiation of the fraudulent receivership action against Cox and JDC Land

20  Holdings, LLC.  Defendant Mark Adams was appointed as the receiver. Defendant Adams has a

21  long history of abusing receiverships. Defendant Adams engaged the law firm Silver &Wright to

22  further his unlawful goals as receiver. Silver & Wright have a long history of aiding Defendant

23  Adams in receivership proceedings, and have been sued in class actions for allegedly engaging in

24  wrongful acts to further unlawful acts in taking property in receivership proceedings.

25  122.    The receivership proceeding was brought under the Health and Safety Codes of

26  California.  "The legislative history of section 17980.6 as originally enacted discloses the

27  Legislature's substantial concern over the 'inadequate enforcement of State Building Codes in

28  regard to substandard housing' and its intent to provide 'new enforcement measures to rehabilitate

COMPLAINT BY PLAINTIFF JERRY COX

1   and maintain existing housing that currently endangers the health and safety of residents or the

2   public.'  Hence, the present version of section 17980.6 serves to enhance the ability of local

3   enforcement agencies to require owners to remediate substandard housing conditions that pose an

4   immediate health and safety threat and to improve the notice given to tenants regarding matters that

5   may directly affect them." *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 925-926.

6         123.    Defendant County and Dahlem knew and or should have known that the subject

7   property was not dilapidated or in need of a receivership appointment.  The subject property is 430

8   plus acres of pristine natural wilderness, farm and well-built cabins that were fully permitted by

9   Plaintiff Cox and his business.  On information and belief, the receivership action was brought in

10  bad faith against Plaintiff Cox with explicit aim of depriving him of his home, business, ivelihood

11  and property so that Cox would leave the County.  On information and belief, the Defendant

12  County, Defendant CRG, and Defendant Adams, seek to profit from the illegal taking of Cox's

13  property.  Adams and CRG neglected the property, failed to pay taxes, property bills, business bills,

14  and interfered with Cox's business interests while they operated the receivership under the color of

15  law.

16        124.    Defendants CRG and Mark Adams are acting as a pseudo governmental agency with

17  the County and are thus subject to the Section 1983 Claims and the Constitutional Claims

18  enumerated herein, including due process, equal protection, unlawful searches and seizures, and

19  property rights.   The health and safety code violations alleged in the complaint against Plaintiff

20  were allegedly brought in the interest and capacity to fulfill a public safety and health

21  concern.  Accordingly, the County and the Receivership are carrying out a local government

22  function.  That function and duty is subject to Plaintiff's individual Constitutional Rights, including

23  Plaintiff's property rights and business interests. The Receivership, Mark Adams and its attorneys'

24  actions are not privileged or immune from Section 1983 and Constitutional Claims.

25        125.    In carrying out such duties the Receivership also has a fiduciary duty to the

26  Plaintiff.  That fiduciary duty requires the Receivership to be a neutral party that takes into

27  consideration the interests of the County and Cox.   It has a duty to manage said property, bring it

28  into compliance, and apply the Receivership funds to pay property taxes, provide for the care of the

1   animals and livestock on said property, its structures, and otherwise maintain the property.  It also

2   has a duty to ensure the property owner can be returned to his property after taking care of any

3   alleged property violations, especially when the property owner depends on said property for his

4   home, life and livelihood.  When the property owner is removed from the property under state law,

5   the Receivership and the County cannot derogate Plaintiff's Constitutional Rights.

6       126.    The Receivership breached said duties and Plaintiff's Constitutional Rights by taking

7   a series of actions that had nothing to do with the County's police and health and safety

8   functions.  The Receivership borrowed heavily against the property and enriched itself and the

9   Defendant with the intent to ultimately sell the property for the financial benefit and gain for the

10  Receivership and its affiliated lenders. In the underlying Receivership matter, the Receivership

11  applied for and obtained approximately $250,000 in the form of Certificates. Plaintiff are informed

12  and believe that the Receivership sold the Certificates to companies affiliated with Defendants CRG

13  and Adams and the Receivership.  In turn, the Receivership and its affiliates took out security

14  interests which they recorded against the property as super priority loans.  These loans were

15  recorded against the interest of the property owner and Plaintiff and with the specific intent to levy

16  on them to enrich the Receivership and its affiliates.

17      127.    Defendants CRG and Adams abused the Receivership in numerous ways, including,

18  by way of example and not by way of limitation the following. After spending all of the funds

19  borrowed against the property on unwarranted and excessive fees, expenses, an outsized and

20  unnecessary security presence, and experimental drone flyovers, the Receivership drained the

21  receivership funds and failed to apply any of the funds for the care and maintenance of the property

22  and failed to spend any money to correct the alleged code violations. Moreover, the Receivership

23  negligently handled the property, allowing it to come to harm, as it had no intent to remedy any

24  alleged code violation on the property.  The Receivership did nothing material to remedy or abate

25  any of the alleged violations which gave rise to the Receivership. In fact, it let the crops and

26  livestock on the property come to harm, allowed its contractors and security guards to camp and

27  enjoy the property at Plaintiff's expense, and let the structures come to structural harm and fire

28  exposure.  For example, Defendants CRG and Adams allowed Plaintiff Cox's beloved pet dogs be

killed, permitted multiple purported security guards to use, abuse and damage several ATV's on the property, broke into buildings by smashing in doors, broke fences, trashed the interior of Cox's residence building, searched through his closets and personal belongings, consumed food, fuel and other of Plaintiff Cox's stocks and supplies on the property, entertained their friends and families using buildings and facilities on the property, including those with numerous health and safety code violations that allegedly were so severe that people, including Cox, were not allowed to remain on the property, and more. The Receivership parties and affiliates undertook such actions with the intent of depriving Plaintiff of their property rights and Constitutional Rights.

128.    For instance, Plaintiff are informed and believe that the Receivership never had any intent to apply the funds borrowed against the property to pay for the remedy of any of the alleged code violations.  Without a formal bidding process, the Receivership submitted estimates for $250,000 to $300,000 to the court, when ultimately the work was completed for less than $8,000 and with the permit fees by contractors, engineers and architects arranged not by the Receivership, but by Cox.   The Receivership's estimates were made in bad faith, did not identify any specific contractors, and were made with the intent to further encumber the property with more debt in order to sell the property for Defendants CRG's, Adams' and MC's financial gain.  The Receivership Order in the underlying action specifically forbids the Receivership from initiating foreclosure proceedings against the property until the alleged violations are abated. The Receivership ignored such orders and caused a premature foreclosure proceeding using the Deed of Trust recorded on the property by its affiliates to initiate attempts to sell the property to permanently evict Cox. Defendants Adams and CRG are claiming a total bill for more than $700,000.00, though they have done nothing on the property than damage it and prevent Plaintiff Cox from occupying his home and conducting his business.   Defendants County and the Receivership are in the process of forcing the sale of Plaintiff's Property for less than its market value to pay off the phony $700,000.00 bill, thus depriving Plaintiff Cox of his property and his home for repairs costing less than $8,000.00.

129.    Receivership is considered an "extraordinary" remedy, and California courts have declined to appoint a receiver when an alternative remedy, such as an injunction, writ of attachment,

1  or issuance of a lis pendens, may serve to protect whatever rights the parties assert in the property

2  that is the subject of the litigation. See, *e.g., A.G. Col Co. v Superior Court* (1925) 196 C 604, 614,

3  238 P 926 (reversing trial court's ex parte order of receivership for corporation because parties'

4  rights could be fully protected by injunction and other remedies). See also *Golden State Glass Corp.*

5  *v Superior Court* (1939) 13 C2d 384, 393, 90 P2d 75 (due to the "drastic" nature of receivership,

6  court's discretion to appoint receiver "is not an entirely uncontrolled one," and ordinarily, if there is

7  any less severe remedy available to adequately protect parties' rights, "a court should not take

8  property out of the hands of its owners"); *Elson v Nyhan* (1941) 45 CA2d 1, 5, 113 P2d 474 (noting

9  that "[r]eceivers are often legal luxuries, frequently representing an extravagant cost to a losing

10  litigant. When it appears that no reasonably certain benefit will result to one litigant, and a distinct

11  disadvantage will result to another, courts should weigh carefully the propriety of appointing a

12  receiver.").

13        130.    The Defendants MC, CRG and Adams' code enforcement business model is centered

14  on California Gov. Code § 38773.5(b), which provides that "A city may, by ordinance provide for

15  the recovery of attorneys' fees in any action, administrative proceeding, or special proceeding to

16  abate a nuisance."

17        131.    Cox's company, JDC Land filed an Answer to Verified Complaint for Nuisance

18  Abatement and Receivership on April 6, 2017. The County filed its motion for appointment of a

19  receiver pursuant to Health & Safety Code section 17980.7 (c) on June 20, 2017.  The motion was

20  based on the phony alleged violations of state and local building codes exemplified above.

21        132.    Plaintiff used the land in dispute as ranch land zoned under the federal Williamson

22  Act. County alleged that Cox had been hosting individuals on his property in a "bed and breakfast"

23  operation and that this was a not permitted agritourism operation in violation of the federal

24  Williamson Act.  The Williamson Act is a statute that is meant to preserve agriculture lands for

25  agricultural land use.  County implicitly asserted that Plaintiff's use of the land for agritourism

26  violated the Williamson Act.  In conjunction with this claim, County alleged a number of different

27  building code violations that were the basis for the motion to appoint receiver under Health &

28  Safety Code section 17980.7(c).

133.   To establish grounds for the appointment of a Health & Safety code receiver, the County falsely maintained that the alleged violations posed a risk to the health of visitors to Plaintiff's land.  Plaintiff Cox and JDC Land Holding Company denied the allegations and argued that if there were minor code violations, the alleged violations were easily correctable by means other than a receivership, or that pre-existing uses and existing permits prevented the county from asserting that the structures in question violated the building code.

134.   Based solely on the declarations filed by County, and without considering – or even viewing – the competing evidence, County of Mariposa Superior Court, Judge Walton, the same judge presiding over Cox's then pending criminal action, issued a summary order appointing the Defendants CRG and Adams as receiver.  The court did so without a full evidentiary hearing or the opportunity for Plaintiff to conduct discovery.

135.   Defendants Adams and CRG are the subject of many investigations, lawsuits and complaints by land and homeowners throughout the State of California who have argued, including in lawsuits, that the Defendants Adams and CRG, in conjunction with county officials and select law firms such as unnamed co-conspirator Silver & Wright LLP, with whom Defendants CRG and Adams frequently work, use exaggerated and false claims of building, health and safety code violations, often based on nothing more than piles of trash or unkempt lawns to launch major civil or criminal actions against property owners.  Just like Defendants MC, CRG and Adams did here, these groups use California's receivership laws in violation of homeowners' constitutional rights to due process and property ownership throughout the State of California to generate huge fees for minimal or no remedial work, run up liens and receivership certificates as encumbrances on the property, all with the chief aim of ordering judicial foreclosures of these properties and selling them on the open market for monetary gain and profit for the Defendant firms and local government entities.

136.   Silver & Wright, the law firm hired by the Defendants Adams, CRG and County and Dahlem is currently subject to a class action lawsuit in County of Riverside Superior Court alleging that the law firm's practices of using criminal code violations to support building and safety code cases against property owners is unconstitutional and violates the property owners' due process

COMPLAINT BY PLAINTIFF JERRY COX

1   rights and constitutes unlawful profiteering by government officials using criminal and code

2   violation cases to profit from home owners. (*See Morales v. City of Indio, City of Coachella and*

3   *Silver & Wright*, Case No. RIC 1803060).

4   137.    These proceedings have had the effect of denying Plaintiff Cox of his due process

5   rights to have evidence heard and considered in defense of his home and livelihood and have

6   resulted in unconstitutional searches and seizures of his property, destruction of his equipment,

7   vehicles and livestock, and loss of Cox's home.  Cox has been essentially homeless nearly the entire

8   time since being released from his unlawful incarceration for Harris' phony rape claim, and was

9   unable to sleep in his own bed for more than two years.

10   138.    At the hearing regarding a motion for appointment of receiver, the court refused to

11   accept evidence offered by Plaintiff Cox showing that the alleged building violations were either

12   meritless, resolved, or already permitted within by County.  The court also refused to consider

13   evidence that Cox already abated many of the conditions that County alleged as bases for the alleged

14   violations of the building code and Health & Safety Code.  At the conclusion of the hearing on July

15   17, 2017, the court issued an order appointing Defendants CRG and Adams as the receiver.

16   139.    The appointment of the Receivership has had the effect of depriving Plaintiff Cox of

17   his home, property and livelihood without due process and otherwise in violation of his

18   constitutional rights.  County supported the receivership application with affidavits and search

19   warrants based on the false testimony of Harris and/or other false allegations against Cox from the

20   criminal case, and otherwise throughout the receivership. County sealed the search warrants and

21   concealed them from the Plaintiff and from the public with the aim of concealing the true motive

22   and intent behind the receivership action which was to deprive Plaintiff Cox of his home and

23   property.

24   140.    Plaintiff Cox has been rendered homeless for nearly two years since these

25   receivership proceedings were brought by the County, and has become indebted to the County's

26   lawyers and to the Defendants CRG and Adams as result of these unconstitutional proceedings.

27   Plaintiff Cox has been forced to sell his tractors, trucks, livestock, horses and bison of significant

28   worth and which are the means of his livelihood and his ability to defend against the Defendants in

41

1   the criminal and the unconstitutional receivership actions.

2        141.    The receiver has continued to seek receivership certificates from the state Court and

3   continued to submit monthly accounting expenses, none of which have had any benefit to abate any

4   alleged health or building code violation on the Property.  None of those funds have been used

5   towards any rehabilitation of the property, but instead have been used to pay CRG's fees, expenses

6   and an outsized and unnecessary security presence for a vacant ranch property which is not a public

7   health and safety threat to anyone.

8        142.    The Defendants County and the Receivership's strategy is the same as the

9   Receivership's strategy in many other cases against other property owners: allege hundreds of false

10  and exaggerated code violations against the property owner, use an expensive law firm and

11  receivership group to litigate the case, and hold Cox financially responsible for all the legal fees,

12  security fees, receivership fees and all other expenses associated with the County and their law

13  firm's handling of this matter, such that they are unable to reoccupy their own property and the

14  Property is sold to pay the Defendants' fees and costs even though they have done nothing to

15  remediate any of the alleged code violations.

16       143.    The receiver was ordered on January 22, 2018 to submit competitive bids and

17  provide details of the contractors and plans to defendant pursuant to the Court's Order which states:

18  "Receiver shall develop a rehabilitation plan for the Subject Property and shall obtain at least three

19  rehabilitation cost estimates from licensed contractors to perform the repairs necessary to

20  rehabilitate the subject property."  Defendants MC, CRG and Adams never fulfilled this court order.

21  Instead the receivership now seeks to sell Plaintiff's properties and home "as-is" in violation of its

22  fiduciary duties to Plaintiff.

23       144.    The County state court proceedings have not provided Plaintiff Cox an adequate

24  opportunity to raise constitutional challenges to the receivership action.  *Herrera v. City of

25  Palmdale*, 918 F.3d 1037 (9th Circuit); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457

26  U.S. 423, 432 (1982).  The Mariposa County Superior Court has refused to permit Plaintiff Cox to

27  sue the Defendants Adams and CRG in state court and has refused to allow Plaintiff Cox a jury trial

28  on any issues in the case.

145.    Defendants Adams and CRG have now attempted to force the sale of Plaintiff's properties for $700,000 or less when an appraisal of the property values it at over $1.4M.  The Defendants are intentionally trying to sell the property to the lowest bidder so long as the proceeds from the sale can pay their exorbitant attorneys' fees, leaving Cox with little to nothing after the phony costs and expense of the receivership are tabulated.  The Superior Court has ordered the sale of the property and Cox is in danger of becoming homeless a second time.  He was rendered homeless previously when the receivership had taken possession, custody and control of the property and forced Cox to vacate.  Although Cox was allowed to return to his home temporarily, the Court has now ordered that the property be sold, effectively depriving Cox of any value and use of his property while this unconstitutional code enforcement action drags on.

**F.      DEFENDANTS ARE FORCED TO DISMISS ALL FELONY COUNTS AGAINST PLAINTIFF COX, BUT CONTINUE MAINTAIN AN UNCONSTIONAL PROPERTY ACTION UNDER THE COLOR OF LAW**

146.    On August 14, 2017, County dismissed all criminal charges Plaintiff Cox involving Ashley Harris pursuant to Cal. Penal Code § 1385.  Although County  dismissed all the criminal charges, it brought a retaliatory civil action, as described above, using California's building, health and safety code violations with the intent and malice to deprive Plaintiff of his Constitutional Rights, including *inter alia*, Plaintiff's 14th Amendment Rights to livelihood, property, due process, his 4th Amendment Right to unlawful searches and seizures, and his 5th Amendment Rights to unlawful takings of property by government actions, and to drive Plaintiff Cox from his land and his home.

147.    The Defendants' actions have collectively constituted a conspiracy to deprive Cox of his livelihood and property, in that each of the Defendants has acted in concert with the intention and express aim of collectively depriving Cox of his Constitutional Rights, but also with the aim of enriching and benefitting government and pseudo-government officials, who are acting in concert to sell a man's property under the color of law under 42 U.S.C. § 1983 by bringing and maintaining an unlawful property action.  Such property receivership action is at the expense of Plaintiff's Constitutional Rights to due process (14th Amendment), life, livelihood, liberty (14th Amendment), property, takings (5th Amendment), searches and seizures (4th Amendment) and right to be free from

cruel and unusual punishment (8th Amendment).

## FIRST CLAIM FOR RELIEF – 42 U.S.C. § 1983 – 14TH AMENDMENT
## OF THE U.S. CONSTITUTION – DUE PROCESS
### (Plaintiff against all Defendants)

148.    Plaintiff incorporate by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

149.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

150.    The 14th Amendment of the U.S. Constitution which applies to states, municipal governments and government actors, states in part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

151.    Plaintiff has a 14th Amendment right to life, liberty, property and are entitled to due process and equal protection of the law.  Cox is entitled to due process with respect to his rights in the criminal prosecution by the county and the civil property action brought by the county which was initiated with the intention of depriving Cox of his liberty, livelihood and property. Plaintiff is also entitled to due process rights in his business interests and ownership.  As discussed above and herein, each of Plaintiff's 14th Amendment rights were violated.

152.    Each of the Defendants, acting in their official and individual capacities,

intentionally, recklessly and in bad faith, and in conspiracy with one another, violated Cox's due process rights by making false allegations and prosecuting Cox under the color of law by undertaking a malicious, bad faith and reckless investigation surrounding the false allegations of rape, sodomy and kidnapping made by false accuser, Harris.

153.    Defendants, individually and collectively failed to collect, preserve and produce exculpatory evidence that would exonerated Plaintiff Cox at the outset of this case, and used false statements from Harris that were clearly contradicted by physical evidence, electronic messages, eyewitness testimony and a plethora of other evidence that was intentionally, recklessly and maliciously concealed, ignored and suppressed by the Defendants in the zeal to prosecute Cox for rape and other crimes.

154.    Defendants also used false statements to support arrest and search warrants against Cox, maliciously and intentionally increased his bail without due process, needlessly delayed important hearings while failing to undertake discovery of exculpatory evidence, and otherwise intentionally, maliciously and/or recklessly ignored the exculpatory evidence in their possession, allowing for the destruction and spoliation of such evidence early in the case that would have exonerated Plaintiff Cox without having to undergo a lengthy criminal proceeding which deprived him of due process, the right to obtain evidence, the right to confront his accuser on false statements, the right to have his witnesses testimony and evidence credited in the investigation and the right to a fair and unbiased investigation that looked at all the evidence, physical, electronic, eyewitness, circumstantial, etc. before charging and maintaining the 11-count plus enhancement felony prosecution effort against Plaintiff Cox.

155.    As discussed herein, Defendants through their bad faith actions in the receivership matter deprived Plaintiff Cox of due process. Defendants intentionally, in bad faith, and recklessly used false allegations from the criminal case, that they knew were false, to obtain search warrants, false declarations from County officials for exaggerated health and safety code violations, and used the receivership process to levy unconstitutional fines, fees and liens on Plaintiff's property with the express aim of evicting Plaintiff from his home and selling Plaintiff's land and property for profit. Each of the Defendants intentionally, in bad faith, and recklessly operated under the color of the

COMPLAINT BY PLAINTIFF JERRY COX

receivership laws to exaggerate and falsify 101 code violations with the express aim of having a receiver appointed by the court who then used the receivership process not to remedy or abate alleged code violations, but for the purpose of applying for receivership certificates that the receiver could sell for a profit and encumber the property with liens.

156. On information and belief, the Defendants improperly applied for and sealed civil search warrants without cause knowing that such warrants were based on false allegations and did so with the express aim of misleading the court and the public concerning the state of Plaintiff's property.

157. As a direct and proximate result of the Defendant's actions, Plaintiff sustained significant damages.

158. As a result of the misconduct alleged herein, Defendants are liable to Plaintiff in an amount to be determined at trial. The full extent harm to Plaintiff is believed to be in excess of $150 million.

159. The Defendants' actions and omissions were willful and/or reckless and/or were made with a conscious disregard of Plaintiff's Constitutional Rights. As a result, the Plaintiff are entitled to punitive damages, in an amount to be determined at trial, sufficient to punish and deter Defendants from further similar misconduct.

**SECOND CLAIM FOR RELIEF – 42 U.S.C. § 1983 – 14TH AMENDMENT OF THE U.S. CONSTITUTION – EQUAL PROTECTION, PRIVILEGES AND IMMUNITIES**
**(Plaintiff against all Defendants)**

160. Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

161. Plaintiff has a 14th amendment right to his life, livelihood, employment, property, and equal protection, privileges and immunities guaranteed under the 14th Amendment of the U.S. Constitution.

162. The Defendants acted, individually and collectively, and in conspiracy with one another, to deprive Plaintiff of his right to be free of government discrimination and selective

1  enforcement in violation of Plaintiff's 14th Amendment Equal Protection and Civil Rights,

2  including those under the Federal Civil Rights Acts.

3      163.    The criminal action brought by Defendants utilized discriminatory classifications,

4  policies, customs, practices, funding, training and procedures with the intent to prosecute a male

5  suspect, Cox, under domestic violence and sexual assault laws using reckless investigatory and

6  prosecutorial standards that would not apply to other classes of crimes.

7      164.    These discriminatory and selective enforcement policies are followed and

8  implemented in many counties of California, such as Mariposa that provide grant funds, rewards to

9  Counties and incentives and special employment to local officials involved in the enforcement of

10  domestic violence or sexual assault crimes; these enforcement efforts, as evidenced in the Cox case,

11  elevate the false accusations of the accuser (as they did with Harris), ignore exculpatory evidence

12  and use selective enforcement and prosecution practices that do not apply to other classes of crimes.

13      165.    These selective enforcement and reckless policies are administered and enforced in

14  California, including the County of Mariposa.

15      166.    The County has a specialized domestic violence and sexual assault prosecution unit

16  that receives state and federal funding and engages in arbitrary and capricious enforcement of sexual

17  assault and domestic violence laws against men, although it does not prosecute other crimes in the

18  same way.  Ample evidence of this was borne out in the Cox case.

19      167.    On information and belief, such actions are supported by "victim advocate" groups

20  in the County, who are federally and state funded and assist the county in prosecuting men based on

21  false statements and a policy of "must believe women" which encourages false allegations, as was

22  done in the Cox case.

23      168.    On information and belief, these groups assert pressure on the County to charge and

24  prosecute men for sexual assault and domestic violence.  Their funding depends on it.  Indeed, in the

25  Cox criminal prosecution, a victim's advocate was present during several interviews between MCS

26  and Harris and on information and belief encouraged Harris and the MCS and Defendants to draft

27  false police reports and ignore exculpatory evidence.

28      169.    On information and belief, the Defendants, individually and collectively, benefitted

from and encouraged these bad faith selective enforcement policies, customs and practices in order to obtain benefits, grant funding and/or to encourage law enforcement and district attorneys to detain, arrest, jail and bring criminal charges or indictments against Cox without probable cause, using the sexual assault and domestic violence laws to target Cox with false allegations.

170.    The County engages in this conduct to improve and inflate the arrest and prosecution statistics for these types of crimes.

171.    On information and belief, the County provides employment or other financial incentives, funding and salaries to officials, including the MCS Defendants to encourage these reckless policies, customs and practices.

172.    These invidious and bad faith selective enforcement policies, formulated, encouraged and enforced by the County, its officials, district attorneys, and law enforcement caused Cox to be arrested, jailed and prosecuted based solely on the word of Harris, whose allegations were known to be false, exaggerated and or easily disproved by evidence that can and should have been collected, reviewed and analyzed following standard criminal investigatory tactics.

173.    The County and MCS do not train, implement or follow standard criminal investigatory and prosecutorial standards when it prosecuted Cox for sexual assault and domestic violence allegations.

174.    The County in bad faith, intentionally, invidiously, and recklessly followed these reckless policies and practices in bringing a 16 felony count criminal complaint against Plaintiff Cox (with multiple enhancements) at the expense and derogation of his constitutional rights.

175.    On information and belief, Defendant County selectively and invidiously enforces these policies against heterosexual men but not against women or LGBTQ groups.

176.    Defendants, individually and collectively furthered false claims pursuant to these policies, without probable cause and prosecuted false claims, knowing of their falsity, and with the intent to deprive Plaintiff of equal protection under the laws.

177.    On information and belief, Harris obtained benefits and gained protected "victim" status by conspiring with the county defendants to deprive Cox of equal protection under the laws.

178.    The County, MCS, and Defendants Adams and CRG made improper and

discriminatory and selective use of the health and safety code laws to target Plaintiff's properties when the county rarely if ever uses these laws against similarly situated farmers and ranchers.

179.    Defendants engaged in arbitrary and selective enforcement of the health and safety code laws against Plaintiff, singling them out for unjust and disproportionate receivership case when such laws are rarely if ever used against similarly situated farmers and property owners in the County.

180.    As a direct and proximate result of the Defendants' actions, Plaintiff sustained significant damages.

181.    As a result of the misconduct alleged herein, they are liable to Plaintiff in an amount to be determined at trial.  The full extent harm to Plaintiff Cox believed to be in excess of $150 million.

182.    The Defendants' actions and omissions were willful and/or reckless and/or were made with a conscious disregard of Plaintiff's Constitutional Rights.  As a result, Plaintiff are entitled to punitive damages, in an amount to be determined at trial, sufficient to punish and deter Defendants from further similar misconduct.

### THIRD CLAIM FOR RELIEF - 42 U.S.C. § 1983 – 4TH AMENDMENT OF THE U.S. CONSTITUTION – UNLAWFUL SEARCHES, SEIZURES, AND MALICIOUS PROSECUTION UNDER THE COLOR OF LAW TO VIOLATE CONSTITUTIONAL RIGHTS
**(Plaintiff against all Defendants)**

183.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

184.    The 4th Amendment of the U.S. Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The Fourth Amendment enforces the notion that "each man's home is his castle," secure from unreasonable searches and seizures of property by the government.  It protects against arbitrary arrests, and is the basis of the law regarding search warrants, stop-and-frisk, safety inspections,

wiretaps, and other forms of surveillance and privacy interests.

185.    The 4th Amendment protect also provides a constitutionally protected right to be free of arrests, detention, incarceration and prosecution without probable cause.  *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017).

186.    The Defendants, individually and collectively, acting in their individual and official capacities, acting under the color of law, did violate Plaintiff's 4th Amendment Rights against unlawful arrest, searches and searches and seizures, pre-trial detention and prosecution of charges against Plaintiff without probable cause.  Defendants intentionally, maliciously, recklessly or in bad faith, with disregard for Plaintiff's Constitutional Rights, wrote police reports based on false evidence and used these false police reports to arrest, detain and then cause Plaintiff to be jailed, subject to unreasonable bail, and prosecution without probable cause.

187.    Harris provided, and Defendants obtained statements from Harris that were clearly false and directly contradicted by a number of eyewitness statements, physical evidence, phone messages, text messages and other data and evidence that was available to the arresting officers on the day Harris made her complaint.  Harris' false statements were used as a pretext for the unlawful searches and seizures of Plaintiff's property.

188.    Defendants used Harris' false statements to arrest and detain Plaintiff Cox.  Cox was wrongfully incarcerated based on the false statements. The false statements and reports of the Defendants were repeated in affidavits and search warrants which were based on false and fabricated testimony that was known to be false to the Defendants.

189.    As a result of a false and exaggerated health and safety code violation case, Defendants CRG and Adams, acting in concert with County officials and under the color of state law, subjected Plaintiff to unlawful searches, seizures and destruction of property based on search warrants and/or warrantless searches that were predicated on false and exaggerated information. Plaintiff's properties were subject to unlawful searches and seizures, raided, stolen, and misused by Defendants under the pretense of a receivership action as outlined herein.

190.    As outlined above, in the due course of the criminal case and receivership matter, Defendants engaged in unlawful and unreasonable searches and seizures of Plaintiff's livestock,

COMPLAINT BY PLAINTIFF JERRY COX

vehicles, residential units, barns, guest cabins, greenhouses, and other structures on Plaintiff's property in bad faith, and in the process killed or hurt his livestock and animals, destroyed or impaired his vehicles, seized his computers and phones, invaded his privacy and other conduct that violates Plaintiff's 4th Amendment Rights to be free from unreasonable searches and seizures.

191.    Plaintiff Cox was arrested, jailed and charged without probable cause, and without a reasonable or even basic investigation into the available facts and evidence.

192.    As a direct and proximate result of the Defendant's actions, Plaintiff sustained significant damages.

193.    As a result of the misconduct alleged herein, they are liable to Plaintiff in an amount to be determined at trial.  The full extent harm to Plaintiff is believed to be in excess of $150 million.

194.    The Defendants' actions and omissions were willful and/or reckless and/or were made with a conscious disregard of Plaintiff's Constitutional Rights.  As a result, Plaintiff are entitled to punitive damages, in an amount to be determined at trial, sufficient to punish and deter Defendants from further similar misconduct.

## FOURTH CLAIM FOR RELIEF – 42 U.S.C. § 1983 - 5th AMENDMENT – PROPERTY, TAKINGS
**(Plaintiff Against Defendants County, Adams and CRG and Does 1-25)**

195.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

196.    The Takings Clause of the Fifth Amendment states that "no person… shall be… deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."   On June 21, 2019, the U.S. Supreme Court ruled that property owners who have had their property taken by state or local governments without compensation may file a Fifth Amendment takings claim in federal court without first having to exhaust remedies in state court. *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019).

197.    A property owner acquires a right to compensation immediately upon an uncompensated taking because the taking itself violates the Fifth Amendment. *See San Diego Gas & Elec. Co. v. San Diego*, 450 U. S. 621, 654, 101 S. Ct. 1287, 67 L. Ed. 2d 551. The property owner may, therefore, bring a claim under §1983 for the deprivation of a constitutional right at that time.

198.    Defendants use of the health and safety code case and resulting enforcement is a 5th Amendment taking as it is uses the State and Municipal powers to restrict and regulate an owner's property beyond the legitimate purpose of the law. *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019). When such actions result in the government taking Plaintiff's property, destroying his business, and rendering him homeless without due process and/or just compensation, it is actionable under the 5th Amendment to the U.S. Constitution.

199.    The Defendants brought and maintained a bad faith criminal and receivership action to deprive Plaintiff of their residence, property and business in the County.   The receivership action was brought by the County government officials, government agents, court appointed receivers for the alleged public benefit, when it was really a sham.  The Defendants, individually and collectively, used the receivership and taking of Plaintiff's property for their use, enjoyment and ultimate financial benefit without due process or just compensation.

200.    As outlined herein, Defendants, acting individually and collectively, under the color of law, intentionally, recklessly and in bad faith, forcibly seized Plaintiff's properties, residence, business, commercial and personal properties, and land, including the Bison Creek Ranch and the Mosher Property, and personal property of Plaintiff, located in the County without due process of law and without just compensation.

201.    Defendants acted under the color of law, *inter alia*, by bringing a health and safety code case and appointment of receivership with the intent to seize Plaintiff's property and land, including nearly 450-acres of pure land that was not under any alleged code violations.  Defendants did so in bad faith, acting under the pretense of public health and safety code violations, when in reality, they intended to eject Plaintiff from his property and deprive him of his home and ownership in his property, his business and livelihood without due process and without just compensation. Defendants did this intentionally, recklessly and in bad faith to enrich themselves and destroy

Plaintiff business and property ownership.

202.    Adams, CRG and County individually, and collectively maintained the code violations case against Plaintiff with the intent of enriching themselves by draining the equity from the property based on County and receivership attorneys' fees.  For example, Adams and CRG applied for approximately $250,000 in receivership certificates with no intent to remedy or abate any code violations and use such certificates to create liens on Plaintiff's properties with the bad faith aim of draining the equity from the property and forcing a foreclosure or sale.  On information and belief, County, Adams and CRG are claiming they are owed approximately $700,000 in fees, one of which was used to remediate or abate any of the alleged code violations.  The code violation case was a pure land grab with the intent to enrich County officials, private law firms, and the receivership.

203.    Even if there were any alleged minor code violations, the total cost of repair approximated $8000. But the Defendants had no intent on abating or remedying code violations. They acted under the color of law to force a sale of property worth potentially millions of dollars when the actual cost of abatement, which itself was false and exaggerated was nominal.  These actions have resulted in Plaintiff becoming homeless and losing the equity and value of his properties, business and land.

204.    Defendants under the color of law, ejected Plaintiff Cox out of his home and prevented him from returning, while causing waste and damage to the property, failing to remediate any alleged code violation, and running up a $700,000.00 plus bill for their charges, and causing the State Court to order a sale of the Property for a price far below its market value, thus insuring Plaintiff Cox would remain homeless, and be deprived not only of the Property, but any value upon its sale.

205.    These intentional, malicious, bad faith and reckless actions by County, Adams and CRG were the direct and/or proximate cause of Plaintiff Cox being ejected from his real property, loss and destruction of Plaintiff's real and personal property, and devaluation of his real

206.    Based on the aforementioned conduct, Plaintiff are entitled to actual, general and punitive damages an amount to be proven at trial.

COMPLAINT BY PLAINTIFF JERRY COX

1    207.    WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

2

3    **FIFTH CLAIM FOR RELIEF -SLANDER OF TITLE**

4    **(Plaintiff Against Defendants County, Adams and CRG, and Does 1-25)**

5

6    208.    Plaintiff incorporates by reference and realleges each paragraph and every allegation

7    contained above, as though fully set forth herein.

8    209.    Defendants County, Adams and CRG published false and unprivileged statements

9    harmful to Plaintiff's interest in, title to, and possession of the Property, a tangible and intangible

10   asset of pecuniary value.

11   210.    By virtue of letters, and other paper and electronic correspondence with counsel for

12   MC, Plaintiff, third parties and others, electronic publications on their public websites, described

13   above, and the purported filings, exhibits and electronic pictures and videos appended to that

14   correspondence, Defendant Adams and CGR published false and unprivileged statements

15   concerning title and access to Plaintiff's Property, and to the use of their Property. Defendants also

16   falsely stated to third parties that Defendant Adams and Defendant CRG were entitled to keep and

17   sell Plaintiff's property. Moreover, Defendants Adams and CRG falsely negated Plaintiff 's

18   entitlement to, or interest in the Property. In violation of the Recevership Order, Defendants Adams

19   and CRG also wrongfully listed Plaintiff's Property for sale, and have otherwise prevented Plaintiff

20   from possessing, living on and otherwise using their Property.

21   211.    The Property described in the preceding paragraphs is a transferable asset with

22   substantial pecuniary value.

23   212.    Defendants' unprivileged publication of false statements described in the preceding

24   paragraphs resulted in actual pecuniary loss to Plaintiff in an amount to be proven at trial, including

25   but not limited to the expenditures, efforts and inconveniences involved in restoring Plaintiff

26   entities' title to, and possession and control of, the aforementioned assets, and the attorney fees and

27   other costs of prosecuting this lawsuit seeking a judicial declaration of the status of these assets as

28   well as an injunction to prevent Defendants from further interference with the Plaintiff's assets.

213.    Defendants County, Adams and CRG together agreed that Defendants Adams and CRG would execute the acts described in. the preceding paragraphs. Defendants knew that these acts were wrongful because, for example, they constituted slander of title, and nonetheless agreed that these acts should be committed and intended that Defendants County, Adams and CRG commit them.

214.    Defendants' unprivileged publication of false statements described in the preceding paragraphs were made with knowledge of their falsity and with the intention that they would result in harm to Plaintiff's interests, or with the recognition that they were likely to do so.

215.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

216.    Defendants' unprivileged publication of false statements described in the preceding paragraphs was willful and malicious and justifies an award of punitive damages in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF FOR BREACH OF FIDUCIARY DUTY
**(Plaintiff Against Defendants County, Adams and CRG, and Does 1-25)**

217.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

218.    By virtue of their purported assumption of roles as receivers of Plaintiff's Property, Defendants voluntarily assumed a position of trust and confidence vis-a-.-vis Plaintiff.

219.    By holding themselves out as Receivers of Plaintiff's Property with the sole authority to possess, manage, rehabilitate, safeguard, prevent waste, and secure, and purporting thereby to accomplish the foregoing, Defendants Adams and CRG assumed a fiduciary duty to Plaintiff, which they breached by acting in the manner described above.

220.    By engaging in the acts described above, without the consent of Plaintiff entities, Defendants misused and abused their assumed position of trust and confidence, and breached their fiduciary duties to Plaintiff.

221.    Defendants together agreed that they would execute the acts described in the

preceding paragraphs. Defendants knew that these acts were wrongful because, for example constituted a breach of each Defendant's fiduciary duties, and nonetheless agreed that these acts should be committed and intended that they be committed. Moreover, by engaging Defendants Adams and CRG to act as a public entity on its behalf, and in concert with it, County, also aided and abetted and otherwise gave substantial assistance or encouragement to Defendants Adams and CRG in their breach of their fiduciary duties.

222.    As a direct result of Defendants' breach of their assumed fiduciary duties, Plaintiff has suffered harm in an amount to be proven at trial, including but not limited to the expenditures, efforts and inconveniences involved in stopping Defendants' breach of duty, and mitigating the damages caused by Defendants' breach, and the attorney fees and other costs of prosecuting this lawsuit seeking a vindication of Plaintiff's rights and interests as the owners of the Property.

223.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

224.    Defendants' breach of fiduciary duties was willful and malicious and justifies an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF
## (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)
### (Plaintiff Against Defendants County, Harris, Adams and CRG, and Does 1-25)

225.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

226.    During the relevant time period, Plaintiff had an economic relationship with various third parties, including with purchasers of bison and agritourism customers, with the probability of future economic benefit to Plaintiff, including by way of the sale of bison raised on the Property by Plaintiff and the use of the Property in the agritourism business.

227.    Defendants were aware of the existence of the economic relationship between

1   Plaintiff and their bison purchasers, as well as his interests in JDC Land Holdings LLC and

2   favorable reputation in the agritourism business, as described above.

3        228.   Defendants deliberately took actions designed to disrupt the relationship between

4   Plaintiff and their bison purchasers, as well as interfering in Plaintiff's burgeoning business, JDC

5   Land Holdings LLC, and favorable reputation in the agritourism business, by making false

6   allegations, taking possession of Plaintiff's Property, farm and business, and preventing Plaintiff

7   from developing a bison herd for sales, by purporting to speak as quasi government entities about

8   Plaintiff's alleged poor management of the Property and claiming it was unsafe for the public, and

9   engaged in wrongful conduct including but not limited to their publication of injurious false

10  statements, slander of title, breach of fiduciary duties (as discussed herein), violation of California

11  Corporations Code Sections 1507 and 2254, and violation of California Penal Code Section 115.

12       229.   Defendants deliberately took actions designed to disrupt the relationship between

13  Plaintiff and their bison purchasers, as well as interfering in Plaintiff's ownership interests and

14  business interests in JDC Land Holdings, LLC.  For example, Defendants failed to pay property

15  taxes, business taxes, neglected the animals and property and farm, and made unprivileged

16  statements that Plaintiff was a criminal or alleged rapist and that his Bison Creek Ranch was

17  dangerous and a supposed threat to public health and safety, knowing these allegations were false.

18       230.   Defendants together agreed that they would execute the acts described in the

19  preceding paragraphs. Defendants knew that these acts were wrongful because, for example, they

20  constituted interference with prospective economic advantage, and nonetheless agreed that these

21  acts should be committed and intended that they be committed.

22       231.   Defendants' conduct in this regard was intentional, wrongful and designed to disrupt

23  Plaintiff's business relationships with third parties, including his visitors to his agritourism business

24  and bison purchasers.

25       232.   Defendants' conduct harmed Plaintiff and caused pecuniary damage in an amount to

26  be determined at trial, including by reason of the expenditures, efforts and inconveniences involved

27  in interfering in Plaintiff's economic relationships with visitors to his agritourism business and

28  bison purchasers.

COMPLAINT BY PLAINTIFF JERRY COX

233.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

234.    Defendants' acts described in the preceding paragraphs were oppressive, malicious and/*or* fraudulent, thereby justifying an award of punitive damages.

## **EIGHTH CLAIM FOR RELIEF FOR CONVERSION**

### **(Plaintiff Against Defendants County, CRG, Adams AND Does 1-25)**

235.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

236.    Defendants intentionally and substantially interfered with Plaintiff's property and assets by falsely alleging numerous code violations at Plaintiff's property, that such code violations endangered the public, that the code violations would cost more than $250,000.00 to remediate, that a receivership needed to be set up and that Defendants CRG and Adams, under supervision and direction from County, needed to be appointed as receivers. Defendants, under the color of law, ejected Plaintiff Cox out of his home and prevented him from returning, while causing waste and damage to the property, failing to remediate any alleged code violation, and running up a $700,000.00 plus bill for their charges, and causing the State Court to order a sale of the Property for a price far below its market value, thus insuring Plaintiff Cox would remain homeless, and be deprived not only of the Property, but any value upon its sale.

237.    Plaintiff did not consent to Defendants' use of possession and use of the Property, nor its sale to repay the Defendants' bogus $700,000.00 plus bills.

238.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

239.    As a direct and proximate result of Defendants' conduct, Plaintiff has been harmed in an amount to be proven at trial, but in excess of the jurisdictional minimum of the Court.

240.    Defendants engaged in the aforementioned acts maliciously, callously, oppressively,

wantonly, recklessly, fraudulently, with deliberate indifference of the truth, and despicably and with evil motive or intent, and in disregard of the rights of Plaintiff. Plaintiff are therefore entitled to an award of punitive damages.

WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

### NINTH CLAIM FOR RELIEF FOR UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS ACTS AND PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200

**(Plaintiff Against Defendants County, CRG, Adams and Does 1-25)**

241.     Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

242.     Defendants' acts and practices as detailed above constitute acts of unfair competition. Defendants have engaged in an unlawful, unfair or fraudulent business act and/or practice within the meaning of California Business & Professions Code §17200.

243.     Defendants have engaged in an "unlawful" business act and/or practice by engaging in the conduct set forth above. These business acts and practices violated numerous provisions of law, including, *inter alia*, state and federal laws as set forth above, California Civil Code §1709-10, as well as operate as a systemic breach of fiduciary duty. Plaintiff reserve the right to identify additional violations of law as further investigation warrants.

244.     Through the above-described conduct, Defendants have engaged in "unfair" business acts or practices in that the justification for such actions and the refusal to notify the general public of the true facts, either in the past or presently, based on the business acts and practices described above is outweighed by the gravity of the resulting harm, particularly considering the available alternatives, and/or offends public policy, is immoral, unscrupulous, unethical and offensive, or causes substantial injury to consumers.

245.     By engaging in the above-described conduct, Defendants have engaged in a "fraudulent" business act or practice in that the business acts and practices described above had a

tendency and likelihood to mislead the courts and the general public. Defendants need only to have violated one of the three provisions set forth above to be strictly liable under this Cause of Action.

246.    The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public. Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

247.    Pursuant to California Business & Professions Code §17203, Plaintiff, on behalf of the general public, seek appropriate equitable monetary relief may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. as the court deems just and appropriate to all persons with a vested interest therein.

248.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

### TENTH CLAIM FOR RELIEF FOR RICO VIOLATION
18 U.S.C. §1961 (b)
(**Plaintiff Against Defendants County, CRG, Adams and Does 1-25**)

249.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

250.    This claim arises under 18 U.S.C. §§1962(b), (c) and (d) which provide in relevant part:

(b) It shall be unlawful for any **person** through a pattern of **racketeering activity** or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any **person** employed by or associated with

any **enterprise** engaged in, or the activities of which affect, interstate or foreign commerce, to

60

1    conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

2    through a pattern of racketeering activity or collection of unlawful debt.

3    And

4    (d) It shall be unlawful for any person to conspire to violate any of the provisions of

5    subsection (a), (b), or (c) of this section.

6    251.    In engaging in the actions and conduct alleged in this Complaint one or more persons

7    at County , Defendants CRG and Adams, and Does 1-25, through the commission of two or more

8    predicate acts, derived income and are seeking to derive income directly or indirectly from a

9    pattern of racketeering or the collection of an unlawful debt by forcing the sale of Plaintiff's

10    Property to satisfy their $700,000.00 plus bill for services they never performed in a receivership

11    set up under false allegations of code violations that did not exist, and participated directly or

12    indirectly in activities which affected interstate commerce.  Said enterprise is engaged in and

13    continues to engage in activities which affect interstate commerce through the use of mails and

14    interstate wires, including but not limited to the CLETS databases and internet wires and

15    communications

16    252.    Defendants CRG and Adams, and one or more persons at County operated the

17    subject receivership through a pattern of racketeering activities, including:

18    18 USCS § 1503 (relating to obstruction of justice in falsely asserting in formal legal

19    proceedings that 101 code violations existed at Plaintiff's Property, that they have legitimately

20    generated  $700,000.00 plus bills for supposedly remediating the non-existing code violations and

21    otherwise falsely claiming they engaged in caring, preserving and safeguarding the property);

22    18 USCS § 1512 (relating to tampering with a witness, victim, or an informant, in tampering

23    with contractor witnesses, neighbor witnesses, security guard witnesses, and Plaintiff Cox);

24    18 USCS § 1510] (relating to obstruction of criminal investigations in one or more persons

25    at County  and County S obstructing the criminal investigation of Plaintiff's alleged rape of Harris,

26    the search warrants for which served to provide fodder for the sham receivership)

27    18 USCS § 1511] (relating to the obstruction of State or local law enforcement, relating to

28    obstruction of criminal investigations in one or more persons at County obstructing the criminal

61

investigation of Plaintiff's alleged rape of Harris, the search warrants for which served to provide fodder for the sham receivership)

18 USCS §§ 891–894 (relating to extortionate credit transactions, in generating bills of more than $700,000.00 for doing nothing and then demanding immediate payment from Plaintiff after Plaintiff's means of generating income were destroyed in Defending against the false criminal allegations of rape, and then forcing the sale of Plaintiff Cox's home and Plaintiff's Property when Plaintiff were unable to pay the outrageous sum)

18 USCS § 1341 (relating to mail fraud engaging in numerous acts of mail fraud throughout the course of the sham receivership),

18 USCS § 1343 (relating to wire fraud engaging in numerous acts of wire fraud throughout the course of the sham receivership),

18 USCS § 1344 (relating to financial institution fraud in obtaining certificates, as alleged herein, by falsely representing that funds were needed to remediate phony code violations when the receiver in truth never remediated a single code violation at the Property but instead failed to protect and preserve the Property and caused damage and waste)

18 USCS § 1513 (relating to retaliating against a witness, victim, or an informant Defendants actions in essentially stealing Plaintiff's Property, are retaliating against Plaintiff Cox for resisting criminal prosecution and resisting Defendants' claims in the receivership proceedings)

18 USCS § 1951 (relating to interference with commerce, robbery, or extortion, in interfering with Plaintiff's running a ranch operation on the Property)

18 USCS § 1961 (A) (relating to state law crimes punishable for more than one year: In California extortion, public officials acting under color of law to compel a person to give up money or property, punishable by imprisonment for 2-4 years Cal Penal Code Section 518; when County and one or more persons at County, Defendants CRG and Adams, all acting as public officials purporting to compel Plaintiff to give up both money and their Property).

In undertaking the aforementioned actions, Defendants, and each of them, conspired to commit, and committed predicate acts under at least the following:

18 USCS §1503 (relating to obstruction of justice) in, among other things as alleged

62

herein, suppressing exculpatory evidence that Plaintiff Cox never raped, kidnapped or held

Harris involuntarily; in Defendants MC, CRG and Adams claiming hundreds of thousands of

dollars in phony code violations in order to acquire substantial interest in  and possession of

Plaintiff's real property;  suppressing the actual bid for phony invoices and running up an

exorbitant bid for repairing phony code violations none of which were addressed, inflated

receivership and legal fees for unnecessary services and services not rendered to the property,

abuse of the receivership, unnecessary, inflated and abusive security costs, and more, all

calculated, planned and designed not to remedy code violations and return the property to

Plaintiff, but to acquire ownership and control in Plaintiff's property and deprive Plaintiff of

the ownership, enjoyment, use and control of their property;

18 USCS §1510 (relating to obstruction of criminal investigations) including but not

limited to, as alleged herein, suppressing exculpatory evidence that Plaintiff Cox never raped,

kidnapped or held Harris involuntarily;

18 USCS §1511 (relating to the obstruction of local law enforcement) including but not

limited to, as alleged herein, suppressing exculpatory evidence that Plaintiff Cox never raped,

kidnapped or held Harris involuntarily; utilizing phony criminal proceedings against Plaintiff

to coordinate and conspire among law enforcement Defendants and MC, CRG and Adams to

use phony charges against Plaintiff Cox as an excuse to obtain a secret warrant to search

Plaintiff's property to look for phony code violations as a   prelude to taking Plaintiff's

property as alleged herein while Plaintiff Cox was jailed and unable to defend Plaintiff's

interest in their property.

18 USCS §1512 (relating to tampering with a witness, victim) including but not limited

to, as alleged herein, suppressing exculpatory evidence that Plaintiff Cox never raped,

kidnapped or held Harris involuntarily;

253.    As a result of the foregoing, Plaintiff has been injured in their business or property

through the use of the racketeering income in an amount to be proven at trial, but not less than

$75,000, said damages to be trebled to not less than $225,000 under 18 U.S.C §1964, together with

interest and attorneys' fees.

WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

## ELEVENTH CLAIM FOR RELIEF –
## CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS

### (Plaintiff Against All Defendants and Does 1-25)

254.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

255.    The Defendants had a common plan and scheme to destroy Cox, render him homeless, and take his property.

256.    Plaintiff Cox alleges that Harris conspired with Defendants and County officials, including deputies Atkinson and Smith with a common plan and scheme to deprive him of his federal constitutional rights as alleged herein, by agreeing, among other things to have Cox wrongfully arrested, by hiding, compromising or destroying exculpatory evidence (including text messages and social media posts), having Plaintiff incarcerated, subject to prosecution without probable cause and for other deprivation of rights as alleged herein.

257.    Harris and County officials, including Atkinson and Smith had a common plan and scheme to violate Plaintiff's federal constitutional rights and cause injury to Plaintiff's person, properties, reputation, livelihood and business by furthering criminal allegations that Harris and County knew to be false.  Harris met and communicated regularly with County officials, including Atkinson and Smith with the express aim of having Cox arrested, jailed and removed from his property.  The County and its officials, e.g., including the Board of Supervisors, encouraged the false allegations and the case against Cox with the express aim and intent of removing him from his property and eventually selling the ranch from a criminal forfeiture or civil proceeding.

258.    Harris and County officials, including Atkinson and Smith, engaged in a common plan and scheme to deprive Plaintiff of his constitutional rights by perpetuating the false criminal action against Plaintiff Cox based on fabricated evidence, false testimony and abuse of laws intended to protect actual victims of sexual assault and violence.

259.    Harris and the Defendants' actions were the actual, direct and/or proximate cause of harm and damages to Plaintiff, including the loss of his liberty, reputation, livelihood and business.

260.    Plaintiff Cox and JDC Land allege that County officials, including Steven Dahlem and members of the Board of Supervisors, including Marshall Long and Merlin Jones, conspired with Defendants CRG and Adams with a common plan to bring a phony health and safety code violation case (receivership action) to deprive Plaintiff of their constitutional rights as alleged herein, including Plaintiff's property rights, livelihood and business, with the specific intent and aim to deprive Plaintiff of his property, home, farm, animals, and personal property.

261.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

262.    Defendants actions were the actual, direct and/or proximate cause of harm and damages to Plaintiff, including the loss of Cox's livelihood, business, reputation, home and properties.

WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

## **TWELFTH CLAIM FOR RELIEF – NEGLIGENCE**

### **(Plaintiff Cox Against all Defendants and Does 1-25)**

263.    Plaintiff incorporates by reference and realleges each paragraph and every allegation contained above, as though fully set forth herein.

264.    Defendants had a duty to Plaintiff to use reasonable care, *inter alia,* to be truthful in their reporting, to properly gather evidence and investigate Harris' allegations, and to comply with the law.

265.    Defendant Adams and CRG also had fiduciary duties to Plaintiff.

266.    By committing the aforementioned acts, Defendants breached said duties to Plaintiff.

267.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

268.    Plaintiff has suffered damages as a result of said breaches.

WHEREFORE, Plaintiff pray for relief against Defendants as set forth below.

**THIRTEENTH CLAIM FOR RELIEF – NEGLIGENT HIRING, SUPERVISION AND TRAINING**

**(Plaintiff Cox Against County and MCS and Does 1-25)**

269.    Plaintiff incorporates by reference each and every allegation contained above as though fully set forth herein.

270.    Defendants County and MCS had a duty to adequately train, supervise and discipline their police officers in order to protect members of the public, including Plaintiff, from being harmed by the actions of their police employees.  These Defendants were deliberately indifferent to such duties and thereby proximately cause the harm to Plaintiff as alleged herein.

271.    Plaintiff are informed and believe and thereon allege, that in doing the acts alleged above, Defendants knew, or in the exercise of reasonable diligence should have known, that Defendants Atkinson and Smith were incompetent and unfit to perform the duties for which they were employed and that an undue risk to persons such as Plaintiff would exist because of the employment.

272.    Defendants County and MCS, by and through those employees and agents who trained and/or supervised Atkinson and Smith, failed to exercise reasonable care when training and supervising them.

273.    As a proximate and direct legal result of Defendants County and MCS' negligence as alleged herein, Plaintiff has suffered the harm alleged in this Complaint, in an amount to be determined at trial, but in excess of the minimum jurisdictional limits of this court.

274.    Plaintiff are informed and believes and thereupon alleges that Defendants had advance knowledge of Defendant Atkinson and Smith's propensity for false reporting, suppression of evidence, and failure to adequately investigate, as they have a history of such acts, and the Defendants knew, or should have known, of such history, which made them unsuitable for employment with County and MCS.

275.    Despite this advance knowledge, Defendants County and MCS retained Atkinson and Smith as employees in conscious disregard of the rights and safety of others, and of Plaintiff.

276.    The County is also liable under a theory of *respondent superior* for the actions of its employees and agents.

WHEREFORE, Plaintiff pray for judgment against Defendants, and each of them, as herein set forth.

## FOURTEENTH CLAIM FOR RELIEF –MONELL CLAIM

### (Plaintiff Cox Against County and MCS and Does 1-25)

277.    Defendants in their official capacity knowingly, or grossly negligently, or with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in this pleading, and/or improperly, inadequately, with deliberate indifference to the state and/or federal constitutional or statutory rights of persons, grossly negligently with reckless disregard to state or federal constitutional and/or statutory rights, failed to properly train, to supervise, to retrain if necessary, to monitor, or to take corrective action with respect to the police and with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by Plaintiff pursuant to the principals set for the in *Monell v. New York City Dept. of Social Services* and its progeny.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray as follows:

1.    That process be issued and served as provided by law, requiring Defendants, and each of them, to appear and answer or face judgment;

2.    For general, special, actual, and compensatory damages against Defendants in an amount to be determined at trial;

COMPLAINT BY PLAINTIFF JERRY COX

3.   For punitive damages against the individual Defendants in an amount to be determined at trial sufficient to punish, penalize and/or deter Defendants and others from engaging in the conduct described herein;

4.   For treble damages, interest and attorneys' fees pursuant to 18 U.S.C §1964;

5.   For costs and expenses of this litigation;

6.   For reasonable attorneys' fees and costs pursuant to statute;

7.   For pre and post-judgment interest on all damages and other relief awarded herein from all entities against whom such relief may be properly awarded;

8.   For declaratory and injunctive relief against future violations of Plaintiff's constitutional rights; and,

9.   For such other relief as the Court deems just and proper.

## **REQUEST FOR A JURY TRIAL**

Plaintiff respectfully request a trial by jury on all matters so triable.

DATED:  August 12, 2019                     Respectfully submitted,

By: _____
Kenneth Frucht
Geonetta & Frucht LLP
Attorneys for Plaintiff

COMPLAINT BY PLAINTIFF JERRY COX