1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

JERRY COX, an individual

            Plaintiff,

    vs.

MARIPOSA COUNTY; MARIPOSA
COUNTY SHERIFF'S OFFICE; SHERIFF
DEPUTY WILLIAM ATKINSON; SHERIFF
DEPUTY WESLEY SMITH; ASHLEY
HARRIS; CALIFORNIA RECEIVERSHIP
GROUP; MARK ADAMS; and DOES 1
through 100, inclusive,

            Defendants.

**CASE NO. 19-CV-01105-AWI-BAM**

**ORDER DENYING SPECIAL MOTION
TO STRIKE BY DEFENDANTS
MARIPOSA COUNTY, MARIPOSA
COUNTY SHERIFF'S OFFICE,
SHERIFF DEPUTY WILLIAM
ATKINSON, AND SHERIFF DEPUTY
WESLEY SMITH**

(Doc. No. 14)

## **INTRODUCTION**

In 2015, Mariposa County (the "County") brought criminal charges against Plaintiff Jerry Cox ("Cox") in connection with a rape that allegedly occurred on property owned by Cox (the "Property"). The charges were ultimately dropped, but while the criminal case was still pending, the County secured an expansive civil warrant to inspect the Property, identified more than 100 putative code violations, and initiated a receivership (the "Receivership") in which Mark Adams ("Adams") and his company, California Receivership Group ("CRG," and together with Adams, the "Receiver") were tasked with bringing Cox's property up to code. The Receiver ultimately put the Property on the market to recover many thousands of dollars in costs relating to the Receivership, and Cox found himself destitute and homeless.

Cox filed this action on August 12, 2019 alleging multiple claims under state and federal

law against the County, the Mariposa County Sheriff's Office ("MCS"), and two sheriff's deputies (the County, MCS and two sheriff's deputies are referred to herein as the "County Defendants"), as well as Adams, CRG and Cox's alleged victim, Ashley Harris ("Harris"). This Order addresses the County Defendants' special motion to strike pursuant to section 425.16 of the California Code of Civil Procedure.[1] Doc. No. 14. For the reasons set forth below, the Court will deny the motion.

## BACKGROUND

### I.  Factual Background[2]

The following summary is distilled from declarations and exhibits filed in connection with this motion,[3] with occasional reference to allegations in the Complaint.[4] The Court notes that neither side filed evidentiary objections and does not believe that any of the facts below are in dispute, but any such disputes would not affect the outcome of this motion.

Cox purchased Bison Creek Ranch, which comprises three parcels totaling more than 400

---

[1] Unless otherwise noted, all references herein to the "section 425.16" are to section 425.16 of the California Code of Civil Procedure.

[2] The County Defendants seek judicial notice for a document identified as the grant deed for the Property, the Verified Complaint for Nuisance Abatement and Receivership ("Verified Complaint") that the County filed in Mariposa Superior Court on March 13, 2017 in connection with the Property, and the Order Appointing Receiver issued by the Mariposa Superior Court on July 17, 2017. Doc. No. 14, page 35 of 123. As to the grant deed, the request is denied as irrelevant since the Court made no use of the grant deed in deciding this motion. See Neylon v. County of Inyo, 2016 WL 6834097, at *4 (E.D. Cal. Nov. 21, 2016). As to the Verified Complaint and Order Appointing Receiver, the request is granted pursuant to Rule 201(b)(2) of the Federal Rules of Civil Procedure. See Trigueros v. Adams, 658 F.3d 983, 987 (9th Cir. 2011). The County Defendants also seek judicial notice for a claim that Cox purportedly filed with the County on June 17, 2019 regarding the subject matter of this case. Doc. No. 28-1. That request is denied as irrelevant since the Court made no use of the claim in deciding this motion. See Neylon, 2016 WL 6834097, at *4.

Cox, for his part, seeks judicial notice for a claim Cox purportedly filed with the County on June 7, 2016. Doc. No. 30. That request is denied as irrelevant since the Court made no use of the claim in deciding this motion. See Neylon, 2016 WL 6834097, at *4.

[3] The portion of the docket pertaining to this motion is in disarray. Henceforth, any notice of motion shall be filed as a separate document, as shall any opening, opposition, or reply memorandum. Each request for judicial notice and each declaration will also be filed as a separate document, with each exhibit thereto filed as a separate attachment, such that if the Declaration of Joe Smith is filed as Document 30, Exhibit A to the Declaration of Joe Smith will be filed as Document 30-1, Exhibit B to the Declaration of Joe Smith will be filed as Document 30-2 and so forth. Further, all filings shall be labeled properly and in a manner that is clear and useful to the Court, using the tools available through the ECF system.

[4] Subdivision (b)(2) of section 425.16 of the California Code of Civil Procedure provides that courts "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based" in deciding a motion brought under section 425.16.

acres in Mariposa, California in 2000 (the "Property"). Doc. No. 26, page 2 of 135, ¶¶3-4. At all times relevant to this action, the Property has been owned by either Cox or JDC Land Company, LLC ("JDC Land Company"), a California limited liability company of which Cox is the principal and 100% owner.[5] See No. 26, page 2 of 135, ¶ 3.

The Property was zoned for "Agricultural Production Use and Compatible Uses" under California's Williamson Act in 1990. Doc. No. 26, page 2 of 135, ¶¶ 3, 4. Cox contends that the Property has since been used only for agritourism, but the County maintains that the Property has been used for short term rentals without proper permitting and that transient occupancy taxes are owed on the Property. Doc. No. 26, page 2 of 135, ¶ 5.

### A. November 2015: Criminal Case Against Cox

In November 2015, the MCS arrested and jailed Cox for allegedly raping Harris on the Property. Doc. No. 26, page 5 of 135, ¶¶ 10-11. In 2015 and 2016, the County filed criminal complaints in Mariposa Superior Court charging Cox with multiple felonies in connection with the alleged incident, including forcible rape with a special allegation of great bodily injury, kidnapping, criminal threats and battery. Doc. No. 1 ¶ 74.

Nearly two years of contentious discovery ensued, in which Cox claims the MCS and the County failed to collect and divulge exculpatory evidence. Doc. No. 26, page 5 of 135, ¶¶ 11-12. At some point, deposition testimony came to light indicating that Harris had lied under oath, and on August 14, 2017, the County dismissed the criminal case against Cox pursuant to section 1385 of the California Penal Code (which provides for dismissal of a criminal action "upon the application of the prosecuting attorney"). Id.; see also Cal. Penal Code § 1385.

### B. October 13, 2016: Civil Warrant for Inspection of the Property

On October 13, 2016—while the criminal case against Cox was still pending—the County secured a civil search warrant for the Property (the "Warrant"), Doc. No. 25, page 80 of 97, which stated, in pertinent part, as follows:

> THIS INSPECTION WARRANT IS HEREBY DIRECTED TO any Code Enforcement Officer, Building and Safety Official or Inspector, Fire Inspector,

---

[5] The precise manner in which title to the Property is held is not germane to this motion.

Environmental Inspector, Planning or Zoning Inspector, Animal Control Officer …, Health Officer, Tax Officer, Assessor, Peace Officer and/or any other law enforcement related agent or agent of the County (collectively "You").

YOU ARE HEREBY COMMANDED TO conduct an inspection of the Subject Property as authorized by Code of Civil Procedure sections 1822.50 through 1822.60 ("Inspection"). The Inspection shall include all areas of the interior and exterior of all buildings, structures, homes, houses, rooms, barn, garages, vehicles, basements, attics, sheds, units, open fields, yards, storage facilities, compartments, drawers, cabinets, papers, and electronic files located on the Subject Property.

Doc. No. 25, page 80 of 97.

The Warrant was based on declarations of the Mariposa County Planning Director, Sarah Williams ("Sarah Williams Declaration"); the Mariposa County Building Director, Michael Kinslow ("Kinslow Declaration"); the Mariposa County Director of Environmental Health, David Conway ("Conway Declaration"); and the Mariposa County Treasurer, Tax Collector, and County Clerk, Keith Williams ("Keith Williams Declaration"). Doc. No. 24, page 78 of 97.

     *1.  Sarah Williams Declaration*

The Sarah Williams Declaration stated that Ms. Williams had been the Planning Director with the Mariposa County Planning Department for more than four years, Doc. No. 25, page 85 of 97, ¶¶ 1-2, and that the following inspection activity had occurred on the Property:

- <u>June 3, 2008</u>: the County Planning Department "discovered violations of [] applicable zoning regulations and unauthorized transient rental use of the [] Property" and "sent the Owner a notice [] ordering that the [] Property be brought into compliance with the law," Doc. No. 25, page 86 of 97, ¶ 5;

- <u>August 12, 2008</u>: the County Building Department and California Department of Forestry and Fire Protection "determined that certain buildings were not properly constructed in accordance with code specifications" and the Building Department "issued a notice … ordering that the structures be brought into compliance," <u>id.</u>, page 86 of 97, ¶ 6;

- <u>August 25, 2008</u>: the Building Department "confirmed that [] building violations remained on the [] Property," "further observed that a designated agricultural storage building was being used for human occupancy," and "issued another notice to the Owner and Property Manager … ordering that the [] Property be brought into

4

compliance," id., page 86 of 97, ¶ 7;

- October 26, 2011: the Mariposa County District Attorney's Office "conducted an aerial inspection of the [] Property," id., page 86 of 97, ¶ 10;

- November 9, 2011: the Mariposa County District Attorney's Office "re-inspected the [] Property" in some unspecified fashion, id., page 86 of 97, ¶ 11;

- January 27, 2012: the Building Department and County Health Department "inspected the [] Property" in some unspecified fashion, id., page 86 of 97, ¶ 12;

- January 31, 2012: the County Assessor and Recorder's Office "inspected the [] Property" in some unspecified fashion, id., page 87 of 97, ¶ 13; and

- February 2, 2012: the County Health Department "re-inspected the [] Property." Id., page 87 of 97, ¶ 14.

In addition to the foregoing, the Sarah Williams Declaration states that on September 1, 2015, a sheriff's deputy inspected the Property "as part of a criminal investigation of a damaged power meter" and "confirmed that a number of [] violating conditions continued to persist on the [] Property, including unpermitted construction, electrical hazards, land use and zoning violations, and unlawful transient occupancy." Doc. No. 25, page 88 of 97, ¶ 19.

> 2. *Kinslow Declaration*

The Kinslow Declaration states that Mr. Kinslow had been the Building Director for the County of Mariposa since 2010, Doc. No. 25, page 91 of 97, ¶¶ 1-2, and that the following inspection activity had taken place on the Property:

- August 12, 2008: inspectors from the County Building Department and the Department of Forestry and Fire Protection inspected the Property, "determined that certain buildings were not properly constructed in accordance with code specifications," and "issued a notice … ordering that the structure be brought into compliance," Doc. No. 25, page 91 of 97, ¶ 5;

- August 25, 2008: the Building Department "re-inspected the [] Property, [] confirmed that the building violations remained, [] further observed that a designated agricultural storage building was being improperly used for human

5

occupancy" and issued a notice ordering that the Property be brought into compliance, id., page 92 of 97, ¶ 6;

- January 27, 2012: Kinslow himself inspected the Property and observed the "[u]permitted construction of a barn, gazebo, deck and a metal agricultural storage facility," as well as "unlawful occupancy of a designated agricultural storage facility." Id., page 92 of 97, ¶ 8.

### 3. Conway Declaration

The Conway Declaration states that Mr. Conway had been the Director of Environmental Health with the County since 2010. Doc. No. 25, page 96 of 97, ¶¶ 1-2.

As to inspections, Mr. Conway states that he inspected the Property with Mr. Kinslow on January 27, 2012 and "observed that a transient rental occupancy business was operating on the [] Property." Doc. No. 24, page 96 of 97, ¶ 4. Further, Mr. Conway states that "[o]n March 19, 2015, the Health Department received a written complaint confirming that food was continuing to be served to guests on the [] Property," Doc. No. 25, page 96 of 97, ¶ 5, and that "[b]ased on online advertisements and reviews about the [] Property …, [Mr. Conway] believe[d] that an unpermitted food facility [was] [] being operated on the [] Property in conjunction with the transient rental occupancy …." Id., page 96 of 97, ¶ 4.

### 4. Keith Williams Declaration

The Keith Williams Declaration states that Mr. Williams was employed as the Treasurer, Tax Collector and Clerk with the County since 2007. Doc. No. 25, page 82 of 97, ¶¶ 1, 2. Further, Mr. Williams states that he was "aware that the [] Property [wa]s being actively mark[et]ed for transient rental occupancy," but that County records shows that "no Transient Occupancy Registration Certificate ha[d] been … issued for the [] Property" and that no tax had been paid on rental income for the Property. Id., page 83 of 97, ¶ 6.

### C. Notices Regarding the Property in 2008

The record also includes a letter that the Mariposa Building Department apparently sent to JDC Land Company on July 16, 2008 and a letter that the Mariposa County Building Department apparently sent to JDC Land Company on August 12, 2008. Doc. No. 21, page 40 of 51, ¶¶ 2-3,

Exhs. 1 and 2. Both letters pertain solely to the improper use for human habitation of agricultural structure "designed and constructed to house farm implements, hay, grain, poultry, livestock or other horticultural products." Id. The second of these letters appears to be the August 12, 2008 letter that Ms. Williams characterizes in her declaration as ordering that multiple "structures be brought into compliance." See Doc. No. 25, page 86 of 97, ¶ 6.

**D.  December 2, 2016 Notice and Order to Repair or Abate 101 Violations**

The Warrant was executed on October 14, 2016. Doc. No. 14, page 38 of 123, ¶ 11. On Friday, December 2, 2016, the County issued a Notice and Order to Repair or Abate ("N&O") based on the October 14, 2016 search that identified 101 "dangerous violations" in connection with seven structures and various other aspects of the Property. Id.; Doc. No. 14, page 51 of 123. The Court lists each of the purported violations here because there is no way to adequately convey their scope and magnitude in summary form:

Structure 1: Office / Residential Unit

    1.  Damaged Floor Supports.

    2.  Dilapidated Exterior Stairway.

    3.  Substandard Interior Stairway.

    4.  Hazardous Electrical Wiring.

    5.  Unpermitted Plumbing Installations.

    6.  Unsafe Sewage Disposal.

    7.  Unauthorized Sewage Disposal.

    8.  Accumulation of Junk and Debris.

    9.  Rodent and Insect Harborage.

    10. Unsecured Hazardous Chemicals.

    11. Combustible Materials.

    12. Blocked and Inadequate Egress.

    13. Missing Fire Suppression System.

    14. Lack of Smoke Detectors.

    15. Lack of Carbon Monoxide Detectors.

16. Unpermitted Construction.

17. Unlawful Occupancy.

18. General Dilapidation and Lack of Maintenance.

19. Unauthorized Commercial Use.

20. Unauthorized Residential Use.

Structure 2: Upper Residential Unit

21. Defective Flooring.

22. Damaged Ceiling and Roof Supports.

23. Unpermitted Construction.

24. Hazardous Septic System.

25. Lack of Required Fire Suppression System.

26. Lack of Smoke Detectors.

27. Lack of Carbon Monoxide Detectors.

28. Lack of Required Fire Extinguishers.

29. General Dilapidation and Lack of Maintenance.

Structure 3: Barn Structure

30. Unpermitted Metal Barn.

31. Damaged and Deteriorating Doors.

32. Accumulation of Junk and Debris.

33. Failure to Obtain Site Plan Approval.

34. Unpermitted Greenhouse.

Structure 4: Deck-Type Structure

35. Unpermitted Deck Construction

36. Unpermitted Plumbing Installations.

37. Dangerous Sewage Disposal.

38. Unpermitted Electrical Installations.

39. Failure to Obtain Site Plan Approval.

Structure 5: Lower Storage Building

8

40. Unlawful Occupancy.

41. Unpermitted Construction.

42. Substandard and Deficient Foundation.

43. Defective Flooring.

44. Insufficient Ceiling and Roof Supports.

45. Dilapidated Exterior Deck Stairway.

46. Substandard Interior Stairway.

47. Lack of Approved Potable Water.

48. Unauthorized Residential Use.

49. Lack of Required Fire Suppression System.

50. Lack of Smoke Detectors.

51. Lack of Carbon Monoxide Detectors.

52. Lack of Required Fire Extinguishers.

53. Deteriorated Bathroom.

54. Exposed Plumbing.

55. Hazardous Misuse of Car Batteries.

Structure 6: Pole Barn

56. Unpermitted Construction.

57. Unauthorized Occupancy.

58. Severely Dilapidated Roof.

59. Severely Dilapidated Walls.

60. No Approved Sewage Disposal.

61. Accumulation of Junk and Debris.

62. No Bathroom Facility.

63. Lack of Kitchen Sink.

64. Exposed Electrical Wiring.

65. Faulty Weather Protection.

66. Inadequate Means of Egress.

67. Failure to Obtain Site Plan Approval.

Structure 7: Gazebo Structure

68. Unpermitted Construction.

69. Collapsed Flooring.

70. Collapsed Roof.

71. Failure to Obtain Site Plan Approval.

Additional Violations

72. Unauthorized RV Camping.

73. Unpermitted Deck Construction.

74. Unpermitted Water Storage Tank.

75. Unauthorized On-Site Mining.

76. Unlawful Primary Use.

77. Unlawful Off-Site Activity.

78. Inadequate Sewage Disposal.

79. Inadequate Water Supply.

80. Inadequate Roadway Access.

81. Unlawful Dwelling.

82. Unlawful Transient Occupancy.

83. Failure to Obtain Valid Certificate of Occupancy.

84. Failure to Obtain Planning Department Approval.

85. Failure to Obtain Valid Transient Occupancy Registration Certificate.

86. Failure to Post Occupancy Limit.

87. Inadequate Sewage Disposal.

88. Inadequate Water Supply.

89. Failure to Obtain Building and Fire Inspections.

90. Failure to Post Address Sign.

91. Failure to Provide Required Notice to Occupant.

92. Failure to Provide Contact Information.

1   93. Unauthorized Wedding (or similar) Venue.

2   94. Inadequate Bridge Construction.

3   95. Inadequate Water Supply.

4   96. Failure to Obtain Transient Occupancy Certificate.

5   97. Failure to Collect Tax.

6   98. Failure to Remit Taxes Owed.

7   99. Failure to Report Taxes Owed.

8   100. Unauthorized Occupancy.

9   101. Incompatible Land Uses.

10   Doc. No. 14, page 51 through 65 of 123.

11   The N&O stated that Cox was "ordered to repair or abate all code violations on the []

12   Property, including, but not limited to, all unlawful conditions identified" in the N&O, and that all

13   such work "**must be completed within 30 days of the date of th[e] N&O**." Doc. No. 14, page 66

14   of 123 (emphasis original). The N&O was dated December 2, 2016, so, per the terms of the N&O,

15   the deadline for all work required under the N&O was New Year's Day 2017.

16   **E.  Cox's December 20, 2016 Request for Extension**

17   On December 20, 2016, Cox requested an extension of time to perform the work required

18   under the N&O on the grounds that he was in process of defending a multi-count criminal case

19   (that had not yet been dropped); the 30-day performance interval contemplated by the N&O ran

20   through two major holidays; and additional time was required to obtain engineering reports

21   relating to putative violations. Doc. No. 26, page 6 of 135, ¶ 15. That request was not granted. Id.

22   **F.  March 13, 2017 Verified Complaint for Nuisance Abatement and Receivership**

23   On March 13, 2017, the County filed a Verified Complaint for Nuisance Abatement and

24   Receivership (the "Verified Complaint") based on the scores of violations set forth in the N&O.

25   Doc. No. 14, page 35 of 123.

26   The Verified Complaint states that "[t]he [] Property ha[d] been the focus of the County's

27   code enforcement efforts for over eight years, since at least 2008," Doc. No. 14, page 37 of 123, ¶

28   7, and that Cox was given "a reasonable and adequate opportunity" to "obtain required permits,

1  correct the [101] violations in the N&O, [and] provide proof of compliance to the City." Doc. No.

2  14, page 40 of 123, ¶ 20. It also alleges six causes of action in connection with a 20-plus-

3  paragraph Prayer for Relief, praying *inter alia*, "[f]or the [] Property to be declared a public

4  nuisance," for the court to appoint a receiver "[t]o take full and complete control of the []

5  Property," and for penalties, damages, attorneys' fees, costs and expenses secured by "a lien

6  and/or special assessment on the [] Property." Id., pages 40 through 49 of 123.

7      **G.  The Receivership**

8      On or around June 19, 2017 (less than two months before the County dismissed the

9  criminal case against Cox), the County filed a Motion for Appointment of Receiver, Doc. No. 26,

10  page 6 of 135, ¶ 19, and on July 17, 2017 (four weeks before the County dismissed the criminal

11  case against Cox), the Mariposa Superior Court issued an order appointing Adams "as the Court's

12  receiver over the [] Property" (the "Order Appointing Receiver"). Doc. No. 14, page 115 of 123.

13      The Order Appointing Receiver stated that the County had "afforded [Cox] a reasonable

14  time to rehabilitate the [] Property …" and that Adams and CRG "ha[d] sufficiently demonstrated

15  the necessary capacity and expertise to acquire funding, develop a viable rehabilitation plan, and

16  supervise the rehabilitation of the [] Property." Doc. No. 14, page 116 of 123, ¶¶ 4, 10.

17      Nearly a year after the Receivership commenced, the Receiver was still taking bids for

18  rehabilitation of the Property, Doc. No. 19, page 24 of 55, and on July 12, 2018, the Receiver filed

19  a Notice of Default and Election to Sell, placing the Property in foreclosure and requiring Cox (or

20  JDC Land Holding) to make payment in the amount of $256,953.85—apparently for rehabilitation

21  costs—to prevent sale of the Property. Doc. No. 26, page 10 of 135, ¶ 34, Ex. K. Several months

22  after the Notice of Default and Election to Sell was filed, the court-ordered rehabilitation of the

23  Property was still not complete. Doc. No. 21, page 40 of 51, ¶ 5; see also Doc. No. 14, page 11 of

24  123, lines 23 through 28 (suggesting remediation was not complete until sometime in the first

25  quarter of 2019).

26  **II.  Procedural History**

27      Cox sought leave from the Mariposa Superior Court to sue Adams and CRG in connection

28  with the Receivership but leave was denied. Doc. No. 1 ¶¶ 51, 144. He then brought this action

1    against CRG, Adams, the County, MCS, two sheriff's deputies, and Harris alleging multiple
2    claims for violation of state and federal law, including several civil rights claims under 42 U.S.C §
3    1983 and the United States Constitution. Doc. No. 1.

4          The Court dismissed the claims against Adams and CRG on jurisdictional grounds on
5    April 6, 2020 without prejudice to bringing such claims in the proper forum, Doc. No. 42, and
6    turns here to the special motion to strike brought by the County Defendants under California's
7    anti-SLAPP law.

8                              **LEGAL FRAMEWORK**

9          "California law provides for the pre-trial dismissal of certain actions, known as Strategic
10   Lawsuits Against Public Participation, or SLAPPs, that 'masquerade as ordinary lawsuits' but are
11   intended to deter ordinary people 'from exercising their political or legal rights or to punish them
12   for doing so.' " Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261 (9th Cir. 2013) (quoting Batzel
13   v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003) (some internal quotation marks omitted); see also,
14   Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 839 (9th Cir. 2001) ("The anti-SLAPP statute was
15   enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression
16   through costly, time-consuming litigation.") Such lawsuits are "generally brought to obtain an
17   economic advantage over the defendant, not to vindicate a legally cognizable right of the
18   plaintiff." Hansen v. California Dep't of Corr. & Rehab., 171 Cal.App.4th 1537, 1543 (2008)
19   (citing Kajima Engineering & Construction, Inc. v. City of Los Angeles, 95 Cal.App.4th 921, 927
20   (2002)).

21         Specifically, section 425.16 of the California Code of Civil Procedure provides for a
22   special motion to strike—commonly known as an "anti-SLAPP motion"—where "the trial court
23   evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of
24   the litigation." Schaffer v. City & Cty. of San Francisco, 168 Cal.App.4th 992, 998 (2008), as
25   modified on denial of reh'g (Dec. 23, 2008) (citing Flatley v. Mauro, 39 Cal.4th 299, 312 (2006)
26   and Varian Medical Systems, Inc. v. Delfino, 35 Cal.4th 180, 192 (2005).)

27         Courts follow a two-step process in deciding anti-SLAPP motions. Roberts v. McAfee,
28   Inc., 660 F.3d 1156, 1163 (9th Cir. 2011); Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 595

1    (9th Cir. 2010); <u>Oasis West Realty, LLC v. Goldman</u>, 51 Cal.4th 811, 819 (2011). First, the

2    defendant must make a prima facie showing that plaintiff's claims arise from an act or acts in

3    furtherance of the defendant's rights of petition or free speech in connection with a public issue.[6]

4    <u>Roberts</u>, 660 F.3d at 1163; <u>Mindys Cosmetics</u>, 611 F.3d at 595; <u>see</u> <u>Oasis West</u>, 51 Cal.4th at 819.

5    Second, once the defendant makes this showing, the burden shifts to the plaintiff to demonstrate a

6    probability of prevailing on the challenged claims. <u>Roberts</u>, 660 F.3d at 1163; <u>Mindys Cosmetics</u>,

7    611 F.3d at 595; <u>see</u> <u>Oasis West</u>, 51 Cal.4th at 819–20. The defendant has the burden on the first

8    issue, while the plaintiff has the burden on the second issue. <u>Flatley</u>, 39 Cal.4th at 314.

9         The special motion to strike under the anti-SLAPP statute is available to litigants

10   proceeding in federal court. <u>Thomas v. Fry's Elecs., Inc.</u>, 400 F.3d 1206, 1206–07 (9th Cir. 2005).

11   Further, courts have found that the protections in the anti-SLAPP statute apply to "some acts by

12   governmental entities and their representatives," <u>see</u> <u>Schaffer</u>, 168 Cal.App.4th at 1002-03,

13   including, for example, "statements and writings of governmental entities and public officials on

14   matters of public interest and concern that would fall within the scope of the statute if such

15   statements were made by a private individual or entity." <u>Vargas v. City of Salinas</u>, 46 Cal.4th 1,

16   16–17 (2009). And section 425.16, subdivison (a) of the California Code of Civil Procedure

17   provides that the ant-SLAPP statute is to be "construed broadly" to further the legislative goals of

18   encouraging participation in matters of public significance and discouraging abuse of the judicial

19   process. Cal. Code. Civ. Pro. § 425.16, subd. (a); <u>see also</u>, <u>Anderson v. Geist</u>, 236 Cal.App.4th 79,

20   86 (2015).

21   **<u>ANALYSIS</u>**

22        The County Defendants contend that Cox's state law claims should be stricken because

23   such claims arise solely "from [] statements, writings, and conduct while the County was

24   enforcing the applicable nuisance abatement laws against [the Property]" and such activities are

25   "protected activities" under California's Anti-SLAPP law as set forth in section 425.16 of the

26

27   _____

[6] The merits of a plaintiff's claims "play no part in the first step of the anti-SLAPP analysis." <u>City of Costa Mesa v.</u>

28   <u>D'Alessio Investments, LLC</u>, 214 Cal.App.4th 358, 371–72 (2013).

California Code of Civil Procedure. Doc. No. 14, page 10 of 123, lines 9 through 14. Further, the County Defendants contend that Cox cannot prevail on his state law claims due to untimeliness, a lack of standing and various other fatal defects. Doc. No. 14, Part III.C. In short, the County Defendants maintain that Cox's "Complaint is nothing more than a retaliation against the County for its legitimate code enforcement investigation, and the Complaint is intended to chill the County's efforts to protect the public and follow state and local law." Doc. No. 14, page 2 of 123, lines 20 through 23.

Cox makes several arguments in opposition to the County Defendants' motion. First, he argues that the motion should be denied—or at least held in abeyance—because, in mimicking a motion for summary judgment, it raises factual issues that require discovery under the Federal Rules of Civil Procedure. See Doc. No. 17, page 6 of 34, lines 10 through 27; id., Part IV.A. Second, he argues that the motion should be denied because the County initiated the code enforcement case against him for the illegal purpose of destroying him financially and punishing him for exposing the County's wrongful conduct in the connection with the criminal case. Id., Part. IV.B.3. Third, Cox argues that, regardless of legality, the County Defendants have failed to show that his state law claims arise from statements, writings or conduct protected by California's anti-SLAPP statute. Id., Part IV.B.1. And finally, Cox argues that he has demonstrated a reasonable probability of prevailing on each of his state law claims against the County Defendants. Id., Part IV.B.2.

The Court will address Cox's illegality argument at the threshold and then turn to other aspects of the anti-SLAPP analysis as warranted.

## I.  Illegality of County's Code Enforcement Activity

### A.  Parties' Arguments

Cox argues that this action "is exempt from anti-SLAPP" because the County's code enforcement actions were undertaken "unlawfully," with the intent to deprive Cox "of his home, his property and his business." Doc. No. 17, page 10 of 34, lines 18 through 20; id., Part IV.B.3.

County Defendants, for their part, argue that the illegality exemption from the anti-SLAPP statute does not apply because "the County has not conceded that its code enforcement activities

were illegal," Doc. No. 28, page 11 of 22, lines 3 through 4, and the " 'evidence' set forth in [Cox's] opposition … does not *conclusively establish* that the County's code enforcement activities were illegal …." Id., page 11 of 22, lines 10 through 14 (emphasis original). The County Defendants maintain that "the County's only interest in the [] Property has been, at all times, to ensure that the violations of law upon it are remedied to protect the health and safety of the occupants, the neighbors, and the surrounding community." Doc. No. 14, page 11 of 123, lines 9 through 11.

### B.  Applicable Law

In *Flatley v. Mauro*, the California Supreme Court held that "section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." City of Montebello v. Vasquez, 1 Cal.5th 409, 423 (2016) (quoting Flatley, 39 Cal.4th at 317) (internal quotation marks omitted); see also, Paul for Council v. Hanyecz, 85 Cal.App.4th 1356, 1365 (2001), disapproved of on other grounds by Equilon Enterprises v. Consumer Cause, Inc., 29 Cal.4th 53 (2002).

The moving defendant's only burden in bringing an anti-SLAPP motion, however, is to make a prima facie showing that a challenged cause of action arises from protected activity. Flatley, 39 Cal.4th at 317. "It is not the defendant's burden … to establish that the challenged cause of action is [] protected as a matter of law." Lieberman v. KCOP Television, Inc., 110 Cal.App.4th 156, 165 (2003).

Thus, to defeat a defendant based on "illegality" at the first step of the anti-SLAPP analysis, evidence must "conclusively demonstrate" that the conduct in question was illegal or "[t]he defendant must concede the point." City of Montebello, 1 Cal.5th at 424 (citing Flatley, 39 Cal.4th at 316–318). "If ... a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." Id. (quoting Flatley, 39 Cal.4th at 316) (internal quotation marks omitted). In *City of Montebello v. Vasquez*, for example, the California Supreme Court found that it was not proper to resolve the question of illegality "at

1    the first step of the anti-SLAPP inquiry" because defendants denied any wrongdoing in connection

2    with the campaign contributions at issue in that case, and plaintiff conceded that its claim

3    depended "on inferences to be drawn from circumstantial evidence" relating to advocacy and

4    voting that preceded receipt of campaign contributions. 1 Cal.5th at 424.

5        **C.  Summary of County's Code Enforcement Activity**

6            As set forth above, the record in this case contains evidence showing the following as to

7    the County's code enforcement activity with respect to the Property:

8            In November 2015, the County brought criminal charges against Cox for rape and related

9    crimes that allegedly took place on the Property. Nearly two years of contentious discovery ensued

10   in which Cox pursued his theories that the County and MCS gave undue deference to the

11   questionable testimony of the alleged victim and failed to collect, gather and divulge evidence that

12   would prove Cox's innocence.

13           On October 13, 2016, while the criminal case against Cox was still pending, the County

14   secured an omnibus civil warrant ordering an essentially unlimited inspection of the Property that

15   included "all areas of the interior and exterior of all buildings, structures, homes, houses, rooms,

16   barn, garages, vehicles, basements, attics, sheds, units, open fields, yards, storage facilities,

17   compartments, drawers, cabinets, papers, and electronic files located on the [] Property."

18           The declarations filed in support of the Warrant uniformly indicated that the Property had

19   been inspected (in some fashion) three times during a roughly three-month period in 2008 and five

20   times in the roughly three-month period between October 26, 2011 and February 2, 2012. Further,

21   the declarations and other records indicate that just three notices were issued in connection with

22   the Property prior to the Warrant application. All three of those notices were apparently issued in

23   2008 and at least two of them appear to have pertained solely to an agricultural structure being

24   used for unpermitted human habitation.

25           There is no indication in the declarations that any civil inspections took place on the

26   Property in the four and a half years prior to the Warrant application, aside from a paragraph in the

27   Sarah Williams Declaration stating that a sheriff's deputy inspected the Property on September 1,

28   2016 "as part of a criminal investigation of a damaged power meter" and "confirmed that a

number of [] violating conditions continued to persist on the [] Property, including unpermitted construction, electrical hazards, land use and zoning violations, and unlawful transient occupancy." The sheriff's deputy himself, however, did not submit a declaration in support of the Warrant application, and Ms. Williams provides no explanation as to how "a criminal investigation of a damaged power meter" came to address such a broad range of issues on such a large piece of property (or how such issues fell within the competencies of the sheriff's deputy).

On October 14, 2016—after more than four and a half years without a civil inspection and more than eight years since the last of three written notices relating to the Property— the County executed the omnibus Warrant and supposedly found more than 100 "dangerous violations" relating to seven different structures and various other aspects of the Property.

On Friday, December 2, 2016, the County issued an N&O ordering Cox to fix all violations within 30 days (including Christmas and New Year's Day). Cox's request for an extension was denied, and in March 2017 the County filed a Verified Complaint stating, *inter alia*, that the Property had been the "focus" of code enforcement efforts since 2008 and that Cox had been given "a reasonable and adequate opportunity" to "obtain required permits, correct the violations in the N&O [and] provide proof of compliance to the City."

On July 17, 2017, the County secured an order from the Mariposa Superior Court appointing Adams as the receiver for the Property; stating that Adams "ha[d] sufficiently demonstrated the necessary capacity and expertise" to rehabilitate the Property; and charging Adams with the task of repairing all 101 "dangerous violations" identified in the N&O.

On August 14, 2017, the County dismissed all criminal charges against Cox in connection with the alleged rape, after concluding that the alleged victim had lied under oath.

As of May 2018—nearly a year after the Receivership commenced—Adams was still collecting bids to repair the Property. On July 2018, Adams put the Property into foreclosure with a demand for payment of more than $250,000 in Receivership-related costs secured by the Property. And it appears that as of the end of 2018—and possibly the first quarter of 2019—the repairs to the Property (work that the County had given Cox 30 days, including holidays, to complete) was still in process.

### D.  Analysis

The foregoing facts make it hard to credit the County Defendants' statement that "the County's only interest in the [] Property has been, at all times, to ensure that the violations of law upon it are remedied to protect the health and safety of the occupants, the neighbors, and the surrounding community." The relatively sparse inspection history described in the Warrant declarations seems to contradict the assertion that the Property had been "the focus" of code enforcement efforts "since at least 2008" and raises obvious questions about the expansive scope of the Warrant (which included not just buildings but also all "vehicles … compartments, drawers, cabinets, papers, and electronic files located on the [] Property"). The notion that Cox could have repaired all 101 "dangerous violations" set forth in the N&O in a 30-day period that included Christmas and New Year's Day strains credulity, particularly since the County's expert receiver was still collecting bids 10 months after the Receivership commenced and was apparently still working on repairs well into the first quarter of 2019. And it is unsettling, to say the least, that the aggressive code enforcement activity evidenced by the record in this action coincided with the County's failed criminal case against Cox.

Even assuming it is all true, however, this circumstantial evidence does not "conclusively demonstrate" anything about the legality of the County's code enforcement activities, one way or the other, and the County, for its part, has expressly asserted that its code enforcement activities were undertaken for the lawful purpose of protecting the Property and the public. See City of Montebello, 1 Cal.5th at 424. Thus, the Court finds that the question of illegality cannot be decided at the first step of the anti-SLAPP inquiry and must be reserved for adjudication (to the extent necessary) under the second prong.[7] See id.; see also Governor Gray Davis Com., 102 Cal.App.4th at 460.

The Court now turns to whether the County Defendants have met their burden under prong

---

[7] It appears discovery would be warranted to the extent adjudication of the "illegality" issue were required under the second prong of the anti-SLAPP analysis in this case. See Rogers v. Home Shopping Network, Inc., 57 F.Supp.2d 973, 985 (C.D. Cal. 1999) (finding that plaintiff was entitled under Rule 56 of the Federal Rules of Civil Procedure to develop his arguments in opposition to a special motion to strike); see also Coleman v. Sterling, 2010 WL 11508571, at *7 (S.D. Cal. Mar. 24, 2010) (finding plaintiff was entitled to conduct discovery to "show that Defendants were engaged in illegal conduct that is not protected by Section 425.16").

one of the anti-SLAPP analysis to make a prima facie showing that the activities giving rise the

harms alleged in Cox's state law claims are protected under section 425.16.

**II. <u>Prong One of the Section 425.16 Analysis: Claims Arising from Protected Activity</u>**

    **A. Parties' Arguments**

Setting aside the question of illegality, the County Defendants argue that they have

satisfied their obligations under prong one of the anti-SLAPP analysis because Cox "admits that

the facts stated in the Complaint took place while the County was investigating code violations

and nuisance activity and taking enforcement action against the [] Property," Doc. No. 14, page 15

of 123, lines 24 through 27, and that "courts have expressly held that code enforcement

investigations and enforcement activity … constitute protected activity under [] section

425.16(e)." Doc. No. 14, page 14 of 123, lines 10 through 15.

Cox does not dispute that valid investigations and enforcement actions are protected by

California's anti-SLAPP statute, but argues that the County Defendants have failed to satisfy the

first prong of the anti-SLAPP analysis because his state law claims arise not only from code

enforcement but also from abuses incident to the Receivership and the County's failed criminal

case against him. Doc. No. 17, Part IV.B.1.

On reply, the County Defendants argue that Cox's claims for slander of title, breach of

fiduciary duty, intentional interference with prospective economic advantage, conversion, and

unfair business practices "arise solely from the County's code enforcement activities" and that

Cox's claims for negligence and negligent hiring, supervision and training should be stricken

despite the fact that they involve allegations relating to the criminal case because "a claim that

contains both protected and unprotected activity is still subject to an anti-SLAPP motion." Doc.

No. 28, Part III.

As set forth below, the Court finds that the County Defendants have failed to meet their

burden under the first prong of the anti-SLAPP analysis because they have not shown how any

challenged cause of action arises from protected activity and because, contrary to the County

Defendants' contentions, code enforcement is not categorically protected under section 425.16.

**B.  Applicable Law**

As set forth above, a defendant bringing an anti-SLAPP motion has "the initial burden of showing that the causes of action against him arose from protected activity." Karnazes v. Ares, 244 Cal.App.4th 344, 353 (2016), as modified on denial of reh'g (Feb. 26, 2016). In other words, "the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." Baral v. Schnitt, 1 Cal.5th 376, 396 (2016); see also, Flatley, 39 Cal.4th at 314. "The only means specified in section 425.16 by which a moving defendant can satisfy [this] requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]."[8] Shahbazian v. City of Rancho Palos Verdes, 17 Cal.App.5th 823, 830–31 (2017) (quoting Park, 2 Cal.5th at 1063) (internal quotation marks omitted); see also Lee v. Silveira, 6 Cal.App.5th 527, 538 (2016) ("[A] defendant can meet the burden of making a threshold showing that a claim arises from protected activity by demonstrating the act or acts underlying the plaintiff's claim falls within one of the four categories identified in section 425.16, subdivision (e)."). "If the moving party fails to demonstrate that any of the challenged causes of action arise from protected activity, the court denies the motion." Shahbazian, 17 Cal.App.5th at 830 (citing City of Cotati v. Cashman, 29 Cal.4th 69, 80-81 (2002) and Trilogy at Glen Ivy Maintenance Assn. v. Shea Homes, Inc., 235 Cal.App.4th 361, 367 (2015)).

**C.  Analysis**

*1.  Acts Underlying Each Cause of Action*

County Defendants recite portions of section 425.16 and assert in blanket fashion that five of Cox's seven state law claims arise exclusively from code enforcement activity and that the two other claims arise at least in part from code enforcement activity. Doc. No. 14, page 13 of 123,

---

[8] The four categories set forth in subdivision (e) of section 425.16 are: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; and (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. Cal. Code Civ. Pro. § 425.16, subd. (e).

Part II.B.; Doc. No. 28, pages 8 through 10 of 22. They make no meaningful attempt, however, to identify the acts underlying each cause of action that purportedly gave rise Cox's injuries or to show how such acts fit into one or more of the categories set forth in subdivision (e) of section 425.16. Indeed, the closest the County Defendants come to addressing their statutory burden under the first prong of the anti-SLAPP analysis is a paragraph in their opening memorandum stating obliquely that: "the facts stated in the Complaint took place while the County was investigating code violations and nuisance activity and taking enforcement action against the [] Property;" "[t]he County's actions [] concern statements and activities involving matters of public interest, namely the safety of property within the County and dangerous nuisance activity taking place thereon"; Cox "bases his fifth claim for slander of title on his allegation that 'Defendants County, Adams and CRG published false and unprivileged statements harmful to Plaintiff….' "; and Cox "bases his seventh claim for intentional interference with prospective economic advantage on Defendants' 'false allegations' and 'publication of injurious false statements.' " Doc. No. 14, page 15 of 123, line 24, through page 16 of 123, line 6.

Such generalized, conclusory and elliptical argument—which gives the shortest of shrift to Cox's fifth and seventh claims while completely failing to address any of the others—is plainly insufficient to show what activity the harms alleged in each—or any—of Cox's state law claims arise from. Shahbazian, 17 Cal.App.5th at 830. To carry its burden under the first prong of an anti-SLAPP motion, the moving defendant must identify the acts supplying the elements of the claims they seek to strike and then show that such activity falls into one or more of the four categories of protected activity set forth in section 425.16, subd. (e). See Park, 2 Cal.5th at 1073 (denying anti-SLAPP motion on finding that plaintiff university had not carried its burden of showing "the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e)"). The shorthand—and shortcuts—in the County Defendants' briefing leave the County Defendants well short of that mark.

### 2.   Protection of Code Enforcement Activity Under Section 425.16

Moreover, even assuming the nebulous assertion that Cox's claims arise from code enforcement activity might otherwise have weight, recent case law from California Courts of

Appeal shows that at least some activity typically associated with code enforcement—including code enforcement activity of the sort at issue here—are not protected under section 4215.16. Doc. No. 14.

In *Shahbazian v. City of Rancho Palos Verdes*, for example, the Shahbazians sued the City of Rancho Palos Verdes (the "City") in connection with permitting activity relating to a residential fence. 17 Cal.App.5th at 827. There, the Shahbazian's neighbors, the Hessers, began construction of a fence that adversely affected the Shahbazian's property without a permit from the City. Id. at 827. The City's "code enforcement division initiated an investigation" at the Shahbazian's request and found that the fence complied with the municipal code. Id. The City then issued a permit for the fence. Id.

To get back at the Shahbazians for complaining about the fence, the Hessers themselves complained to the City about a deck the Shahbazians had built without a permit. Id. at 827-28. The City conditionally approved a permit for the deck pending certain modifications, but ultimately declined to issue a final permit for the deck when the Shahbazians purportedly failed to make the required modifications. Id. at 828

The Shahbazians sued the City for negligence, inverse condemnation and selective enforcement, and the City filed a special motion to strike under section 425.16 arguing that "all oral or written statements purportedly supporting [the Shahbazians'] causes of action against the City were made in connection with the proceedings of ... official government bodies." Shahbazian, 17 Cal. App. at 828-29.

The trial court denied the City's motion to strike on the grounds that the City failed to show the Shahbazians' causes of action arose from protected activity, and the Court of Appeal affirmed, finding that the Shahbazians' causes of action arose not "from any statements, writings, or conduct in furtherance of the City's rights to petition or speech," but "from the City's decisions to grant the Hessers a permit for their wall … and to deny the Shahbazians a permit for their deck." 17 Cal.App.5th at 835. Further, the Court of Appeal stated that, if section 425.16 applied to the Shahbazians claims, "plaintiffs … challenging decisions government entities make every day would have to satisfy the second step of the section 425.16 analysis before proceeding with their

cases" and that "[s]uch a burden would discourage lawsuits contesting government decisions like those in [the *Shahbazian*] case, a consequence the Legislature did not intend in enacting section 425.16." <u>Shahbazian</u>, 17 Cal.App.5th at 3839 (citing <u>San Ramon Valley Fire Prot. Dist. v. Contra Costa Cty. Employees' Ret. Assn.</u>, 125 Cal.App.4th 343, 358 n.9 (2004) (section 425.16 is not intended to discourage "petitions seeking to overturn the denial of a planning or zoning permit applied for by an individual property owner").

In *Anderson v. Geist*, similarly, plaintiff brought 10 causes of action against two sheriff's deputies of the San Bernardino County Sheriff's Department, including illegal search and seizure, slander and intentional infliction of emotional distress, alleging that the deputies "unlawfully entered her residence on two occasions, attempting to arrest her daughter pursuant to a bench warrant, and in the process [made] defamatory statements to her neighbors." 236 Cal.App.4th at 82. The defendant sheriff's deputies brought a special motion to strike, asserting that "a peace officer's execution of an arrest warrant is protected activity" under subdivision (e)(4) of section 425.16, and the trial court denied the motion. 236 Cal.App.4th at 86.

In affirming the trial court, the Court of Appeal recognized that "[e]xecution of an arrest warrant is of course 'an act in furtherance of a criminal prosecution,'" but found that "execution of a warrant is not protected activity under the anti-SLAPP statute" because "[a]t base, the execution of a warrant is not an exercise of rights by the peace officer … [but rather] the performance of a mandatory duty …." <u>Id.</u> at 86 (citing <u>Barnett v. State Farm General Ins. Co.</u>, 200 Cal.App.4th 536, 546 (2011)). "Because peace officers have no discretion in whether or not to execute a warrant issued by [a] court," the Court of Appeal found it "unlikely that a lawsuit asserting claims arising from such activity could have the chilling effect that motivated the Legislature to adopt the anti-SLAPP statute, or that extending protections of the anti-SLAPP statute to such activity would serve the statute's goals." <u>Id.</u> at 87 (citing § 425.16, subd. (a).)

Furthermore, the cases cited by the County Defendants can properly be read to say that all (or even most) aspects of code enforcement are protected under section 425.16. *Levy v. City of Santa Monica* found only that a neighbor's complaint to the City of Santa Monica—and a council member's subsequent email to the director of planning—about an unpermitted playhouse fell

within subdivision (e)(3) of section 425.16. 114 Cal.App.4th 1252, 1258 (2004). In *Squires v. City of Eureka*, plaintiffs did not dispute that actions taken by the defendant City of Eureka "in the investigation and prosecution of … code enforcement violations" were protected under California's anti-SLAPP statute, and thus neither the trial court nor the Court of Appeal had occasion to decide the issue. 231 Cal.App.4th 577, 589 (2014). And the Court sees nothing at all in *Doe v. State of California* either finding that code enforcement activity is categorically protected under section 425.16 or reading *Squires* for such a proposition. 8 Cal.App.5th 832, 839 (2017). Indeed, *Squires* appears only once in *Doe*, as the fourth case in a string cite for the uncontroversial proposition that "numerous courts … have concluded that public entities are not categorically precluded from seeking protection under the anti-SLAPP statute." Id.

In light of the foregoing, the Court cannot agree with County Defendants that "[y]ears of case law have settled the question: code enforcement acts are protected under [] section 425.16." Doc. No. 14, page 15 of 123, lines 13 through 18. While certain aspects of code enforcement— such as the pre-enforcement communications at issue in *Levy*—are protected under California's anti-SLAPP statute, it is equally clear from California case law that other aspects of code enforcement—such as the permitting determinations at issue in *Shahbazian* and the warrant at issue in *Anderson*—are not. See San Ramon, 125 Cal.App.4th at 354 ("Acts of governance mandated by law, without more, are not exercises of free speech or petition.")

Like *Shahbazian*, this case involves determinations regarding permits. And like *Anderson*, this case involves the execution of a warrant. Thus, even if accurate, the mere assertion that "code enforcement activity" gave rise to all of the injuries alleged in Cox's state law causes of action is insufficient to satisfy the first prong of the anti-SLAPP analysis. See Shahbazian, 17 Cal.App.5th at 826 (finding that section 425.16 applies to some government acts but not others and that it is "important to distinguish" accordingly). It was incumbent upon the County Defendants, as the moving parties, to identify what types of code enforcement activity gave rise to the harms alleged in each of Cox's state law causes of action and then to show how those types of code enforcement activity (whether communication of some sort, the execution of a warrant, a permitting determination or what have you) are protected under California's anti-SLAPP statute. The County

1  Defendants failed to do so. Thus, they have not met their burden under the first prong of the anti-

2  SLAPP analysis and the special motion to strike must be denied. Park, 2 Cal.5th at 1073.

3  **CONCLUSION**

4      For the foregoing reasons, the Court finds that the County Defendants have failed to show

5  that the harms alleged in any of Cox' state law causes of action arise from activity protected under

6  subdivision (e) of section 425.16 of the California Code of Civil Procedure. As such, the County

7  Defendants have failed to carry their burden under the first prong of the anti-SLAPP analysis, and

8  their special motion to strike must be denied on that basis. See City of Cotati, 29 Cal.4th at 80-81.

9      The Court need not consider the County Defendants' arguments that Cox failed to establish

10  a probability of prevailing on the merits under prong two of the anti-SLAPP analysis, since the

11  burden never shifted to Cox to do so. See City of Cotati, 29 Cal.4th at 80-81. Similarly, it is

12  unnecessary to consider the other arguments raised by Cox in opposition to the motion.

13  **ORDER**

14      Accordingly, IT IS HEREBY ORDERED that the special motion to strike brought by

15  Mariposa County, the Mariposa County Sherriff's Office, Sheriff Deputy William Atkinson and

16  Sheriff Deputy Wesley Smith (Doc. No. 14) is DENIED in its entirety.

17

18  IT IS SO ORDERED.

19  Dated:   May 1, 2020

                      SENIOR  DISTRICT  JUDGE