**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| JERRY COX, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 1:19-1105 |
| | § | |
| MARIPOSA COUNTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This dispute arises out of criminal charges brought against Jerry Cox based on an alleged rape that occurred on property Cox owned. The rape charges were later dropped. While those charges were pending, Mariposa County secured an expansive civil warrant to inspect Cox's property for health-and-safety Code violations. The County identified more than 100 putative code violations during the search. The County initiated a receivership, headed by Mark Adams and his company, the California Receivership Group, to bring the property up to Code. The receivership spent so much money doing so that it had to sell the property to recover the costs. As a result of the criminal and civil proceedings, Cox lost title to his property, his equity in it, and his savings.

Cox and his limited liability corporation, JDC Land Company, LLC,[1] sued Mariposa County; two sheriff's deputies, William Atkinson and Wesley Smith; Adams and CRG; and the alleged rape victim, Ashley Harris. Cox moved for summary judgment against the County and Harris. (Docket Entry Nos. 210, 211). Those defendants cross-moved for summary judgment

---

[1] For purposes of this Memorandum and Opinion, the opinion will refer to both plaintiffs as Cox.

against Cox.  (Docket Entry Nos. 215, 217).  Atkinson and Smith moved for summary judgment against Cox as well.  (Docket Entry No. 217).

Based on the motions, the responses, the replies, the supplemental briefs, the extensive record, and the applicable law, the court grants the defendants' motions for summary judgment, (Docket Entry Nos. 215, 217), and denies Cox's motions for summary judgment, (Docket Entry Nos. 210, 211).  The reasons for these rulings are set forth in more detail below.  Briefly, prior state-court litigation between these parties precludes much of this case, and Cox cannot prevail at trial on the remaining claims in this federal case.

## I.    Background[2]

In 2000, Jerry Cox purchased Bison Creek Ranch, a three-parcel property totaling more than 400 acres in Mariposa, California.  *Cox v. Mariposa County*, 445 F. Supp. 3d 804, 808 (E.D. Cal. 2020).  Until the property fell into receivership, either Cox or JDC Land Company, LLC—a California limited liability company of which Cox is the principal and 100% owner—owned it. *Id.*

On Friday, November 13, 2015, Mariposa County Sheriff's Deputies William Atkinson and Wesley Smith interviewed Ashley Harris about an alleged rape that occurred on Cox's property on Wednesday, November 11, 2025.  (Docket Entry No. 246-1 at 2–3, Docket Entry No. 246-2 at 2).  Harris first made the allegations at a California Highway Patrol office.  (*See* Docket Entry No. 219-2 at 1–2).  Atkinson and Smith were dispatched to interview her.  (*See id.*).  While "in the break room" of the patrol office, "Ashley who at the time was visibly emotional by noticeably shaking hands, and tearing up reported [that] on Wednesday night she had been forcibly

---

[2] The factual background and procedural history of this case is voluminous.  This section offers an overview of the relevant events and will include some details.  The court discusses in more detail the facts material to resolving the pending motions for summary judgment in its analysis of the issues.

raped by Jerry Cox." (*Id.* at 2). Atkinson asked Ashley "to discontinue her statement" and accompany him to the "Mariposa County Sheriff's Office where the interview would be conducted." (*Id.*). There, she gave a full statement in the presence of Atkinson, Smith, and a Mariposa County Victim Witness Advocate. (*See id.* at 2–4; Docket Entry No. 246-1 at 2–11; *see also* Docket Entry No. 218-6 (recording transcript)).

In the interview, Harris stated that she had met Cox on Farmersonly.com several weeks earlier and that they had communicated online and over the phone. (Docket Entry No. 218-6 at 2–3; Docket Entry No. 219-2 at 2). Harris and Cox eventually agreed "that she would come to Mariposa to visit on" Wednesday, November 11, 2015. (Docket Entry No. 219-2 at 2; Docket Entry No. 218-6 at 5–7). She arrived on Wednesday evening after she went to an earlier appointment, (Docket Entry No. 218-6 at 7), and socialized with Cox, his friends Aaron Rivera and Armando Hernandez, and Rivera's girlfriend, Darlene Windham, (*see* Docket Entry No. 231 at 3). Harris stated that she felt comfortable when she arrived, was socializing easily, and saw no untoward sexual comments or inappropriate advances. (*See* Docket Entry No. 218-6 at 10–11; Docket Entry No. 219-2 at 2).

Harris stated that when she went to go to sleep in the guest cabin on Wednesday night, Cox said she could sleep in the first room on the left. (*See* Docket Entry No. 218-6 at 11–12; Docket Entry No. 219-2 at 2). Harris closed the door and went to bed. (*See* Docket Entry No. 218-6 at 11–12; Docket Entry No. 219-2 at 2). Harris alleged that Cox came into the room where she slept, tried to crawl into her bed, and eventually became forceful by placing his hands around her neck and pulling off her clothes. (*See* Docket Entry No. 218-6 at 11–12; Docket Entry No. 219-2 at 2). Harris stated that after she physically and verbally resisted, Cox told her to "shut the fuck up" and to "be quiet." (*See* Docket Entry No. 219-2 at 2; Docket Entry No. 218-6 at 12). Harris recounted

3

in detail Cox's forced sexual acts, including oral copulation, sexual penetration in multiple positions, during which Cox choked, slapped, and smothered Harris, and ejaculation in Harris's vagina. (*See* Docket Entry No. 218-6 at 13–20; Docket Entry No. 219-2 at 2). Harris stated that afterwards Cox ordered her to stay quiet, warning that "no one was going to believe" her and threatening that she could be "easily replaced." (Docket Entry No. 218-6 at 26:19–27:12; Docket Entry No. 219-2 at 2–3).

On Thursday through Friday morning, Harris was allegedly trapped at Cox's ranch. Harris told the officers that she could not leave Cox's ranch until Friday morning, when she received help from Windham. (*See* Docket Entry No. 219-2 at 3). She stated that she did not have cell reception. (Docket Entry No. 218-6 at 20). She explained that Cox had taken her keys, which were missing from her purse and no one besides Cox had been in the room to take them. (*See id.* at 20–21). Harris described that she did not know how to open the gate to leave the ranch. (*See id.* at 21–22; Docket Entry No. 219-2 at 3). Cox forcibly took her around the ranch on Thursday but she otherwise did not leave. (Docket Entry No. 218-6 at 21–22; Docket Entry No. 219-2 at 3). Harris explained that she could not open the doors to the cabin where she stayed, either because they were locked from the outside or the "wood had expanded." (*See* Docket Entry No. 218-6 at 23–24; Docket Entry No. 219-2 at 3). Harris stated that on Friday morning, Windham helped her leave the ranch. (*See* Docket Entry No. 218-6 at 25; Docket Entry No. 219-2 at 3). Harris told the officers that, with Windham's help, she found her keys, retrieved her vehicle, went to Windham's friend's residence, and eventually reported the incident to the California Highway Patrol. (*See* Docket Entry No. 218-6 at 25–41; Docket Entry No. 219-2 at 3–4).

Atkinson and Smith concluded the interview by asking Harris to restate parts of her account, photographing her physical injuries, such as bruises and red marks, asking whether Harris

4

continued to fear Cox, and informing Harris of the next steps in the investigation. (*See* Docket Entry No. 218-6 at 25–63; Docket Entry No. 219-2 at 3–4). Harris then allowed the Sexual Assault Response Team ("SART") to document her case. (*See* Docket Entry No. 220-5). The officers did not collect Harris's cell phone or search it in detail. (Docket Entry No. 235-14 at 37:10–11, 48:14–49:3, 178:8–16; Docket Entry No. 235-15 at 106:7–14, 107:12–108:23). Cox argues that the officers' failure to do so was critical because it would have undermined Harris's story by showing that Harris had visited the ranch and met Cox previously; that Cox and Harris were in a consensual sexual relationship; that Harris had cell service while she was at the ranch; and that Harris could come and go from the ranch at will. Given Harris's statement, Atkinson did not think her cell phone was immediately relevant. Instead, he started drafting a search warrant to gather evidence, such as Harris's underwear, from Cox's property. (Docket Entry No. 218-6 at 31:2–3; Docket Entry No. 235-14 at 37:7–8, 37:16–19, 72:4–19; Docket Entry No. 219-8 at 4–8).

At around 8:00 p.m. on Friday, November 13, 2015, Detective Sargeant Packard saw a vehicle matching Cox's and initiated a traffic stop. (Docket Entry No. 219-2 at 8). Packard detained Cox with handcuffs until investigators arrived to question him about Harris's allegations. (*See id.*). Detective Sergeant Land, Detective Totten, and Deputy Lunquist arrived at the traffic stop. (*See id.*). Sergeant Land reported that there was probable cause to place Cox under arrest. (*See id.*). Cox was "arrested at the instruction of Detective Sergeant Land," (Docket Entry No. 246-1 at 5), placed in Land's patrol vehicle, driven to the Mariposa County Jail, and booked without incident, (Docket Entry No. 219-2 at 8).

About when Cox was arrested and booked, Atkinson prepared an affidavit based on Harris's statement and presented it to Judge Fagalde to apply for a search warrant, emergency protective order, and bail increase. (Docket Entry No. 219-2 at 10; Docket Entry No. 215-16 at 2,

5

4; Docket Entry No. 219-8 at 4; Docket Entry No. 246-1 at 11). Judge Fagalde signed these documents around 9:55 p.m. and set Cox's bail at $500,000. (*See* Docket Entry No. 219-8 at 4; *see also* Docket Entry No. 219-2 at 10).

Atkinson then went to the jail to interview Cox. (*See* Docket Entry No. 219-2 at 6 (serving Cox with the protective order); Docket Entry No. 219-4 at 18:24–25 (bail "had been increased" by the Cox interview)). Cox described how Harris had been "hanging out" at the ranch for the past couple of weeks, leaving and returning several times over that period. (Docket Entry No. 219-4 at 3, 5). Cox discussed his relationship with Harris, including how the pair had gone to a wedding together on the previous Saturday. (*See id.* at 5). Cox mentioned that Harris had said she was raped before. (*See id.* at 4). Cox stated that after the wedding, he had asked Harris to leave the ranch but that she stayed, upset at Cox's request. (*See id.* at 6). Cox thought Harris was overstaying her welcome. (*See id.*). Cox arrived back at the ranch on Wednesday before Harris returned from an appointment. (*See id.* at 7–8). When the officers asked Cox whether he and Harris had done something sexual, Cox replied, "[a]bsolutely not." (*Id.* at 9:17). Cox stated that he "never had sex with" Harris, "never even kissed her," and "[a]bsolutely" never made "any sexual advances towards her," including even talking "about" sex. (*Id.* at 12:12–22; *see also id.* at 17:21–18:8). Atkinson continued to press Cox on any sexual relationship with Harris and about other facts Harris had related. (*See id.* at 10–17). Atkinson then took Cox's phone under the signed search warrant, informed Cox of his $500,000 bail, and served him with the emergency protective order. (*See id.* at 17–22).

Around this time on Friday, November 13, other officers were executing the search warrant on Cox's property. (Docket Entry No. 246-2 at 6). After the officers arrested Cox, they went to his property to seal it until the "search warrant arrived." (Docket Entry No. 219-2 at 15). When

the signed warrant arrived, the officers, including Smith, searched the property. (*Id.* at 18). "Armando Hernandez and Aaron Rivera were outside the residence with Deputy Lundquist and they provided access" to the guest cabin and the office. (*See id.*). Smith reported that the back door of the guest cabin was "was difficult to open and seemed to drag on the top and lock side of the door." (*Id.*). The front door was also difficult to open. "[T]he entire door had to be lifted and pushed" "while simultaneously turning the dead bolt lock to the right." (*Id.*). In the guest cabin and the office, the officers found, among other things, bed sheets and bath towels, a laptop, and a plastic bag filled with bed sheets. (*Id.* at 18). They also found black lace panties matching the description Harris had provided. (*Id.* at 19). The officers did not record whether they checked for cell reception in the cabin or any surveillance video of the property. (*See id.* at 19–20).

On Saturday and Sunday, November 14 and 15, 2015, the officers continued to investigate. Atkinson interviewed Harris again and obtained another search warrant from Judge Fagalde to conduct a SART exam on Cox. (Docket Entry No. 219-2 at 13–16). Smith talked to Rivera and Hernandez, and Atkinson talked to Windham. (Docket Entry No. 219-2 at 11, 20–22; Docket Entry No. 218-5; Docket Entry No. 246-1 at 12). Atkinson also obtained the records from Harris's Sunday visit to the emergency room for treatment of "complaints of pain in her throat/neck area, right side ribs, and bilateral groin." (Docket Entry No. 219-2 at 17). The records stated that Harris "appeared normal with the exception of noticeable bruising to specific extremities" and "appeared depressed and upset with visible tears." (*Id.*). The officers recorded their interviews and findings in the case file.

On Monday, November 16, 2015, Deputy District Attorney Gina Florick, with District Attorney Thomas K. Cooke's concurrence, filed a criminal complaint against Cox. (Docket Entry No. 215-19; Docket Entry No. 215-7 at 155:2–11, 197:6–14, 198:1–13). The same day, Judge

Fagalde confirmed Cox's increased bail and continued his arraignment so that Cox could present "financial statements." (Docket Entry No. 215-16 at 4). On Tuesday, November 17, 2015, with Judge Tauber presiding, Cox pleaded not guilty. (*Id.* at 2, 3). The proceedings were continued to Thursday, November 19, 2015, for "Bail Review." (*Id.*). The record does not include information about the subsequent bail review.

On November 25, 2015, Smith, Florick, and a victim-witness advocate interviewed Harris again. In this interview, Harris recounted how and when she met Cox online; that she first agreed to meet Cox at the ranch in October 2015, not November 11, as previously reported; her stays at the ranch while Cox was not there; the wedding she attended with Cox around November 7; and her recollection of the events from November 11–13. (Docket Entry No. 219-2 at 24–29). At the interview, Florick reviewed the text messages on Harris's phone. (Docket Entry No. 235-15 at 106:22–107:11; Docket Entry No. 235-13 at 2–9). The officers did not formally collect information from Harris's cell phone for use in the case, nor did Florick direct them to do so. (*See* Docket Entry No. 219-2 at 56–63, 65–68 (collecting Harris's phone records in November 2016 and February 2017)).

The investigation continued. (Docket Entry No. 219-2 (documenting the case development)). In February 2016, Florick amended the criminal complaint to add five charges. (Docket Entry No. 215-14; *see* Docket Entry No. 215-7 at 166:12–18). Florick eventually left the DA's office, and Cooke assigned the case to a rotating cast of prosecutors. (Docket Entry No. 235-3 at 32:22–37:22, 87:9–25). Several of them expressed concern about Harris's credibility. (*See id.*). Cooke then reassigned these prosecutors to different cases. (*See id.*). Smith also began to doubt Harris's credibility. (*See* Docket Entry No. 219-2 at 60; Docket Entry No. 235-15 at

158:7–161:2).  Cooke continued the prosecution because he still thought Harris had been assaulted. (Docket Entry No. 235-3 at 36:9–25).

In October 2016, County officials obtained a search warrant to inspect Cox's property for health-and-safety Code violations.  (Docket Entry No. 25 at 80).  The warrant was based on declarations of the Mariposa County Planning Director, Sarah Williams; the Mariposa County Building Director, Michael Kinslow; the Mariposa County Director of Environmental Health, David Conway; and the Mariposa County Treasurer, Tax Collector, and County Clerk, Keith Williams.  These declarations relied on evidence collected from inspections on June 3, 2008; August 12, 2008; August 25, 2008; October 25, 2011; November 9, 2011; January 27, 2012; January 31, 2012; February 2, 2012; and September 1, 2015.  (Docket Entry No. 208-5 at 9–13). The declarations reported repeated code violations, ranging from violations of zoning regulations to unauthorized transient rental use of the property to construction deficiencies.  (*See id.*).

Based on this inspection, on December 2, 2016, "the [C]ounty issued [JDC Land] a notice and order to repair or abate . . . of violations . . . by January 2, 2017."  *County of Mariposa v. JDC Land Co., LLC*, No. F076310, 2020 WL 5015561, at *2 (Cal. Ct. App. Aug. 25, 2020).  The County sued in March 2017, alleging a failure to comply, asserting six claims for relief, and seeking nuisance abatement and receivership.  (Docket Entry No. 219-11).  In June 2017, the County filed a motion to appoint a receiver.  (Docket Entry No. 219-18).  JDC Land lodged procedural and substantive objections, arguing that the motion could not proceed until after additional discovery to allow it to prepare a defense, that it was entitled to a jury trial, and that the substantive violations were either insubstantial or fixed.  (Docket Entry Nos. 219-17, 220-2).  The trial court held a hearing on the motion in July 2017, during which JDC Land presented its objections.  *See JDC Land Co.*, 2020 WL 5015561, at *6–7.  The trial court rejected JDC Land's procedural arguments,

9

concluding that a jury trial was not necessary before placing the property into receivership and that JDC Land had sufficient notice and opportunity to develop its defenses to the County's charges. *See id.* The trial court then rejected JDC Land's substantive arguments, explaining that the evidence was clear and uncontroverted. *See id.* JDC Land appealed, and the California Court of Appeal for the Fifth District rejected its complaints in a thorough opinion. *See generally id.* The California Supreme Court then denied review of JDC Land's appeal from the order appointing a receiver. *See County of Mariposa v. JDC Land Co.*, No. S264800 (Cal. Dec. 10, 2020).

In June 2017, Harris testified in a workers' compensation proceeding that she had not been the victim of violent crime or sexual or physical abuse. (Docket Entry No. 208-14 at 117:20–118:1). After learning of this testimony, in August 2017, Cooke decided to drop the case against Cox. (Docket Entry No. 215-7 at 200:6–18). Cooke did not think he "could prove [the alleged crimes] beyond a reasonable doubt, because [Harris's] credibility was really in question." (*Id.* at 149:19–25; *see id.* at 105:4–106:7).

In August 2018, Cox sued Harris in state court for malicious prosecution based on allegations that she had falsely reported to the Sheriff that Cox raped her, which caused the District Attorney to file charges against him. (*See* Docket Entry No. 134-1). Harris filed an anti-SLAPP motion to dismiss the case. (Docket Entry No. 134-2 at 4). Cox opposed the motion by attaching cell phone records and other evidence that allegedly undermined Harris's claims to the officers. (*See id.* at 5–6). Harris replied with copies of the police and SART reports and witness statements, including Cox's. (*See id.* at 7). The California trial court granted Harris's anti-SLAPP motion and awarded Harris attorney's fees and costs. (*See id.* at 9).[3] The California appellate court affirmed

---

[3] In November 2018, Harris filed requests for a temporary restraining order and a domestic-violence restraining -rder against Cox. A California court issued a temporary restraining order. (Docket Entry No.

the trial-court ruling in September 2021.  (*See id.* at 21).  The appellate court determined that "Cox did not substantiate the minimal merit of his cause of action for malicious prosecution."  (*Id.*).  Cox did not appeal to the California Supreme Court, (Docket Entry No. 134-3), and a remitter was issued in November 2021, (Docket Entry No. 134-3 at 6).

During this litigation, the receiver proceeded slowly to remediate the property.  Cox was excluded from the property and could not "maintain buildings, roads, vegetation and care for [his] remaining livestock, including [his] horse, chickens, goats and pig."  (Docket Entry No. 212 at 10).  Cox stated in an affidavit that the receiver hired unnecessary bodyguards who "fed [his] horses moldy hay which could have sickened or killed them, [] drove [his] ATVs around the ranch, and allowed their children to come onto the ranch for recreation."  (*Id.* at 10).  Cox stated that he "obtained several estimates" on the costs of the repairs needed to bring the property up to code, ranging "from about $8,000 to about $13,000."  (*Id.* at 11–12; *cf.* Docket Entry No. 208-8 (receiver's November 2018 report)).  When a court order allowed Cox to return to the property in February 2019, he allegedly found it in disrepair, heavily damaged, trashed, and infested.  (Docket Entry No. 212 at 15–16).

In May 2019, the property was in a dire financial condition, with outstanding costs of over $500,000.  (Docket Entry No. 218-4 at 15–16).  The receivership filed a motion to confirm the property sale.  (*Id.*).  Cox and JDC Land opposed the sale, arguing that it would violate Cox's constitutional rights because there had been no trial on the County's claims; the receiver had

---

232-1 at 2; Docket Entry No. 232-2).  The court extended the restraining order several times.  (Docket Entry No. 232-1 at 1; Docket Entry Nos. 232-3, 232-4).  The court eventually denied the motion for a domestic-violence restraining order and dismissed the temporary restraining order, finding that Harris "ha[d] failed to carry her burden of proof by a preponderance of the evidence."  (Docket Entry No. 208-13 at 195:16–19, 198:20–28).  The court found that "Harris lacked credibility"; that her "testimony just could not hold water"; and that any "reasonable person could not conclude that her story was straight."  (*Id.* at 196:13–15).

inflated its costs and fees; there were better offers available for the property; and there were less drastic ways to remedy the property's financial condition. (*See generally* Docket Entry No. 219-14). In October 2019, the trial court confirmed the sale of the property. (Docket Entry No. 219-12). The appeals court dismissed Cox's appeal from the order confirming the sale. (Docket Entry No. 137-5).

In February 2022, the California trial court discharged the receiver. (Docket Entry No. 219-16). Neither Cox nor JDC Land "requested the court to conduct any audit or to require the Receiver to explain or provide proof of the propriety of any specific actions or expenditures." (*Id.* at 4). The court found that the "billings on the part of the Receiver were substantially appropriate" and discharged "any and all claims and/or causes of action which may arise from this receivership matter." (*Id.* at 5). The court found "that the sale [of the property] itself was properly conducted, and that the sale price was reasonably commensurate with the value of the property as determined by the level of interest therein shown by potential buyers." (*Id.* at 5–6). In light of the discharge order, the County moved for summary judgment on the underlying civil claims. The trial court denied the motion because the previous rulings on the auxiliary receivership proceedings did not establish liability on the civil claims as a matter of law. (Docket Entry No. 220-1 at 2–3).

After the receivership proceedings ended, Cox filed the Second Amended Complaint, asserting six claims for relief. (Docket Entry No. 169). After discovery, the parties cross-moved for summary judgment. (Docket Entry Nos. 210, 211, 215, 217). These motions are ready for ruling.

## II.   The Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986).  An issue is genuine if a reasonable trier of fact could return judgment for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary."  *Id.*

### III.    Analysis

#### A.    Cox's Motion for Summary Judgment Against Mariposa County

First, Cox argues that California's nuisance-abatement statute, which permits authorities to abate nuisances and violations of California housing regulations and codes, is unconstitutional. Second, he argues that Mariposa County violated the Fourth Amendment when it searched his property with a helicopter and when it executed a civil search warrant against his property in connection with the County's receivership proceedings.  Third, he argues that Mariposa County knowingly submitted false declarations to obtain an inspection warrant and to support the motion for a receivership.

Cox's motion is largely inappropriate for summary judgment because he does not argue the proper standard for relief against a municipal defendant.  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality may not be held liable for 42 U.S.C. § 1983 violations under respondeat superior for the actions of its subordinates.  In order to establish municipal liability, a plaintiff must show that a "policy or custom" led to the plaintiff's injury.  *Id.* at 694.  The Court has required plaintiffs to demonstrate that a municipality policy or custom "reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  A municipality like Mariposa County may be held liable under § 1983 only when "(1) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government

entity; (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (cleaned up).

*Monell* liability is narrower than constitutional liability. *See Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). But Cox argues his claims based on general § 1983 principles without assessing whether the County should be liable for conduct that may not result from official policy or custom. Cox's summary-judgment briefs do not address whether Mariposa County, under a policy or custom, searched his property with a helicopter; executed a civil search warrant against his property in connection with the County's receivership proceedings; or submitted false declarations to obtain an inspection warrant and to report a motion for receivership. *Monell* precludes this court from granting summary judgment on these parts of Cox's claims. *See City of Canton*, 489 U.S. at 385 (explaining that the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); *see, e.g.*, *Clinton v. Los Angeles Men's Cent. Jail*, No. 04–cv–9022, 2005 WL 8149563, at *2 (C.D. Cal. Apr. 12, 2005) ("In order to allege a claim against . . . the County, plaintiff must meet the requirements of *Monell*."); *Campbell v. County of Los Angeles*, No. 17–cv–4477, 2017 WL 10543662, at *1 (C.D. Cal. Aug. 15, 2017) ("Because a local government cannot be sued under a theory of respondeat superior, Plaintiff is required to allege the County's liability under *Monell*."). At most, Cox may ask the court to declare that only certain facts underlying these claims are not in dispute and consider granting partial summary judgment on that basis. The court does so in its assessment of the County's cross-motion for summary judgment.

14

Cox advances one claim that is facially attached to a policy or custom: his argument that California's nuisance-abatement statute, CAL. HEALTH & SAFETY CODE § 17980.6, is unconstitutional. Under this provision, when a building is maintained in a manner that violates state or local building maintenance regulations and "the violations are so extensive and of such a nature that the health and safety of residents or the public is substantially endangered," *id.*, a local enforcement agency, such as a county, may issue a notice and order requiring the unlawful conditions to be repaired or abated within a reasonable period, *see City of Santa Monica v. Gonzalez*, 43 Cal. 4th 905, 920 (2008). Receivership is a potential consequence of a failure to correct or abate the violations. *See id.*

The "statutory scheme clearly seeks to ensure that property owners are afforded due process before judicial appointment of a receiver." *Id.* at 926. The statute provides that "[n]othing" in it must "be construed to deprive an owner of a substandard building of all procedural due process rights guaranteed by the California Constitution and the United States Constitution, including, but not limited to, receipt of notice of the violation claimed and an adequate and reasonable period of time to comply with any orders that are issued by the enforcement agency or the court." CAL. HEALTH & SAFETY CODE § 17980.7(c)(14). Its specific provisions afford "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

First, the statute guarantees notice of the alleged Code violations and an opportunity to correct them. The enforcement agency must issue a "notice to repair issued pursuant to section 17980.6." *Gonzalez*, 43 Cal. 4th at 921. "This clause makes clear that if the owner fails to comply with the notice to repair within a reasonable time, an enforcement agency, a tenant, or a tenant

15

association or organization may seek an order from the trial court appointing a receiver." *Id.* It also "serves as a predicate for other judicial remedies, such as an order for statutory and an order affecting state tax deductions and benefits." *Id.* (internal citations omitted). An enforcement agency seeking to appoint a receiver must provide additional notice. A party initiating a receivership proceeding must include proof in the petition that notice was served not less than three days before filing on all persons with a recorded interest in the property. CAL. HEALTH & SAFETY CODE § 17980.7(c); *accord Gonzalez*, 43 Cal. 4th at 921.

Second, the statute provides for judicial review of the enforcement agency's actions. No receiver may be appointed unless a court concludes that "the owner has been afforded a reasonable opportunity to correct the conditions cited in the notice of violation." CAL. HEALTH & SAFETY CODE § 17980.7(c)(1). The court must then review the substance of the receivership petition. Even with an administrative determination that a receivership is appropriate, a court "may exercise its independent judgment on the evidence to determine whether the findings are supported by the weight of the evidence." *Id.* § 17980.8. Under the statute, trial courts may hear evidence, for instance, about a challenged "property's deteriorating and dilapidated state" and the inability of local governments to compel owners to repair or abate structural issues. *See, e.g.*, *Gonzalez*, 43 Cal. 4th at 931–33.

Third, trial court decisions are subject to appellate review. Although the California Supreme Court has applied a deferential abuse-of-discretion standard, trial courts must "consider all material facts and evidence and [] apply legal principles essential to an informed, intelligent, and just decision." *Id.* at 931 (quoting *Cal-Am. Income Prop. Fund VII v. Brown Dev. Corp.*, 138 Cal. App. 3d 268, 274 (Cal. Ct. App. 1982)). California appellate courts have reversed trial courts for abusing their discretion in approving a receiver's actions. *See, e.g.*, *Brown Dev. Corp.*, 138

Cal. App. 3d at 275 ("The court did not adequately consider the surrounding facts and circumstances in light of fairness, justice, and the rights of the parties and therefore abused its discretion in confirming the sale.").

This scheme affords property owners, such as Cox, due process. Cox does not cite a case in which the Supreme Court has held that an administrative scheme that affords property owners notice, an opportunity to be heard, a right to judicial findings and conclusions, and a right of appeal violates due process. Such robust layers of review satisfy even the most muscular views of due process guarantees. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 266–70 (1970). Cox instead argues that the statute is unconstitutional and vague because it provides only for a "reasonable" time to correct alleged deficiencies; because states have an obligation to use the least-restrictive means to regulate property; and because the County used false testimony to procure a receivership under the statute.

Cox's first argument fails because, although reasonableness is "difficult to define," "it is a common term in the legal world and" many "are familiar with its meaning." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). For this reason, "[e]ven in the criminal context, 'a statute is not void for vagueness merely because it uses the word "reasonable" or "unreasonable."'" *Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016) (quoting *United States v. Krumrei*, 258 F.3d 535, 538 (6th Cir. 2001)); *see Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 42 (D.D.C. 2016) (collecting cases). In fact, "[t]he term 'reasonable' has restrictive significance that has been deemed sufficient to save a statute from a void-for-vagueness challenge." *Cortes v. City of Houston*, 536 F. Supp. 2d 783, 797 (S.D. Tex. 2008); *see, e.g.*, *Karlin v. Foust*, 188 F.3d 446, 468 (7th Cir. 1999); *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515,

17

520 (8th Cir. 1999); *Kildea v. Electro–Wire Prods., Inc.*, 144 F.3d 400, 407 (6th Cir. 1998). California's statute is not unconstitutionally vague so as to deny due process.

Cox's second argument fails because it does not apply the correct governing law. State action is presumptively lawful, so "if a law neither burdens a fundamental right nor targets a suspect class," a court "will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). In assessing whether a state has a rational basis for passing the challenged law, a court "must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when" the state passed the challenged law. *Munn v. Illinois*, 94 U.S. 113, 132 (1876); *accord Williamson v. Lee Optical of Ok. Inc.*, 348 U.S. 483, 487–90 (1955); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Only if "no state of circumstances could exist to justify" the statute at issue "may [a court] declare" it "void." *Munn*, 94 U.S. at 132. Simply because California's statute intrudes on property rights does not mean that it must use the least-restrictive means to accomplish its desired end of eliminating public nuisances, blight, and property waste.

The main cases on which Cox relies, *Champlin Refining Company v. Corporate Commission of the State of Oklahoma*, 286 U.S. 210, 243 (1932), and *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 30–31 (1977), are inapposite. *Champlin* was decided in the *Lochner* era, under standards that the Supreme Court has since rejected in favor of the rational-basis test. *U.S. Trust* concerned a challenge under the Constitution's Contract Clause, which specifically proscribes states' interference with contracts. *See* 431 U.S. at 3, 30–31. That Cox's property was at issue does not change the applicable principles of constitutional review.

Cox's third argument fails because it is not properly presented on his motion for summary judgment. The argument that the County abused California statutes through reliance on false

evidence is subject to *Monell*.  *See, e.g.*, *Holley v. City of New York*, No. 34-cv-1838, 2024 WL 1116107, at \*2 (S.D.N.Y. Mar. 14, 2024) (dismissing a malicious prosecution claim against a municipality for failure to allege an applicable custom or policy); *Aurecchione v. Falco*, No. 22-cv-4538, 2023 WL 6255529, at \*6 (S.D.N.Y. Sept. 25, 2023) (same); *Hutson v. N.Y. City Police Dep't*, No. 15-cv-8797, 2017 WL 727544, at \*3–4 (S.D.N.Y. Feb. 23, 2017) (same); *Bagley v. City of Sunnyvale*, No. 16-cv-2250, 2017 WL 344998, at \*17–18 (N.D. Cal. Jan. 24, 2017) (same); *Stokes v. Wayne County*, No. 23-cv-6482, 2024 WL 4262276, at \*13 (W.D.N.Y. Sept. 23, 2024) (same); *see also Duvall v. Torres*, No. 11-cv-5106, 2012 WL 12883816, at \*8 (C.D. Cal. July 27, 2012).  Cox makes no argument and points to no evidence of a policy or custom of using false or fabricated evidence that would subject the County to liability.

For these reasons, Cox's motion for summary judgment, (Docket Entry No. 210), is denied.

### B.    Cox's and Harris's Cross-Motions for Summary Judgment

Cox moves for partial summary judgment seeking a declaration that he did not sexually assault Harris.  (Docket Entry No. 211).  Cox argues that a 2018 ruling rejecting Harris's request for a restraining order against Cox requires this court to find that Harris falsely reported Cox's sexual assault to the police.  (*See, e.g.*, Docket Entry Nos. 208-11, 208-12, 208-13 (Hearing Transcripts)).  Harris makes three arguments in her summary-judgment motion: (1) the statute of limitations bars Cox's claims against Harris; (2) a previous California state-court judgment between the parties precludes Cox's action against Harris; and (3) Cox has not pointed to sufficient evidence to support his civil-rights claims against Harris, a non-state actor.  (*See* Docket Entry No. 215).

The court denies Cox's motion for summary judgment and grants Harris's motion for summary judgment.  Limitations bars most of Cox's claims; the California state-court judgment

against Cox precludes his claims; and Cox did not substantiate Harris's connection, as a private actor, to the limited parts of his state-actor conspiracy claims that survive both limitations and claim preclusion.

### 1.       The Statute of Limitations

Cox's claims are potentially subject to limitations.  *See Cox v. Mariposa County*, No. 19-cv-1105, 2022 WL 4664129, at *12 & n.6 (E.D. Cal. Sept. 30, 2022).  The judge who previously presided over this case denied Harris's motion to dismiss based on limitations because she did not properly analyze when Cox's claims accrued.  *Cox v. Mariposa County*, No. 19-cv-1105, 2021 WL 4975361, at *7 (E.D. Cal. Oct. 26, 2021).  Harris renews her arguments with an appropriate accrual analysis.

Whether limitations bars a claim under 42 U.S.C. § 1983 depends on both state and federal law.  State law governs the time in which plaintiffs must bring their claims; courts apply the forum state's limitations period for personal-injury actions.  *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004) (citing *Fink v. Shedler*, 192 F.3d 911, 914 (9th Cir. 1999)).  California has a two-year statute of limitations for personal-injury actions.  CAL. CIV. PROC. CODE § 335.1.  Federal law governs when claims accrue—when the two-year limitations period begins to run.  A claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action.  *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004) (quoting *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir.2001)).  When a plaintiff knows or has reason to know of the alleged constitutional injury depends on the claim asserted.  *See McDonough v. Smith*, 588 U.S. 109, 115 (2019) ("An accrual analysis begins with identifying the specific constitutional right alleged to have been infringed." (cleaned up)).  Cox filed this lawsuit on August 12, 2019.  The question is whether each of Cox's claims accrued on or before August 12, 2017.

Limitations mostly bars Cox's claims based on his alleged false arrest, the alleged unlawful search of his ranch, and the alleged unlawful seizure of his personal effects. There is a genuine dispute of material fact as to whether limitations bars Cox's claims based on the October 2016 inspection warrant. Cox may not proceed against Harris based on the County's receivership action against the property because *Heck* bars it. Cox's claim against Harris for her role in the County's malicious prosecution is not barred by limitations.

### i.      Illegal Seizure by False Arrest

Cox's false-arrest claim accrued in November 2015. Cox alleges that "Defendants used Harris' false statements to arrest and detain Plaintiff Cox," and "Cox was wrongfully incarcerated based on the false statements." (Docket Entry No. 169 ¶¶ 197, 199). Cox's initial November 2015 arrest occurred without a warrant. (*See id.* ¶ 72). This gives rise to a wrongful arrest or false-imprisonment claim. *See Wallace v. Kato*, 549 U.S. 384, 389–91 (2007); *Gervin v. Florence*, 139 F.4th 1236, 1253 (11th Cir. 2025) ("[P]recedent has long separated malicious-prosecution claims from false-arrest or imprisonment claims on the basis that malicious-prosecution seizures were made under legal process but false-arrest or imprisonment seizures were made without legal process."). A claim for wrongful arrest or false imprisonment accrues when "the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389 (emphasis omitted). After that point, if the individual is still held, his claim transforms into the separate constitutional tort of malicious prosecution. *See id.* at 390. Cox was arraigned on November 17, 2015. Limitations ran on the false-arrest claim on November 17, 2017. Limitations bars his false-arrest claim against Harris.

### ii. Illegal Searches and Seizures of Cox's Property

Limitations bars most of Cox's claims based on illegal searches and seizures related to the criminal case. At the latest, these claims accrued in March 2017. Cox alleges that his property was improperly searched on October 25, 2011; November 13–14, 2015; and on October 14, 2016. (Docket Entry No. 169 ¶¶ 76, 104; *see* Docket Entry No. 210 at 18–19, 22–24). "Cox's laptop computer, bedsheets, clothing items, and other items found in the guest cabin" at the Bison Creek Ranch were seized on November 13–14, 2015. (Docket Entry No. 169 ¶ 76).

A plaintiff "is placed on constructive notice of the illegal conduct when the search and seizure takes place." *Klein v. City of Beverly Hills*, 865 F.3d 1276, 1279 (9th Cir. 2017) (per curiam). Although the discovery rule tolls accrual until the plaintiff has access to the "underlying affidavit" or other facts placing the plaintiff on notice that the search or seizure was improper, *see id.* at 1279–80, Cox claims that he knew from the start the searches and seizures were improper. He alleges that, at the latest, he "became aware that Harris had withheld and destroyed evidence upon receipt in March 2017 of the DOJ download of Harris's phone," *Cox*, 2021 WL 4975361, at *6.

The one exception is for the October 14, 2016, search of Cox's property under the inspection warrant issued before the receivership proceedings. Cox argues that the "inspection warrant" was "kept sealed and prevented [him] or [his] counsel from seeing [it] until it was released in this litigation." (Docket Entry No. 231 ¶ 20). But the declarations in support of the inspection warrant were filed with the clerk of the Mariposa Superior Court in October 2016. (*See* Docket Entry No. 25 at 78–97). At a minimum, this creates a genuine dispute of material fact on whether Cox had notice of the inspection warrant affidavits, because the face of the documents does not show that they were sealed by the court. Based on this court's review of the brief and record, Cox

22

does not make a similar claim with respect to the searches and seizures arising out of the criminal case against him.  Cox's claims for those searches and seizures accrued at the latest in March 2017.  Limitations ran on them in March 2019.  Limitations bars his search-and-seizure claims against Harris, with the exception of the October 2016 inspection.

Cox argues that limitations for these claims could not accrue under California law.  (Docket Entry No. 236 at 17).  California law bars suits against peace officers "based upon conduct . . . relating to the offense for which the accused is charged . . . while the charges against the accused are pending before a superior court."  CAL. GOV. CODE § 945.3.  The law then tolls the statute of limitations for claims "[w]hen the commencement of an action is stayed by injunction or statutory prohibition."  CAL. CIV. PROC. CODE § 356.  These statutes do not help Cox because Harris is not a peace officer under Section 945.3.  *See, e.g.*, *Matthews v. Macanas*, 990 F.2d 467, 469 (9th Cir. 1993) ("[S]ection 945.3's tolling provision does not apply to federal officials."); *Damjanovic v. Ambrose*, 3 Cal. App. 4th 503, 506 (Cal. Ct. App. 1992) (holding that Section 945.3 "is inapplicable to causes of action against civilian defendants").  Limitations bars Cox's search-and-seizure claims against Harris.

### iii.        Malicious Prosecution of the Civil Case and Receivership Proceedings

Most of Cox's claims based on the civil receivership proceedings never accrued, so they may not proceed.  Cox's claims that Harris helped the County proceed against his property based on false evidence sounds in malicious prosecution.  *See, e.g.*, *McDonough*, 588 U.S. at 117–19; *Gervin*, 139 F.4th at 1259 (explaining that the tort of malicious prosecution "could redress a wide array of baseless legal proceedings, civil and criminal alike, that could injure a person or her property").  Malicious-prosecution claims—that is, claims that a defendant injured the plaintiff through legal process "using fabricated evidence"—begin to run when the legal proceedings

23

terminate in the plaintiff's favor. *McDonough*, 588 U.S. at 125; *accord Laskar v. Hurd*, 972 F.3d 1278, 1292 (11th Cir. 2020) ("[T]he favorable-termination requirement functions as a rule of accrual . . . ."). But at least part of the civil proceedings against Cox—the receivership proceedings—never terminated in his or his LLC's favor. A California appeals court affirmed the appointment of the receiver, *County of Mariposa v. JDC Land Co., LLC*, No. F076310, 2020 WL 5015561, at \*21 (Cal. Ct. App. Aug. 25, 2020); a California appeals court dismissed the appeal of the order confirming the sale of the property, (Docket Entry No. 137-5); and the discharge order stated that, aside from some billing irregularities that did not rise to a breach of a fiduciary duty, the sale and receivership were properly conducted, (Docket Entry No. 150-1). Cox cannot show that a claim based on the receivership accrued in the first place.

The Supreme Court addressed a similar issue in *Heck v. Humphrey*, 512 U.S. 477 (1994). In that case, a state prisoner who had been convicted sued under § 1983 for malicious prosecution, arguing that the prosecution had destroyed exculpatory evidence to cause his conviction. *See id.* at 478–80. The Supreme Court held that to "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87 (footnote and citations omitted). The Court adopted this requirement in part to avoid the "the statute-of-limitations issue wrestled with by the Court of Appeals"—how to equitably toll actions "while state challenges to the conviction or sentence were being exhausted." *Id.* at 489. Just as a malicious-prosecution action does not "accrue until the criminal proceedings [] terminated in the plaintiff's favor," a "§ 1983 cause of action for damages

24

attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90.  The *Heck* Court "den[ied] the existence of" the plaintiff's "cause of action." *Id.* at 489.

Applying *Heck* results in the conclusion that Cox has no cause of action because there are valid civil orders on which his claims are based and "a judgment [in this case] in favor of" him "would necessarily imply the invalidity of" those orders.  512 U.S. at 487; *see Olivier v. City of Brandon*, 146 S. Ct. 916, 925 (2026) (*Heck* bars "damages attributable to" a valid state-court order or judgment).[4]  Although the litigation that forms the basis of Cox's claims is civil, not criminal, courts have held that "*Heck* is not confined to challenges to criminal convictions." *Hall v. Porfert*, 2023 WL 6274833, at *1 (11th Cir. Sept. 26, 2023) (per curiam) (collecting cases); *Huftile v. Miccio-Fonseca*, 410 F.3d 1136, 1139–40 (9th Cir. 2005); *see, e.g.*, *Thomas v. Eschen*, 928 F.3d 709, 711 (8th Cir. 2019) (concluding that *Heck* barred a malicious-prosecution claim based on a prior civil-commitment order and rejecting the civil-criminal distinction the plaintiff attempted to draw); *see also Gervin*, 139 F.4th at 1254–60 (surveying the history of malicious-prosecution actions and concluding that the civil or criminal nature of the initial suit was immaterial).[5] Applying *Heck* here avoids the same "risk of having 'parallel litigation' leading to 'two conflicting

---

[4] Although no party raised the *Heck* issue, *cf. United States v. Sineneng-Smith*, 590 U.S. 371, 380 (2020), Harris's motion for summary judgment, and the parties' dispute over whether Cox's claims accrued within the limitations period, necessarily raised issues that required this court to apply *Heck*.  The court requested supplemental briefing and considered the parties' arguments.  (Docket Entry Nos. 266, 267).

[5] Although many of the cases applying *Heck* to civil cases are based on civil commitments, the fact of confinement is not material to applying *Heck*.  Justice Scalia rejected Justice Souter's rule that would have linked *Heck*'s bar to the term of the plaintiff's commitment, explaining that "the principle barring collateral attacks . . . is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Heck*, 512 U.S. at 490 n.10.  The principle barring collateral attacks precludes Cox's claim while the orders in the receivership proceeding remain valid, binding, and final.

resolutions arising out of the same or identical transaction,' which would undermine both 'finality and consistency.'" *Thomas*, 928 F.3d at 711 (quoting *Heck*, 512 U.S. at 484–85).

*Heck*'s rule also resolves complicated accrual issues. For example, Harris asserts that Cox's "causes of action accrued . . . when the receiver took possession and control of the property." *Shree Shiva, LLC v. City of Redding*, No. 21-cv-00211, 2021 WL 3912258, at *1 (E.D. Cal. Sept. 1, 2021); *see Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) ("[T]he cause of action accrued not later than the date the receiver was appointed."). Cox responds that his claims accrued when the California court ordered the sale of his property in October 2019, or when the receivership action closed in February 2022. Adopting Harris's position follows the principle that a cause of action accrues when the plaintiff knows of the fact and the cause of an injury, even if the full extent of the injury is not known. *Amin Ijbara*, 860 F.3d at 493 (quoting *Wallace*, 549 U.S. at 388). To the extent the remainder of the receivership proceedings would have affected Cox's suit, courts would, "in accord with common practice, . . . stay the civil action" until the receivership proceedings were completed. *Wallace*, 549 U.S. at 393–94. By contrast, adopting Cox's position follows the usual accrual rule for malicious-prosecution cases: the cause of action accrues upon the favorable termination of the prior legal proceeding. *See McDonough*, 588 U.S. at 125. Cox's position ignores the consequences of when a proceeding does not terminate favorably. *Cf. Smith v. Hill*, 237 Cal. App. 2d 374, 386 (Cal. Ct. App. 1965) ("The right of action against a party wrongfully procuring the appointment of a receiver accrues on the adjudication that the appointment was improper."). *Heck* resolved that question by holding that the claim did not accrue and did not exist under § 1983. *See Heck*, 512 U.S. at 489–90.

This conclusion holds even though the underlying civil action against Cox did not terminate in his favor. (*See* Docket Entry No. 220-1 (the order denying the County's motion for summary

26

judgment on the civil claims underlying the receivership relief)).   The common law in effect when Congress enacted § 1983, *see Nieves v. Bartlett*, 587 U.S. 391, 405 (2019), distinguished between malicious-prosecution claims based on an underlying civil action and the preliminary, ancillary, or auxiliary relief sought in that underlying action, *see* THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 187–88 (Chi., Callaghan & Co., 1879).  With some exceptions,[6] the general rule was that parties could maintain a suit for malicious prosecution based on relief in a prior ancillary proceeding only if that proceeding terminated in the accused's favor.  *See id.* at 188 ("If, however, the validity of the attachment was allowed to be tested, and its justification inquired into, in some distinct proceeding while the suit itself was pending, we should say that a suit for maliciously suing out the writ could not be brought until the writ itself was dissolved or quashed."); *see, e.g.*, *Tisdale v. Kingman*, 13 S.E. 547, 548–49 (S.C. 1891) ("[I]t was necessary to allege and prove that the proceedings under the provisional remedy, by attachment, had terminated in favor of the plaintiff before the commencement of this action." (citing *Hogg v. Pinckney*, 16 S.C. 387 (1882))).

The question is whether the receivership proceedings' conclusion would be consistent with a verdict for Cox in this case.  *See Laskar*, 972 F.3d at 1291; *Heck*, 512 U.S. at 486–87; *Olivier*, 146 S. Ct. at 924–25.  Ruling for Cox here would create an inconsistency.  The California appellate court made clear that "if the property is *not* substandard by degree or even substandard at all, the receiver would inform the trial court," as required by its fiduciary duties as an officer of the court.

---

[6] There was no favorable termination requirement if the preliminary or ancillary relief was obtained *ex parte*.  COOLEY, LAW OF TORTS, at 187–88; *see, e.g.*, *Bump v. Betts*, 19 Wend. 421, 422 (N.Y. Sup. Ct. 1838); *Fortman v. Rottier*, 8 Ohio St. 548, 552–53 (1858); *Swensgaard v. Davis*, 23 N.W. 543, 543 (Minn. 1885).  In some cases, there was no distinction between the ancillary relief and the underlying complaint, so the favorable-termination requirement did not distinguish between the two.  *See White Lighting Co. v. Wolfson*, 68 Cal. 2d 336, 347–51 (1968) (recounting the common-law rules); *see, e.g.*, *Crews v. Mayo*, 165 Cal. 493, 496 (1913).

*JDC Land Co.*, 2020 WL 5015561, at *17. Yet the receiver did not do so. It instead completed its assigned work on the property, abating the various Code violations that it found. (Docket Entry No. 208-8). Cox did not challenge the necessity or propriety of the receiver's work. As the discharge order recounted, although "Cox/JDC Land" have "cried foul and have raised some legitimate questions in a general sense, neither have requested the court to conduct any audit or to require the Receiver to explain or provide proof of the propriety of any specific actions or expenditures." (Docket Entry No. 219-16 at 4). The court found that the receiver "substantially complied with its fiduciary and other obligations in its actions in administering the receivership." (*Id.* at 7). This finding is inconsistent with the conclusion that the property was Code compliant and that the receivership was not necessary. *See JDC Land Co., LLC*, 2020 WL 5015561, at *17. Under the "common-law principle [derived] from multiple bodies of well-established decisions," *Laskar*, 972 F.3d at 1291, the receivership proceedings did not terminate in Cox's favor. The *Heck* bar applies.

One complication is that Cox framed his claim arising out of the receivership proceedings as like the tort of "abuse of process." *Cox*, 2022 WL 4664129, at *9. In *Heck*, the Supreme Court recognized that an abuse-of-process claim is distinct from a malicious-prosecution claim because the relevant injury is "limited to the harm caused by the misuse of process, and does not include harm (such as conviction and confinement) resulting from that process's being carried through to its lawful conclusion." 512 U.S. at 486 n.5. This distinction does not help Cox, however, because he does not assert harm from the alleged misuse of process itself. He alleges an abuse of process and seeks damages caused by the lawful conclusion of that process, *see Thomas*, 928 F.3d at 712–13; *Heck*, 512 U.S. at 486 n.5: "the gravamen of JDC's claims against the County Defendants is abuse of process involving the falsification of evidence and culminating in the deprivation of

constitutionally protected property rights," *Cox*, 2022 WL 4664129, at \*11.  Cox lost his property under lawful orders that are still valid.  *Heck* bars his claim to damages based on those orders or the process leading to them while they are still valid.  *See Heck*, 512 U.S. at 486 n.5 (explaining, for example, that expenses a plaintiff incurs in defending against crimes charged are not compensable in a suit for abuse of process).

Under *Heck*, Cox's cause of action based on the receivership proceedings never accrued, so they do not exist under § 1983.  Limitations do not completely bar Cox's claims based on the underlying civil action, however, because the civil case closed without a final judgment on the County's causes of action.

### iv.        Malicious Prosecution of the Criminal Case

Limitations do not bar Cox's malicious-prosecution claim based on the allegedly wrongful motion to increase bail and on the state criminal prosecution.  The District Attorney's Office dismissed the criminal charges against Cox on August 14, 2017.  (Docket Entry No. 215 at 14).  A dismissal of charges is a favorable termination.  *Thompson v. Clark*, 596 U.S. 36, 39 (2022).  Cox filed suit just before limitations barred his claim.  Cox's claims based on the allegedly wrongful motion to increase bail and the state criminal prosecution itself survive limitations.

### 2.        Claim Preclusion

Cox's remaining claim against Harris is precluded.  On August 22, 2018, Cox sued Harris in the California state courts for malicious prosecution.  Cox based that action on his allegation that Harris had falsely stated "to the public and to the Sheriff, that [Cox] raped her," which resulted in the criminal charges against Cox.  (Docket Entry No. 134-1 ¶¶ 5–6).  On December 19, 2018, Harris filed an anti-SLAPP motion in the state-court civil case.  (Docket Entry No. 134-2 at 4).  Cox opposed the motion by, among other things, attaching a record of cell phone texts Harris made

during the time she claimed she was trapped at Cox's ranch and could not make outgoing calls. (*Id.* at 5–6).  Harris's reply to Cox's opposition included a copy of the police report, which contained findings that Harris's vaginal area contained semen with DNA matching Cox's and testimony from a Sexual Assault Response Team examiner who concluded that Harris had bruising over her body and showed "signs of trauma or micro fractures to [her] vagina" that were "consistent with" her "report of a sexual assault."  (*Id.* at 7).  The trial court granted Cox's motion and dismissed the case, and an appellate court affirmed.   (*See id.* at 21–22).  Cox did not pursue additional review.   A remittitur issued in November 2021 finalized the case. (Docket Entry No. 134-3).

Under 28 U.S.C. § 1783, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *see Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 83 (1984) (holding that claim preclusion bars constitutional claims under § 1983 which could have been argued in an earlier state-court proceeding).  "Claim preclusion arises if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit."  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015).  The second and third elements of claim preclusion apply here: Cox and Harris were both parties to the state-court suit, which resulted in a final judgment on the merits.  The questions are whether Cox is alleging the same cause of action he pursued in state court and whether the state-court action provided due process.  If so, claim preclusion can apply.  *See Cox v. Mariposa County*, No. 19-cv-1105, 2022 WL 4226143, at *13 (E.D. Cal. Sept. 13, 2022).  Both issues resolve in Harris's favor.

First, Cox recycles the claims at issue in the state-court suit. Claim preclusion "is based upon the primary right theory." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 904 (2002). "[T]he primary right is simply the plaintiff's right to be free from the particular injury suffered." *Crowley v. Katleman*, 8 Cal. 4th 666, 681 (1994).[7] The injury is distinct from both the legal theory on which a plaintiff relies and the specific remedy the plaintiff seeks. *See id.* at 681–82. In *Crowley*, the California Supreme Court addressed how the primary-right theory interacted with malicious-prosecution claims: if the plaintiff "filed a second malicious prosecution action," then the "defendants could have invoked the primary right theory to support . . . the bar of res judicata." *Id.* at 682. Both the first and the second malicious-prosecution suits "sought to vindicate a single primary right—the right to be free from defending against a lawsuit initiated with malice and without probable cause." *Hindin v. Rust*, 118 Cal. App. 4th 1247, 1258 (Cal. Ct. App. 2004). The same goes for both of Cox's suits. Cox's state-court suit sought redress from Harris for forcing him to defend against a baseless criminal prosecution. This federal suit does the same, based on the same criminal prosecution. Claim preclusion applies to subsequent malicious-prosecution

---

[7] There is a point of potential confusion. Courts have often repeated the California Supreme Court's admonition that the "primary right theory" is "ill-suited to the anti-SLAPP context." *Williams v. Drs. Med. Ctr. of Modesto, Inc.*, 100 Cal. App. 5th 1117, 1134 (Cal. Ct. App. 2024) (quoting *Baral v. Schnitt*, 1 Cal. 5th 376, 395 (2016)). This admonition applies to the interpretation of the anti-SLAPP statute and whether a defendant may use the anti-SLAPP procedure to strike certain allegations and dismiss certain claims. *See Baral*, 1 Cal. at 396 (providing guidance on whether the anti-SLAPP procedure can be used in a subsequent lawsuit). If a party chooses to dismiss a subsequent suit based on issue preclusion, and the first suit was resolved by an anti-SLAPP ruling, the issues actually litigated and necessarily decided in the first suit are limited to the scope of the anti-SLAPP statute. *See Williams*, 100 Cal. App. 5th at 1136 ("If an element of a cause of action or claim is not based on a specific allegation that was previously determined to constitute protected activity, then the prior anti-SLAPP ruling will not have [issue] preclusive effect."); *see also id.* at 1136 n.8 (noting that claim preclusion was waived). But claim preclusion promotes judicial economy by requiring all claims based on the same primary right to be brought in one suit, *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 92 (2020), so, unlike issue preclusion, its force is not limited by the scope of the anti-SLAPP mechanism that was used to resolve the first suit, *see, e.g.*, *Davis v. Purple Mountain Empire X, LLC*, No. D078450, 2022 WL 167452, at *9 (Cal. Ct. App. Jan. 19, 2022) (using the primary-right framework to conclude that the anti-SLAPP dismissal in the previous suit claim precluded the instant litigation).

claims based on a single malicious prosecution.  *See, e.g.*, *Mycogen Corp.*, 28 Cal. 4th at 908 (applying claim preclusion to subsequent suits based on "a single breach of contract").

Cox relies on previous rulings in this case, which held that his current suit is based on misconduct after the criminal charges had been filed.  Cox reasons that this federal suit attempts to vindicate "his right to be free from violations of his rights in the course of prosecution," such as the right not to have exculpatory evidence destroyed.  *Cox*, 2022 WL 4226143, at *14.  With respect to the previous rulings in this case, such a distinction does not hold up under state or federal law.

The primary right that Cox seeks to vindicate under state law covers both the initiation and prosecution of the criminal case against him.  "The duty involved in a malicious prosecution action . . . is the obligation to refrain from maintaining a malicious and unmerited lawsuit." *Nicholson v. Fazeli*, 113 Cal. App. 4th 1091, 1102 (Cal. Ct. App. 2003).  The tort makes actionable both the initiation and continuation of a lawsuit that lacks probable cause.  *See Zamos v. Stroud*, 32 Cal. 4th 958, 970 (2004) ("[A]n attorney may be held liable for malicious prosecution for continuing to prosecute a lawsuit discovered to lack probable cause."); *see also Cuevas-Martinez v. Sun Salt Sand, Inc.*, 35 Cal. App. 5th 1109, 1119 (Cal. Ct. App. 2019); *Bulkley v. Klein*, 206 Cal. App. 2d 742, 748 (Cal. Ct. App. 1962).  If someone initiates, maintains, or continues an action based on fabricated testimony or maliciously hidden exculpatory evidence, then the alleged tort sounds in malicious prosecution.  *See, e.g.*, *Patrick M. v. County of Ventura*, No. B173748, 2005 WL 361389, at *3 (Cal. Ct. App. Feb. 16, 2005) ("Absent triable facts of perjury, malicious fabrication of evidence, or the malicious concealment of exculpatory evidence, appellants may not sue for malicious prosecution."); *see also Greene v. Bank of Am.*, 236 Cal. App. 4th 922, 933 (Cal. Ct. App. 2015).  Whether Harris helped initiate a criminal prosecution against Cox or detain him

based on fabricated testimony, or whether she played a part in continuing the prosecution or detention by helping the State withhold or destroy exculpatory evidence, *see Cox*, 2022 WL 4226143, at *14, the injury to Cox is the same: he was injured by being detained and having to defend against a criminal action that should not have started or continued because it lacked probable cause.

Supreme Court precedent confirms this conclusion. The Court has been clear that § 1983 claims based on fabricated testimony or buried exculpatory evidence sound in malicious prosecution. *See, e.g.*, *Heck*, 512 U.S. at 478–79, 484 (destroyed exculpatory evidence); *Manuel v. City of Joliet*, 580 U.S. 357, 359 (2017) (fabricated inculpatory evidence); *McDonough*, 588 U.S. at 112 (fabricated inculpatory evidence). Section 1983 claims based on either initiated or continued proceedings sound in malicious prosecution. *See Manuel*, 580 U.S. at 369 n.8 (explaining that fabricated evidence can result in a Fourth Amendment violation "[w]hatever [the] precise form . . . [of] the proceeding"); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 563 (2024) ("[I]f an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated.").

Cox's current theory that he has a distinct right to be free from due process violations in the course of the prosecution against him is difficult to square with these precedents. The "group of constitutional privileges" that "deliver[] exculpatory evidence into the hands of the accused . . . protect[s]" them "from erroneous conviction." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Those rights are not relevant for purposes of § 1983 until trial. *See Manuel*, 580 U.S. at 369 n.8 ("[O]nce a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment."). There is "no constitutional

violation for failure to provide material evidence under *Brady*" if the plaintiff's "criminal charges were dismissed." *Puccetti v. Spencer*, 476 F. App'x 658, 660 (9th Cir. 2011) (mem.); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("Such a violation occurred at trial (for *Brady* identifies a trial right) . . . ."); *Deeter-Larsen v. Whatcom Humane Soc'y*, No. C18-300 RAJ, 2019 WL 2524939, at *6 (W.D. Wash. June 19, 2019) ("[A] *Brady* violation cannot occur where there is no conviction."); *see also Glossip v. Oklahoma*, 604 U.S. 226, 246–48 (2025) (explaining that a "conviction" obtained through the knowing use of materially false testimony violates the Constitution).

Until a trial occurs, the Fourth Amendment—and the malicious-prosecution tort that make up its § 1983 analogue—control. *See Manuel*, 580 U.S. at 369 n.8 (explaining that the Framers drafted the Fourth Amendment to address the pretrial deprivations of liberty and the standards and procedures applicable to suspects detained pending trial). Fourth Amendment protections are narrower than due-process and common-law protections because, absent a seizure, there is no § 1983 claim for malicious prosecution. *See Thompson*, 596 U.S. at 42 (explaining that courts have "held that malicious prosecution is actionable under the Fourth Amendment to the extent that the defendant's actions cause the plaintiff to be 'seized' without probable cause" (quoting *Pitt v. District of Columbia*, 491 F.3d 494, 510–511 (D.C. Cir. 2007))); *see, e.g., Karam v. City of Burbank*, 352 F.3d 1188, 1193–94 (9th Cir. 2003). The Ninth Circuit has recognized a broader substantive due process right "not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en

banc)).[8] But the injuries are the same as in malicious prosecution: unlawful detention and baseless criminal charges. This places Cox between a rock and a hard place. He cannot state a *Brady* claim because he was neither tried nor convicted, or his malicious-prosecution claim falls within the primary right he asserted in the California state court. Either way, his remaining claims against Harris fail.

Second, Harris obtained the state-court judgment in compliance with due process. To render a valid judgment, "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481 (1982). The core of due process is notice and the opportunity to be heard. *Mullane*, 339 U.S. at 314. This includes the "full and fair opportunity to litigate" claims. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "[N]o single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause." *Kremer*, 456 U.S. at 483. Due process requires fair procedures, not necessarily a correct application of those procedures or a substantively correct outcome. "Federal district courts, as courts of original jurisdiction, may not serve as appellate tribunals to review errors allegedly committed by state courts." *Turnbow v. Pac. Mut. Life Ins. Co.*, 934 F.2d 1100, 1103 (9th Cir. 1991) (emphasis omitted) (quoting *MacKay v. Pfeil*, 827 F.2d 540, 543 (9th Cir. 1987)).

---

[8] Other cases in the Ninth Circuit suggest otherwise, holding that "no substantive due process right exists under the Fourteenth Amendment to be free from prosecution without probable cause." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004). This rule is more consistent with Supreme Court precedent holding that the Fourth Amendment, not the Due Process Clause, addresses pretrial deprivations of liberty. *See Manuel*, 580 U.S. at 369 n.8; *see generally Albright v. Oliver*, 510 U.S. 266 (1994) (debating this question in the plurality and concurring opinions). *But see Thompson*, 596 U.S. at 42 n.2 (acknowledging that "[i]t has been argued that the Due Process Clause could be an appropriate analytical home for a malicious prosecution claim under § 1983"). For purposes of this opinion, the court will assume that, under Ninth Circuit precedent, there is a substantive due process right to be free of unfounded criminal charges.

To prove a due process violation, there must be "a compelling showing of unfairness" based on something more than "a conclusion that the first determination was patently erroneous." RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. j (AM. L. INST. 1982). Cox must point to, at a minimum, "a substantial procedural limitation in the first litigation." *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, No. 74-cv-3566, 1984 WL 2943, at *4 (C.D. Cal. Jan. 19, 1984). If Cox had the opportunity to "raise[], brief[], and argue[]" the pertinent issues, he received due process. *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 639 (9th Cir. 2020); *see Ross v. Alaska*, 189 F.3d 1107, 1113 (9th Cir. 1999) (concluding that the plaintiff received a full and fair opportunity to litigate an issue in a prior Alaska state court proceeding when the plaintiff was able to raise, fully brief, and argue the issue).

Cox received due process in the California state courts. He had the opportunity to raise, brief, and argue the merits of his case in response to Harris's anti-SLAPP motion. (Docket Entry Nos. 134-1, 134-2, 134-3). When the trial court rejected his arguments, he had the opportunity to appeal, raise any errors he thought the trial court made, and brief and argue those claimed errors before an appellate tribunal. (*See id.*). When the appellate court rejected his appeal, he again had the opportunity to appeal to the California Supreme Court and raise any errors he thought the appellate court made. Cox declined that opportunity. (*See* Docket Entry No. 134-3 at 5 ("Remittitur issued.")). There is little reason to think "this panoply of procedures" is insufficient "under the Due Process Clause." *Kremer*, 456 U.S. at 484.

Cox's response briefly touches on the due process issue.[9] He mostly relies on the previous ruling in this case that the California state proceedings did not comply with due process. (*See*

---

[9] Cox briefly argues that the state-court judgment does not deserve preclusive effect because it only determined that his pleadings were deficient. (Docket Entry No. 238 at 22–23). But the appellate court

Docket Entry No. 166 at 8–38). Again, with respect for the previous rulings in this case, the due process analysis that Cox relies on goes far beyond the question whether the California courts afforded him "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer*, 456 U.S. at 481. The California court of appeals affirmed the dismissal of Cox's claim because it concluded that he had not shown that the prosecution's dismissal of the criminal case against him indicated his innocence, an essential element of his malicious-prosecution claim under California law. (*See* Docket Entry No. 134-2 at 18). The previous ruling in this case found the California court's reasoning inconsistent with due process because the tribunal could "not see how the appellate court reached the conclusion that there was 'no evidence' as to the 'favorable termination' of the criminal case against Cox" based on the record. *See Cox*, 2022 WL 4226143, at *19. Nor could the previous ruling explain how the California courts ignored the erroneous exclusion of Harris's June 2017 deposition transcript testimony that she had not been a victim of a sexual assault. *See id.* at *20. The previous ruling saw these errors as due process issues based on a concern that overbroad application of the anti-SLAPP mechanism could undermine a plaintiff's jury-trial rights. *See id.* This was mistaken.

---

determined that Cox failed to provide "evidence on the essential issue of a favorable termination" such that he "did not substantiate the minimal merit of his cause of action for malicious prosecution." (Docket Entry No. 134-2 at 21). The case was resolved on the merits. Cox argues in passing that the more recent order denying Harris's motion for a restraining order supersedes her judgment against Cox in his state-court civil suit. (Docket Entry No. 238 at 22–23). But the last-in-time rule does not apply because the judgments are not "inconsistent." RESTATEMENT (SECOND) OF JUDGMENTS § 15. There is no issue inconsistency because a decision finding that Cox posed no present threat to Harris and that, after new and later testimony, Harris's allegations were not credible does not undermine the earlier civil-suit ruling that the prosecution did not terminate in Cox's favor. *See Crowley*, 8 Cal. 4th at 686 (explaining that the probable-cause and favorable-termination elements "serve different purposes, and the legal tenability of the underlying action is not the standard by which to judge whether the action was terminated in plaintiff's favor" (cleaned up)). The restraining-order ruling presented narrow legal issues that the first civil suit did not preclude; the second judgment has an independent issue-preclusive effect that does not undermine the claim-preclusive effect of the first judgment. *Cf.* RESTATEMENT (SECOND) OF JUDGMENTS §§ 26(c) & reporter's note, 83(3).

Cox had the opportunity to raise, brief, and argue his disagreements with the trial-court decision that he now challenges as erroneous. He raised some of those disagreements, but not others. For example, he forfeited the argument that his key piece of evidence—a YouTube video allegedly showing the prosecutor confess Cox's innocence—was erroneously excluded from the anti-SLAPP proceedings. (Docket Entry No. 134-2 at 20). He had the opportunity to appeal those rulings but did not do so. (Docket Entry No. 134-3 at 5). The mere fact that anti-SLAPP procedures are at the aggressive end of pre-trial screening mechanisms, and so may implicate plaintiffs' state-law jury trial rights, *see Wilcox v. Superior Ct.*, 27 Cal. App. 4th 809, 823 (Cal. Ct. App. 1994), *disapproved of on other grounds by Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53 (2002), does not give a federal court license to evaluate whether a state trial court adhered to the state-law standards of review. If that were the case, then state-court judgments based on anti-SLAPP mechanisms would be given full faith and credit only if a federal district court agreed with the case's outcome, or at least thought that the outcome was reasonable. But that is not the standard. Even "patently erroneous" rulings may preclude future litigation. RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. j. If the state court erred, then Cox should have raised the issue on direct appeal. His "fail[ure] to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy." *Kremer*, 456 U.S. at 485.

Cox's concern about his right to a jury trial is also misplaced. Although California courts have expressed concern that anti-SLAPP procedures may deprive plaintiffs of their jury rights, this does not violate the Fourteenth Amendment. The Fourteenth Amendment does not require states to guarantee civil litigants the right to a jury trial. *Minneapolis & St. L.R. Co. v. Bombolis*, 241 U.S. 211, 217 (1916); *see R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 924 (9th Cir. 2005) ("[T]he Seventh Amendment's guarantee of the right to a civil trial by jury does not apply to the

states and was not incorporated into the Fourteenth Amendment."). The federal Constitution does not forbid states from making the judge the finder of fact in many civil cases. States have built sophisticated legal regimes based on the extra leeway retained in the absence of incorporation. *See* Samuel Bray, *Incorporate the Seventh Amendment Civil Jury Trial Right?*, DIVIDED ARGUMENT (May 22, 2025), https://perma.cc/J73W-2J5B ("[I]ncorporation of the civil jury trial right would be a neutron bomb on the Delaware Court of Chancery."). Even if the state-court rulings undermined Cox's right to a jury trial, that error would not necessarily raise a federal due process issue that prevents claim preclusion. Although California courts may not give preclusive effect to their own judgments rendered in violation of state-constitutional rights, *see Allen*, 449 U.S. at 96, Cox has not cited a case in which, for that reason, California courts have refused to give claim-preclusive effect to their own anti-SLAPP judgments. There is insufficient support for this court to conclude that the anti-SLAPP ruling affirmed by a California appeals court violated the California constitution.[10]

The record reveals no "substantial procedural limitation" in the state-court proceedings. *Phonetele, Inc.*, 1984 WL 2943, at *4. Cox points to the erroneous exclusion of some evidence, including the YouTube video and the June 2017 deposition transcript. But Cox had the opportunity in the trial court and on appeal to challenge the exclusion of both pieces of evidence. The California court of appeals explained that Cox forfeited his arguments about whether the YouTube video was admissible and noted that, even if Cox had raised the argument, he still could not have prevailed because he did not follow the requirement that videos must be introduced with

---

[10] In addition, the California appeals court cited case law that highlights concerns about the conflict between Californian's jury-trial rights and the anti-SLAPP procedure. (*See* Docket Entry No. 134-2 at 2 (citing *Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 6 Cal. 5th 931, 940 (Cal. Ct. App. 2019)); *see Sweetwater*, 6 Cal. 5th at 943 (discussing jury-trial rights). The California appeals court knew the limits of the anti-SLAPP procedure when it ruled against Cox.

transcripts.    (Docket Entry No. 134-2 at 20 & n.10).    The appellate decision discussed the deposition transcript briefly but did not consider its impact on the merits of Cox's claim.  (*Id.* at 5, 8).  Perhaps that was an oversight by the California court of appeals, as the previous ruling in this case suggests.  *See Cox*, 2022 WL 4226143, at *20.  Perhaps the California court of appeals never addressed the deposition transcript because Cox never argued that the deposition transcript proved that his criminal prosecution terminated favorably.  Either way, there was no due process violation. Any error was substantive, not procedural, and, in any event, not so egregious as to constitute a denial of due process.  Cox had the opportunity to make his arguments and appeal errors to the California Supreme Court.  He did not do so.

Cox bears the burden of showing that the state-court judgment was obtained in violation of due process.  *See Dagher v. Ford Motor Co.*, No. D072436, 2018 WL 4057400, at *7 (Cal. Ct. App. Aug. 27, 2018) ("[T]he appropriate framework would place the burden of proof on the party seeking to establish a constitutional violation and avoid claim preclusion."); *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 448 (5th Cir. 2016) ("[A] plaintiff asserting that preclusion should not apply because the prior" judgment "violated due process has the burden of proving a due process violation."); *see, e.g.*, *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992) (holding that the plaintiff "fail[ed] to present facts which indicate a lack of adequate representation").  He has not met that burden.  The state-court judgment against Cox precludes his malicious-prosecution claims against Harris.

### 3.    State Actor

Even if Cox's claims were not barred by limitations or precluded, Cox has not established that Harris is a state actor.  Section 1983 applies only to persons acting "under color of" state law. 42 U.S.C. § 1983.  As a result, Cox must show that Harris's acts as a private citizen were

sufficiently intertwined with the State's to amount to state action. A private individual may act "under color of state law" if there is "significant" state involvement in the action. *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir. 1997) (quoting *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983)). Cox has the burden to show that Harris's actions are "fairly attributable" to the government. *Collins v. Womancare*, 878 F.2d 1145, 1151 (9th Cir. 1989) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011). Cox may satisfy the state-action requirement by showing that Harris "conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002). Cox must also establish that Harris was the proximate cause of the alleged violations. *King v. Massarweh*, 782 F.2d 825, 828–29 (9th Cir. 1986).

Under the joint-action test, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin*, 312 F.3d at 445 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995)). The question is whether the State "has so far insinuated itself into a position of interdependence with the private actor that it must be recognized as a joint participant in the challenged activity." *Id.* (cleaned up). Ninth Circuit precedent demands "a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on civil rights." *Id.* This normally requires "repeated requests" by the private individual for state assistance or a private actor's interference in a matter or direction of how to conduct an official investigation. *See id.* "[M]erely complaining to the police does not convert a private party into a state actor." *Collins*, 878 F.2d at 1155. Nor does executing "a sworn complaint which forms the basis of an arrest." *Id.*

To prove a conspiracy between the County defendants and Harris under § 1983, Cox must show "an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers*

*of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (cleaned up). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* at 1541. "[I]t is not enough to show an agreement to do something; the private party and the government must also have agreed on what the something is." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 755 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025). "The generalized allegation of a wink and a nod understanding does not amount to an agreement or a conspiracy to violate the plaintiff's rights in particular." *Id.* at 755–56 (cleaned up). "A plaintiff must show some specificity to the understanding between the private actor and the government." *Id.* Evidence of parallel conduct or a common goal is insufficient to proceed to trial. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("Without more, parallel conduct does not suggest conspiracy . . . ."); *Children's Health Def.*, 112 F.4th at 756 (holding that statements that are "consistent with the explanation of parallel objectives" and that "do not show the specific agreement" do not prove a conspiracy).

Cox can establish neither that Harris jointly acted with state officials nor that she conspired with them. The record shows that Harris reported Cox to the police, gave statements and other evidence to the police, and complied with their requests for interviews and information. (*See* Docket Entry No. 219-2 (showing the development of the case through police investigative reports)). Neither the initiation of a criminal case by making allegations to the police nor the "acquiescence . . . to the investigation request[s]" of police officials is enough to prove a conspiracy. *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). Even if Harris's report to the police was false, "a person who supplies inaccurate information that leads to an arrest is not involved in joint activity with the state." *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1357

42

(9th Cir. 1981) (citing *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978)); *see Est. of Smith v. Holslag*, No. 16-2989, 2020 WL 7863428, at *17 (S.D. Cal. Dec. 31, 2020) ("Providing false information to the police does not automatically transform a private individual into a state actor."); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1087 (C.D. Cal. 2009) ("Providing false information to the police does not transform a private individual into a state actor.").

The record does not include evidence of aggravating circumstances, such as a "prearranged plan" involving Harris to arrest Cox based on certain allegations, *Arnold*, 637 F.2d at 1358 (citing *Smith v. Brookshire Bros.*, 519 F.2d 93 (5th Cir. 1975) (per curiam)), or Harris directing the police to take specific action against Cox, *see Howerton*, 708 F.2d at 384; *Franklin*, 312 F.3d at 445–46. Rather, both officers testified that Harris did not direct their investigation and that Harris did not make the decision to arrest Cox or ask to increase his bail. (Docket Entry No. 215-5 at 185:3–20; Docket Entry No. 215-6 at 203:18–205:20, 206:13–24). Other than Harris filing the initial police report and sitting for interviews, the only interactions between Harris and the County or State that Cox identifies are Harris's report that Cox stalked her and her counsel's request to the receiver to collect on her judgment against Cox.[11] These facts are insufficient to show that Harris was a state actor.

Cox argues that he can proceed to trial against Harris based on the facts that the police: (i) took immediate possession of Cox's phone, but left Harris's phone in her possession for more than a year, after ignoring messages that contradicted Harris's accusations; (ii) selectively preserved

_____

[11] The plaintiffs claim that Harris communicated with the Mariposa District Attorney's Office or Sheriff's Office about her application to the California Victim's Assistance Program. (Docket Entry No. 239 at 4–5). But the only evidence in support of this allegation is that Detective Smith filled out a form in support of Harris's application. (*See* Docket Entry No. 235-15 at 197:24–25 ("I filled out the form and the process is run through victim witness.")). The mere fact that Smith filled out a form for the Victim's Assistance Program does not establish, even in combination with other record evidence, a reasonable inference that Harris conspired with the County to violate Cox's rights.

messages that inculpated Cox; (iii) conveyed to Harris during interviews that cell phone records would bear on the outcome of the criminal case; but (iv) actively sought to avoid producing the contents of Harris's phone to Cox by not downloading the contents of Harris's phone until December 2016, 13 months after Cox was arrested, and further delaying producing to Cox the downloaded records that allegedly revealed that Harris had deleted messages. (Docket Entry No. 238 at 21–22). Cox's arguments are insufficient to survive summary judgment, for three reasons.

First, the record does not support the theory that Harris deleted materially exculpatory evidence. Cox argues that Harris deleted exculpatory messages because "an analysis conducted by Cox's defense further showed that at least 49 messages between Cox and Harris that appeared on Cox's cell phone did not appear in the County's download of Harris's cell phone." (Docket Entry No. 237 at 10). But Cox introduced no expert evidence or summary exhibit comparing the cell phone records, showing which ones Harris had deleted, and explaining why the deleted texts are materially exculpatory. (*See* Docket Entry No. 235-2 at 46:1–2); *see Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.*, 695 F.2d 839, 846–47 (5th Cir. 1983) ("Judges are not ferrets!"); *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002) ("'Judges are not like pigs, hunting for truffles buried in' the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).[12]

The police reports include excerpts of logs from Harris's and Cox's cell phones. (*See* Docket Entry No. 219-2 at 49–53, 65–68). The police reports recount that "some of the messages [in Cox's phone] appeared to be cut off" because "when a text message has been deleted from a

---

[12] Nor has Cox shown how this information is material or how its deletion violated his rights. Cox had access to all the text messages between himself and Harris. It is hard to see how, even if Harris deleted 49 messages between them from her phone, his *Brady* rights to exculpatory evidence were violated.

cell phone the Cellabrite recovery program is only able to collect a certain amount of the characters from the actual texts." (*Id.* at 53). The police reports do not state that Harris's phone records suffered the same issue. (*See id.* at 65–68 (not including a note that Harris's messages were deleted or cut off)). Cox argues that some texts are missing and were therefore deleted. But his examples pull from discrepancies in the police report that are explained by the fact that the report summarized only parts of the lengthy 5575-page file of Harris's phone contents. (Docket Entry No. 219-2 at 65).

Cox argues that Harris spoliated a truncated text message about rough sex, sent on November 11, 2025. (Docket Entry No. 169 ¶ 97). That text message did not appear in the police report because it did not fall within the time and dates that the report summarized. (*Compare* Docket Entry No. 219-2 at 66 (summarizing messages starting at "1534 hours" or 3:34 p.m.), *with id.* at 50 (sending the "rough sex" text message at 2:22 p.m.)). The police report recommended that the prosecutors review "the entire document . . . for accuracy and context." (*Id.* at 65). Cox does not proffer expert testimony or the raw files to show that Harris deleted evidence. The record does not support a reasonable inference of spoliation.[13]

Second, the evidence does not suggest an agreement between Harris and Mariposa County officials. Atkinson and Smith both testified that they did not review Harris's cell-phone records at the initial interview and before Cox's arrest. (Docket Entry No. 235-14 at 37:10–11, 178:8–16;

---

[13] Nor is there a basis in the record to support Cox's allegation that Harris deleted communications on her phone between herself and others, or after November 13, 2025. The phone records reveal who Harris contacted during October and November 2015, including other acquaintances and family members. (Docket Entry No. 219-2 at 65–68). The search warrant for Harris's phone authorized only the collection of data up to November 14, 2015. (*See* Docket Entry No. 219-2 at 60). The fact that the police reports did not focus on the content of Harris's phone towards the end of the collection period does not create a reasonable inference that Harris deleted substantial portions of the records on her phone. The report includes evidence that Harris's phone received voicemails on November 14, 2025, contradicting Cox's assertions. (*Id.* at 68).

Docket Entry No. 235-15 at 106:7–21, 107:12–108:23).[14]  In a follow-up interview, only Deputy District Attorney Florick reviewed some of the text messages on Harris's phone.  (*See* Docket Entry No. 215-6 at 106:22–107:11; *see also* Docket Entry No. 219-2 at 27–28 (referring to text messages on Harris's phone)).  Atkinson and Smith did not know that the phone had exculpatory evidence on it.  They could not have agreed to allow Harris to retain her phone expecting her to delete evidence from it.

The record could support such an inference only if the officers thought from the initial interview that Harris was untrustworthy, hiding exculpatory evidence, and falsely accusing Cox.  But Cox has not pointed to evidence that either Atkinson or Smith subjectively thought from the start that Harris was lying and therefore wanted her to keep her phone so that she could delete material evidence.  (*See* Docket Entry No. 219-2 (illustrating the development of the investigation)).[15]  This conclusion is inconsistent with the record, in which the review of Harris's phone prompted additional investigation and interviews to clarify the data downloaded from it.  (*Id.* at 60–61, 65–71).  Had the officers known what was on the phone and understood that it was

---

[14] A different officer briefly reviewed some of Harris's texts and showed a few text messages to Atkinson. (Docket Entry No. 235-14 at 37:5–19).  This testimony is consistent with the recording of Harris's initial interview, in which one of the officers states that he "saw" the final text exchange between Harris and Cox. (Docket Entry No. 218-6 at 41:6–21).

[15] Cox points to testimony showing that Smith and some attorneys in the District Attorney's office later developed doubts about prosecuting the case against Cox because of concerns about Harris's credibility. (Docket Entry No. 236 at 6).  For example, Cox argues that Smith refused to testify at a preliminary hearing in September 2016 in Harris's case because of those doubts. (*Id.*).  Drawing inferences from the testimony in Cox's favor, as this court must do, the testimony is still insufficient to create a genuine dispute of material fact on the question of a conspiracy.  Cox's interpretation of Smith's testimony undercuts his conspiracy claims because it shows that Smith was not investigating the case with the intent to undermine Cox's rights. Smith refused to testify against Cox without additional preparation or investigation into Harris's story, which had some discrepancies. (Docket Entry No. 235-15 at 158:7–161:2).  Smith affirms that Harris was credible at first. (*See* Docket Entry No. 246-2 at 3).  Smith then requested Harris's phone for a search in November 2016, after doubts about her credibility arose. (Docket Entry No. 219-2 at 60).  Smith's investigation is facially inconsistent with a conspiracy against Cox, and no reasonable juror could find otherwise.

exculpatory, these investigative steps would not exist. There is no basis in the record to find that Harris and state actors "agreed to" do something like deleting material exculpatory evidence or perpetuate fraudulent testimony. *Children's Health Def.*, 112 F.4th at 755.

Third, at a minimum, Harris was not a state actor with respect to the County's receivership proceedings against Cox. Officers Atkinson and Smith testified that they did not speak with Harris about Code violations on Cox's property or discuss the receivership proceedings with her. (Docket Entry No. 215-5 at 187:6–188:22; Docket Entry No. 215-6 at 206:17–24). Harris interacted with the receiver only to collect the attorney's fees judgment against Cox. (*See* Docket Entry No. 237 at 24–25 (asserting "Ms. Harris made a formal request to the receiver to collect $47,000"); Docket Entry No. 231 ¶ 62 (acknowledging that the request to the receiver was to collect court "awarded . . . attorney's fees" in the state-court action filed by Cox)). Harris did not jointly act or conspire with the County to bring the receivership claims against Cox.

Nor was she a proximate cause of the alleged harms flowing from the receivership proceedings. The opinion affirming the appointment of the receiver rejected the argument that the criminal proceedings influenced the trial court's decision. *JDC Land Co.*, 2020 WL 5015561, at *20–21. The court of appeals held that "[t]he trial court expressly stated it was not considering anything related to Cox's criminal proceeding" and that "[r]eferences to that criminal case . . . were therefore not admitted into evidence and expressly were not considered in deciding the motion." *Id.* at *20. The court affirmed because there was "sufficient evidence from county's experts about the substandard and dangerous conditions on the Property to support the appointment of a receiver." *Id.* at *21. The California court of appeals's ruling showed that Harris had no impact on the receivership proceedings and was not a proximate cause of harm to Cox flowing from those proceedings.

47

*    *    *

For these reasons, Harris's motion for summary judgment, (Docket Entry No. 215), is granted. Cox's motion for summary judgment against Harris, (Docket Entry No. 211), is denied. Because there appear to be no remaining claims against Harris, the court declines to rule on Harris's motion for summary judgment on Cox's claim to obtain punitive damages from Harris.[16]

### C.    The County Defendants' Motion for Summary Judgment

The County and officers Atkinson and Smith have moved for summary judgment against Cox and JDC Land. (Docket Entry No. 218). The defendants argue that there was probable cause to arrest Cox and prosecute his criminal case, to search his property, and to initiate the Code and receivership proceedings; that issue preclusion bars Cox's claims; and that the *Rooker-Feldman* doctrine bars Cox's claims. For the following reasons, the court grants their motion for summary judgment.

### 1.    The Criminal Case: Arrest, Searches, and Criminal Prosecution

Cox's claims against Atkinson, Smith, and the County arise out of five incidents: (1) Cox's arrest on November 13, 2025; (2) the search and seizure of his property, based on a warrant signed that same day; (3) the application for an increase in bail on November 14, 2025; (4) the charges filed against Cox on November 16, 2025; and (5) the continuation of the prosecution until the

---

[16] Cox reasserts a claim under 42 U.S.C. § 1985(3) in opposition to Harris's motion for summary judgment. (Docket Entry No. 238 at 24). Cox argues that the claim was "inadvertently omitted in the redrafting of the FAC." (*Id.*). Cox cannot raise a claim in a response to a motion for summary judgment. *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291–94 (9th Cir. 2000) (affirming a summary-judgment ruling because the plaintiff failed to allege a particular theory of liability in the complaint and raised it for first time on summary judgment); *Josfan v. Indochine*, No. 09-7904, 2012 WL 12906356, at *11 (C.D. Cal. Jan. 13, 2012) (same), *aff'd*, 595 F. App'x 716 (9th Cir. 2015). Cox must move for leave to amend to reassert the omitted claim. Such amendment appears futile, however, because "the absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations." *Caldeira v. County of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989).

charges were later dismissed, including by amending the criminal complaint and refusing to produce allegedly exculpatory evidence.

The first question is probable cause. If the defendants had probable cause to arrest Cox, search and seize his property, increase his bail, or maintain criminal charges against him, then there is no liability. The second question is causation. Prosecutors decide whether to file criminal charges and whether to drop them as an investigation progresses. The officers, and therefore the County, may be liable if they caused the prosecution to charge and maintain charges against Cox without probable cause to do so.

### i.    Cox's Arrest

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Conclusive guilt or "certainty or even a preponderance of the evidence" are not required. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006). "Mere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)). The question is "whether a reasonable officer could conclude— considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)); *see Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012) ("Probable cause exists when there is a fair probability or substantial chance of criminal activity." (quoting *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004))).

49

When plaintiffs sue state officers under § 1983 for monetary damages and probable cause is disputed, qualified immunity augments the analysis.  Qualified immunity protects officers from suit when they make a reasonable mistake of law or fact.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  As a result, the question is "whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity."  *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011) (en banc); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (cleaned up)).  If "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests," then qualified immunity applies.  *Wesby*, 583 U.S. at 68.

A reasonably trustworthy eyewitness is generally sufficient to establish probable cause. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 978 (9th Cir. 2003) (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)).  A key indicia of trustworthiness is the level of detail that a witness provides; the informant must "furnish underlying facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator."  *Fuller*, 950 F.2d at 1444 (quoting *People v. Ramey*, 16 Cal. 3d 263, 269 (1976)).

This principle often decides probable cause in sexual-assault cases because, "at the end of the day," there are often "only two people" in the room "where the alleged rape occurred."  *Walz v. Randall*, 2 F.4th 1091, 1104 (8th Cir. 2021) (quoting *Walz v. Randall*, No. 1:18-cv-00067, 2019 WL 7285555, at *11 (N.D. Iowa Dec. 27, 2019)).  In *Kiser v. City of Huron*, 219 F.3d 814 (8th Cir. 2000), for example, the Eighth Circuit affirmed an order granting qualified immunity when an officer arrested a suspect "[b]ased solely" on "a credible and unsolicited report from the alleged

victim." *Id.* at 816. Although the accusation was "admittedly one-sided," it "contained sufficient detail to suggest that the complainant spoke truthfully." *Id.*; *accord Walz*, 2 F.4th at 1101.[17] "And in sexual-assault cases," inconsistencies or errors in a victim's statement do not materially undermine an officer's probable-cause determination because those reactions "are not rare among victims of such crimes." *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) (per curiam). Officers may credit a witness, despite inconsistencies, when her testimony about "the solid core . . . regarding what was actually done to her" is reasonably reliable. *Shed v. Oklahoma Dep't of Hum. Servs.*, 729 F. App'x 653, 657 (10th Cir. 2018). The Ninth Circuit has granted qualified immunity to officers who made an arrest based on uncorroborated, but otherwise trustworthy, allegations of sexual assault. *See Zelaya v. County of Los Angeles*, 628 F. App'x 535, 536 (9th Cir. 2016) (mem.) (holding that qualified immunity applied because there is "no precedent forbidding the use of a child sexual assault victim's uncorroborated accusations to establish probable cause" (citing *Stoot v. City of Everett*, 582 F.3d 910, 922 (9th Cir. 2009))); *see also Decker v. New York State Dep't of Corr. Servs.*, 486 F. App'x 910, 911 (2d Cir. 2012) (per curiam) ("[T]he inmate's accusation of sexual assault was sufficient to provide probable cause—or, at a minimum, arguable probable cause—until an investigation undermined the inmate's credibility.").

Courts readily find probable cause when an officer bases an arrest on both a reliable victim statement and some corroborating evidence, such as visible wounds or other physical or medical evidence. *See Evans v. Chalmers*, 703 F.3d 636, 652 (4th Cir. 2012) ("A rape allegation, paired with corroborating medical evidence, undoubtedly establishes probable cause that a rape was

---

[17] The court relies on comparable case law from other circuits because qualified immunity protects officers when there is a circuit split. *See Pearson*, 555 U.S. at 245 (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999)). Absent an on-point case from the Ninth Circuit that rejects out-of-circuit cases—which Cox has not cited—officers may reasonably rely on case law from other appellate courts. *See id.* at 244–45 ("Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions.").

51

committed."); *see, e.g.*, *Ortiz v. County of Los Angeles*, 187 F.3d 648, at *1 (9th Cir. 1999) (mem.) (finding probable cause for an arrest on a reported sexual assault after a witness interview and medical examination); *Scafidi v. Las Vegas Metro. Police Dep't*, No. 23-15657, 2024 WL 1795150, at *2 (9th Cir. Apr. 25, 2024) (mem.) (finding probable cause for an arrest on a reported sexual assault because the responding officer found the victim locked and bleeding in a hotel bathroom and the victim had called 911 out of fear of harm); *see also Mitchell v. Obenski*, 134 F. App'x 548, 551 (3d Cir. 2005) (rejecting the argument that the "police investigation could have been more thorough" when the witness provided "a credible, consistent account of sexual assault that was supported in part by hotel records"). Corroborating medical evidence may lessen or even vitiate the need for a more thorough inquiry into a witness's story. *See, e.g.*, *Zendejas v. County of Los Angeles*, No. CV 09-04858 DDP JCX, 2010 WL 4537090, at *4–5 (C.D. Cal. Nov. 1, 2010).

Under these principles, qualified immunity applies. In the initial interview, Harris "provided a detailed description of the incident, going step by step through what happened between her and" Cox. *Walz*, 2 F.4th at 1101. Harris started with how the two met online; described how she came to Cox's ranch, including her arrival on the night of November 11, 2015, after an appointment in the late afternoon; identified the relevant cabins at the ranch with specific names; gave detailed descriptions of the cabin layouts, including specific rooms and the furnishings in them; presented vivid details about the alleged rape; and related lingering concerns about her safety based on Cox's comments. (*See* Docket Entry No. 218-6). Atkinson's sex-crime narrative captured these details and reported that Harris was "visibly emotional as she was noticeably shaking and would begin to cry at the detailed portions of her statement." (Docket Entry No. 219-2 at 2; *see also* Docket Entry No. 246-1 at 2–3; Docket Entry No. 246-2 at 3). At the conclusion

of the interview, officers took photographs of the redness on Harris's neck and the bodily bruises. (*See* Docket Entry No. 218-6 at 55–63).[18]

Harris presented the officers with a detailed and emotional witness statement, supported by physical injuries. *See Walz*, 2 F.4th at 1101; *Kiser*, 219 F.3d at 815–16; *Ortiz*, 187 F.3d 648, at *1. Adkinson "had experience with sexual assault cases and, drawing on that experience, found [Harris] credible and believed her description of the night." *Walz*, 2 F.4th at 1101 (citing *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017)); *see Ornelas v. United States*, 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists."); (*see also* Docket Entry No. 246-1 at 7). Atkinson and Smith "reasonably believed that [Harris] had sexually assaulted [Cox]." *Walz*, 2 F.4th at 1101. Indeed, based on this information, a magistrate judge signed a warrant to search Cox's property. (*See* Docket Entry No. 219-8 at 4–8).

Cox responds that the officers did not have probable cause to arrest him because they ignored evidence on Harris's phone that would have exonerated him. (Docket Entry No. 236 at 3–4). A full review of Harris's cell-phone contents would have contradicted her allegation that she did not have cell service at the ranch; that November 11, 2015, was her first time visiting the ranch; and that she was not kidnapped and imprisoned at the ranch but rather was free to leave when she wanted. (*Compare* Docket Entry No. 218-6, *with* Docket Entry No. 219-2 at 49–53, 65–68). Cox points to the officers' testimony that they thought the other officers would collect the information from Harris's cell phone early in the investigation process. (Docket Entry No. 235-14 at 48:14–49:3; Docket Entry No. 235-15 at 107:12–108:23). Cox argues, based on this

---

[18] A November 13, 2015, SART report, which was collected on November 17, 2015, documents bruising on Harris's body and micro-tears and other injuries in her vagina. (*See* Docket Entry No. 220-5).

evidence, that the officers should have immediately reviewed Harris's phone, which would have materially undermined her credibility.

Although Cox's argument has force, it is not enough to overcome qualified immunity.[19] The officers reasonably found Harris's statement to be credible. *See Walz*, 2 F.4th at 1101; *Kiser*, 219 F.3d at 815–16; *Ortiz*, 187 F.3d 648, at *1. That statement included an explanation that Harris and Cox had been speaking online and over the phone for several weeks but had not yet met in person; that Harris was at first comfortable and friendly with Cox and the other ranch-hands during the evening; that Cox then became abusive; and that Harris did not have cell service while at the ranch. (Docket Entry No. 218-6 at 4:3–5:11, 5:20–8:4, 10:1–10, 20:19–23). In other words, the officers reasonably credited Harris's statement that suggested her phone had limited relevant evidence, either inculpatory or exculpatory. Atkinson thought it was important to collect the phone but testified that he did not review its contents immediately because, "at the time, it wasn't completely relevant." (Docket Entry No. 235-14 at 37:7–8, 16–19). Atkinson instead turned to drafting a search warrant to gather evidence, such as Harris's underwear, that Harris had reported

---

[19] In addition, there is a genuine factual dispute material to whether Atkinson and Smith caused Cox's warrantless arrest. Atkinson and Smith did not effect Cox's warrantless arrest. The record shows that they were attempting to gather more evidence at the time of the arrest. On November 13, 2015, the night Cox was arrested, Officer Packard was on the lookout for Cox's truck. (Docket Entry No. 219-2 at 8). He eventually found a Dodge flat-bed pickup that resembled a vehicle associated with Cox, conducted a traffic stop, and detained Cox with handcuffs until investigators arrived at the scene to question him about Harris's allegations. (*See id.*); *see also Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003) (handcuffing an individual does not necessarily turn a *Terry* stop into an arrest); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (same). Sergeant Land, Detective Totten, and Deputy Lunquist arrived at the traffic stop, and Sergeant Land reported that there was probable cause to place Cox under arrest. (Docket Entry No. 219-2 at 8). Atkinson stated in his affidavit that "Cox had been arrested at the instruction of Detective Sergeant Land," (Docket Entry No. 246-1 at 5); he told Harris that they would draft an arrest warrant based on what Harris reported to them, (Docket Entry No. 218-6 at 47:19–22); and he testified that, when Cox was arrested, he was working on investigating or attempting to corroborate her story by, for example, drafting search warrants, (Docket Entry No. 235-14 at 72:4–19). A reasonable jury could find that Atkinson and Smith did not cause Cox's arrest; they could find instead that Atkinson and Smith asked other officers to look for Cox as a suspect and to question him but that the other officers made the independent decision to make the arrest.

was still on Cox's property.  (Docket Entry No. 218-6 at 31:2–3; Docket Entry No. 235-14 at 72:4–19; Docket Entry No. 219-8 at 4–8).

A "reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting" their choices.  *Wesby*, 583 U.S. at 68.  An objection that a police investigation "could have been more thorough does not vitiate probable cause" in the face of a "credible" accusation "of sexual assault that was supported" by physical injuries.  *Mitchell*, 134 F. App'x at 551; *see Decker*, 486 F. App'x at 911; *see also Walz*, 2 F.4th at 1103 (citing *Gilmore v. City of Minneapolis*, 837 F.3d 827, 833 (8th Cir. 2016)) (suggesting that plaintiffs cannot argue an investigation was inadequate when an officer relies on "an eyewitness' detailed statement").[20]

Nor can the court conclude that, had the officers reviewed Harris's phone messages, they would have lacked probable cause to arrest Cox.  *See Walz*, 2 F.4th at 1103–04 (finding probable cause when additional investigation did not exonerate the suspect); *cf. Gervin*, 139 F.4th at 1249 (finding no probable cause because officers had ready access to information that exonerated the plaintiff).  The messages may have undermined some of the charges against Cox, such as the kidnapping charge, but would not have vitiated probable cause to arrest Cox for sexual assault or rape.  A "non-consensual sexual assault can still occur between two adults who have previously had consensual sexual contact with each other."  (Docket Entry No. 246-1 at 6).  Under California law, if "during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection," then a crime has been committed.  *In re John Z.*, 29 Cal. 4th 756, 760 (2003) (applying CAL. PENAL CODE § 261(a)(2));

---

[20] Cox's expert testified that he "clearly would have seized the cell phone and look[ed] at the records" to confirm Harris' testimony.  (Docket Entry No. 235-2 at 87:10–13).  This opinion is a reasonable one, but it does not render the officers' choices constitutionally unreasonable.

*accord Walz*, 2 F.4th at 1101.  Harris's text messages with Cox would have shown that the two had previously had "rough sex," involving "getting slapped in the face," to which Harris objected as a "trigger."  (Docket Entry No. 219-2 at 50).  Some of the texts would have supported the "solid core . . . regarding what was actually done to" Harris, even if it undermined her credibility as to certain details or aspects of her account.  *Shed*, 729 F. App'x at 657.

This hindsight approach to Cox's arrest is made more difficult by his interview with the officers following the arrest.  Cox lied to the officers.  He stated that he "never had sex with" Harris, "never even kissed her," and "[a]bsolutely" never made "any sexual advances towards her," including even talking "about" sex.  (Docket Entry No. 219-4 at 12:12–22; *see also id.* at 17:21–18:8).  The officers quickly discovered evidence suggesting that Cox was lying when they executed a search warrant that night and found Harris's underwear "in the first bedroom," where she thought it would be.  (Docket Entry No. 219-2 at 19; *see also* Docket Entry No. 218-6 at 31:2–23).  If the officers had searched Harris's phone, they would have obtained confirmation that Cox lied about other important details.  (Docket Entry No. 219-2 at 50–51).  "[A] suspect lying to the police is an important factor in establishing probable cause."  *United States v. Brittingham*, No. CR 02-00627 DDP, 2003 WL 27385207, at *4 (C.D. Cal. Nov. 7, 2003), *aff'd*, 220 F. App'x 540 (9th Cir. 2007); *see Walz*, 2 F.4th at 1102 ("A suspect's 'apparently false statements and inconsistent stories' can support probable cause that he committed a crime." (quoting *United States v. Ameling*, 328 F.3d 443, 449 (8th Cir. 2003)).  Cox's denial "not only undermined his credibility" but "also made" Harris's story "more believable by comparison."  *Walz*, 2 F.4th at 1102.

The record precludes concluding that Cox's arrest was constitutionally unreasonable considering the totality of the circumstances.  Harris relayed an emotional, detailed, step-by-step account to Atkinson and Smith.  She presented with bruising and described lingering pain she had

from the alleged assault.  Atkinson and Smith reasonably credited Harris's account, and, based on that account, a magistrate signed a search warrant.  Atkinson and Smith had sufficient cause for qualified immunity to shield them from Cox's claims.  Facts that the officers "uncovered after the arrest are irrelevant."  *United States v. Collins*, 427 F.3d 688, 691 (9th Cir.2005) (citing *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1996)).  And to the extent those facts are relevant, they do not show that the officers acted unreasonably.  A reasonable officer could have found that Harris's phone was not immediately relevant or that it would not have exonerated Cox.  That the officers arrested Cox on an account that was later undermined does not create liability under § 1983.

### ii.    The Search and Seizure of Cox's Property

"[N]o reasonable officer could believe that it is constitutional to act dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant."  *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002).  If "an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost."  *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995) (cleaned up).  The ultimate issue in a case of judicial deception is whether "the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause."  *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)); *see Butler*, 281 F.3d at 1024 ("A plaintiff must make (1) a substantial showing of deliberate falsehood or reckless disregard for the truth, and (2) establish that but for the dishonesty, the challenged action would not have occurred." (cleaned up))).

"Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). "Nor may a claim of judicial deception be based on an officer's erroneous assumptions about the evidence he has received." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (citing *Smith*, 588 F.2d at 739–40). "[W]here omissions are involved, materiality may not have been clear at the time the officer decided what to include in, and what to exclude from, the affidavit," so "when it is not plain that a neutral magistrate would not have issued the warrant, the shield of qualified immunity should not be lost"; "a reasonably well-trained officer would not have known that the misstatement or omission would have any effect on issuing the warrant." *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997). An officer recklessly disregards the truth if he or she "'possessed information giving rise to an exculpatory inference' but did nothing to examine the 'easily discoverable facts that would confirm or contradict that inference.'" *Gervin*, 139 F.4th at 1249 (quoting *Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019)); *see Sevigny v. Dicksey*, 846 F.2d 953, 957–58 (4th Cir. 1988) (finding a Fourth Amendment violation when an officer "did not avail himself of readily available information" or undertake "rudimentary inquiries" that would have revealed the arrest to be "factually unsupportable"); *cf. Walz*, 2 F.4th at 1103–04 (finding no constitutional violation because the case was "not one in which minimal further investigation would have exonerated the suspect" (cleaned up)).

Cox's claim fails under this standard. A magistrate judge signed the search warrant at 9:55 p.m. on November 13, 2025. (Docket Entry No. 219-8 at 4). The magistrate judge did so based on Atkinson's accurate portrayal of Harris's initial interview and his assessment of Harris's account based on his experience in similar assault cases. (*See id.* at 5–8). At that time, the officers

58

had not looked through Harris's phone.  (Docket Entry No. 235-14 at 37:10–11, 178:8–16; Docket Entry No. 235-15 at 106:7–21, 107:12–108:23).  Nor had they interviewed Cox, who had been arrested about two hours earlier by officers in the field and returned to the station for booking. Atkinson was preparing the search warrant at the time of the arrest.  (Docket Entry No. 246-1 at 5; Docket Entry No. 235-14 at 72:4–19; Docket Entry No. 219-2 at 6; *see also* Docket Entry No. 219-4 at 18:24–25 (bail "had been increased" by the Cox interview)).  Atkinson accurately presented to the magistrate the evidence he knew about, and the magistrate signed the warrant. The search is presumptively proper unless Atkinson falsified or recklessly disregarded material information.  *See United States v. Leon*, 468 U.S. 897, 922 (1984) ("'[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" (quoting *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982))).

Atkinson did not act so as to undermine the presumptive propriety of the warrant.  Other evidence that was potentially available to Atkinson were Cox's statement and Harris's cell-phone text messages.  For the reasons already discussed, Atkinson did not act in reckless disregard of the truth by requesting a warrant without presenting either Cox's statement or the text messages.  If the officers continued to credit Harris's account, they were "free to disregard" Cox's testimony; a suspect's "innocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect."  *Wesby*, 583 U.S. at 67–68.  The same analysis would apply to the magistrate.  "[I]t would not have been plain that *any* magistrate would not have issued the warrant."  *Crowe v. County of San Diego*, 608 F.3d 406, 436 (9th Cir. 2010).

These issues also apply to the text messages on Harris's phone.  The officers had no compelling reason to believe that the phone contained material exculpatory evidence.  (*See* Docket Entry No. 235-14 at 37:7–8, 16–19).  The magistrate concurred with that assessment.  The officers

presented the magistrate with a detailed report of Harris's allegations, which included Harris's statement that "she and [Cox] began to email, text and call one another on a daily basis" several "weeks" before the incident. (Docket Entry No. 219-8 at 6). Yet the magistrate did not "ask[] more questions and require[] more information," including about their past communications, "before signing the search warrant." *Crowe*, 608 F.3d at 436.

The officers are entitled to qualified immunity because nothing in the record shows that they recklessly omitted material information from the search warrant, which otherwise establishes probable cause.

### iii.       The Bail Application

The same magistrate judge who signed the search warrant also approved the increase in Cox's bail on November 13, 2015, the night of Cox's arrest, (Docket Entry No. 219-2 at 10; Docket Entry No. 246-1 at 11), and confirmed the $500,000 bail again at the arraignment on November 16 and 17, 2015, (Docket Entry No. 215-16 at 2, 4). A somewhat different analysis applies to the bail issue. Although probable cause for a single crime—in this case, sexual assault or rape—can make Cox's arrest and the search warrant legal, Cox's bail is not such a binary choice. If the officers disregarded evidence material to a single charge or theory of the probable cause, the inclusion of that omitted evidence could have changed the bail analysis, the amount of bail, and the length of time that Cox would have been jailed. *See Chiaverini*, 602 U.S. at 563 ("The inclusion of the baseless charge—though brought along with a good charge—has thus caused a constitutional violation, by unreasonably extending the pretrial detention.").

Cox attempts to assert this claim. His bail was set at $500,000. The officers told Cox the bail amount at the end of the initial interview following his arrest. (*See* Docket Entry No. 219-4 at 18:24–25:19). Cox had to pay $50,000 for release on bond. (*See id.* at 19:1–5); *see People v.*

*Martinez*, 15 Cal. 5th 326, 334 (2023) (noting that the premium is typically 10 percent of the bail amount). But he could not do so for two weeks. (Docket Entry No. 212 at 5; Docket Entry No. 231 at 5; *see* Docket Entry No. 237 at 4). Under California law, "[i]n fixing the amount of bail and release conditions, . . . courts must consider the protection of the public, the safety of the victim, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of the defendant appearing at the trial or hearing of the case." *In re Kowalczyk*, 85 Cal. App. 5th 667, 691 (Cal. Ct. App. 2022). Cox argues that, had the officers reviewed his cell phone, presented other witnesses' statements to the judge, or collected exculpatory evidence from his home, then his bail would have been lower and he would have been released sooner. *See Chiaverini*, 602 U.S. at 563.

Cox's argument fails, for two reasons. First, Cox's bail was increased based on Harris's reasonably credited testimony. (*See* Docket Entry No. 219-2 at 10; Docket Entry No. 246-1 at 11). The magistrate increased Cox's bail before the officers interviewed him. (*See* Docket Entry No. 219-4 at 18:24–25:19). For the reasons already explained, the officers' failure to review fully and immediately the text messages in Harris's phone or to credit Cox's own statement was not constitutionally unreasonable. The officers did not recklessly disregard exculpatory evidence when they presented the bail-increase evidence to the magistrate on November 13, 2015. *See Crowe*, 608 F.3d at 436.

Second, the record lacks sufficient evidence to sustain a claim that the officers wrongfully maintained Cox's bail at $500,000 at the November 16, 2015, arraignment and at the bail review on November 17 and 19, 2015. (Docket Entry No. 215-16). Over the weekend, the officers collected additional evidence (and, according to Cox, failed to collect exculpatory evidence), that could have been used to reassess bail (and, according to Cox, would show that bail had been set at

an unreasonably high level). (*See* Docket Entry No. 219-2 at 6–22 (cataloging the investigation); Docket Entry Nos. 218-5, 218-7). But there is no record evidence about what occurred at the hearings, including whether Cox attempted to argue that his bail should be reduced, whether or how the prosecution responded and with what evidence, whether the officers testified at those hearings, and whether the judge considered any additional evidence. (*See* Docket Entry No. 215-16 at 4 (noting "DA requests bail increase . . . .")). The record is wholly insufficient to hold that the officers recklessly disregarded the truth by providing testimony or false evidence at these additional hearings to maintain Cox's bail at $500,000. *See Davis v. Pinterest, Inc.*, 601 F. Supp. 3d 514, 522 (N.D. Cal. 2022) ("If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant."), *aff'd*, No. 22-15804, 2023 WL 5695992 (9th Cir. Sept. 5, 2023)

The absence of evidence is important considering police officers' duties after a judicial finding of probable cause. Although "a police officer cannot lie or omit material evidence in later testimony to continue detention," "the discovery of exculpatory evidence after a determination of probable cause does not undermine the validity of a detention based on a judicial order." *Washington v. Howard*, 25 F.4th 891, 904 (11th Cir. 2022); *see Baker v. McCollan*, 443 U.S. 137, 144–46 (1979) (explaining that the speedy-trial guarantee protects against continued detention). Officers traditionally have "no duty to 'run after'" a warrant. *Howard*, 25 F.4th at 912 (quoting *Page v. Wiple*, (1803) 102 Eng. Rep. 618, 619). Neither the Fourth nor the Fourteenth Amendments "impose on investigators a duty to return to the magistrate after discovering exculpatory evidence." *Id.* at 907. A constitutional violation can be based only on an officer's "affirmative act[s] to continue the prosecution," such as giving testimony or concealing information from the prosecutors who have taken over the case. *Id.* at 912; *cf. Ismail v. County of*

*Orange*, 676 F. App'x 690, 692 (9th Cir. 2017) (mem.) (citing *Galen v. County of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007)) (explaining that the presiding judge, not the police officers, were responsible for a bail increase absent evidence that the officers deliberately or recklessly misled the judge); *Tatum v. Moody*, 768 F.3d 806, 819–20 (9th Cir. 2014) (claims for an officers' failure to disclose evidence, which allegedly prolonged detention, "is restricted to detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks").

Because Atkinson did not violate Cox's constitutional rights by requesting a bail increase on November 13, 2015, and because there is no evidence showing that the officers took affirmative steps to keep his bail at that level afterwards—such as by providing materially incomplete testimony or concealing evidence from the prosecutors—Cox's claims against them for his bail amount fail.

### iv.       Initiation of the Prosecution

The liability analysis for Cox's claims about the initiation of the criminal prosecution changes because the named defendants are not the parties primarily responsible for prosecuting criminals in California.  District attorneys, not police officers, file criminal charges.  "When deciding whether to prosecute an individual, a district attorney in California acts not as an officer of the city or county, but as an officer of the state." *Sanders v. City & Cnty. of San Francisco*, 226 F. App'x 687, 692 (9th Cir. 2007) (mem.); *see Weiner v. San Diego County*, 210 F.3d 1025, 1031 (9th Cir. 2000) ("[A] California district attorney is a state officer when deciding whether to prosecute an individual."); *Goldstein v. City of Long Beach*, 715 F.3d 750, 759 (9th Cir. 2013)

(holding that "it is clear that the district attorney acts on behalf of the state when conducting prosecutions"); *Jackson v. Barnes*, 749 F.3d 755, 767 (9th Cir. 2014) ("The District Attorney's Office, however, acts as a state office with regard to actions taken in its prosecutorial capacity, and is not subject to suit under § 1983."). As a result, county entities, like Mariposa County, or its officers generally "cannot be held liable" for the decision to bring criminal charges against a defendant. *See, e.g.*, *Sanders*, 226 F. App'x at 692; *Weiner*, 210 F.3d at 1031; *Jackson*, 749 F.3d at 767.

A county or its police officers may be held liable for wrongful acts during the prosecution in limited circumstances. One is if the alleged constitutional violation flows from "local administrative policies . . . distinct from the prosecutorial act." *Goldstein*, 715 F.3d at 759. Another is if the officers "wrongfully caused the charges to be filed." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002)). This second circumstance is at issue on these cross-motions for summary judgment. (*See* Docket Entry No. 236 at 24–25).

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy*, 368 F.3d at 1067 (citing *Smiddy v. Varney (Smiddy I)*, 665 F.2d 261, 266–67 (9th Cir. 1981), o*verruled in part on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006)). But "the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.*

64

To preclude summary judgment, there must be evidence in the record sufficient "to overcome the presumption." *Newman v. County of Orange*, 457 F.3d 991, 994 (9th Cir. 2006). Evidence that the prosecutor based the decision to prosecute reasonably and solely on the officers' reports, which include omissions and conflicting stories from the officers, can be sufficient. *See, e.g.*, *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988); *Barlow v. Ground*, 943 F.2d 1132, 1137 (9th Cir. 1991). But if the prosecutor knows what the officer knows or the prosecutor conducts an investigation into the facts, then the presumption holds. *See, e.g.*, *Ayala v. KC Env't Health*, 262 F. App'x 27, 29 (9th Cir. 2007) (mem.); *Jackson v. City of Los Angeles*, No. 24-5396, 2026 WL 352639, at *1–2 (9th Cir. Feb. 9, 2026) (mem.); *cf. Broam v. Bogan*, 320 F.3d 1023, 1033 (9th Cir. 2003) ("Investigators satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor." (quoting *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996))). In such a case, an "officer is allowed to defer to the prosecutor, who has the power to determine whether to proceed with the prosecution . . . based on the evidence collected." *Howard*, 25 F.4th at 907.

District Attorney Cooke testified that Deputy District Attorney Florick, with his concurrence, made the independent decision to charge Cox. (Docket Entry No. 215-7 at 155:2–11, 197:6–14, 198:1–13; *see* Docket Entry No. 215-19 at 3–13).[21] Cooke testified that, as a general matter, district attorneys work off the law enforcement reports and ask officers "to go out and do other things" to collect evidence. (Docket Entry No. 235-3 at 192:3–19). The record does not include testimony from Florick that explains her decision to prosecute the case, how she evaluated the relevant evidence, and why she decided to charge Cox instead of continuing the investigation.

---

[21] If the prosecutor invokes attorney-client privilege, then the presumption of a prosecutor's independent judgment does not hold. *Beck v. City of Upland*, 527 F.3d 853, 862–63 (9th Cir. 2008). District Attorney Cooke testified in a deposition about how he and his office handled the case, so the presumption applies.

There is no record evidence showing what Florick reviewed and whether her charging decision was based solely on "the police investigation and arrest" instead of on "an independent judgment on the existence of probable cause." *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (quoting *Smiddy I*, 665 F.2d at 267). Importantly, the November 16, 2015, criminal complaint was filed after the police searched Cox's property; after the police collected additional witness statements, including Cox's; and after Harris had been evaluated by emergency-room doctors. (*See* Docket Entry No. 169 ¶ 77; Docket Entry No. 219-2 at 17, 23; Docket Entry No. 215-19 at 3). Harris's interview was also recorded. (Docket Entry No. 218-6). There is "a body of evidence" that Florick presumably relied on. *See Jackson*, 2026 WL 352639, at *1.

Nor is there evidence that the officers concealed or falsified evidence presented to the prosecution before the criminal complaint was filed. Cox argues that the officers erred by not collecting Harris's cell phone; by not investigating Harris's online activity, such as on FarmersOnly; and by not adequately identifying ready inconsistencies and falsehoods in Harris's statement. (*See* Docket Entry No. 236 at 7–15). None of these arguments depends on a reckless suppression or falsification of evidence to the prosecutors. With the limited exception of Darlene Windham's testimony,[22] Cox does not argue that the witness statements the officers took were inaccurate reflections of what the witnesses told the officers at the time. (*Compare* Docket Entry

---

[22] The one exception is Cox's assertion that the officers ignored Windham's exculpatory statements. (Docket Entry No. 236 at 4). But there is no evidence that Windham told the officers around the time of the arrest she was extremely skeptical of Harris's claims. (*Contra id.* (quoting the district court's order that summarized the complaint allegations, not record evidence)). The evidence in the record from Windham is from her later testimony at the 2019 restraining-order hearing. (*See* Docket Entry No. 235-11). Windham did not recall speaking to Atkinson and testified that she spoke to a female officer instead. (*See id.* at 155:6–14, 156:1–11, 156:27–157:27; *see id.* at 157:7–10 (stating that she was very drunk on November 14, 2015)). There is no record evidence suggesting who that female officer is. Windham's later testimony adverse to Harris does not show that she made materially exculpatory statements to Atkinson or Smith at the time Cox was arrested and charged. To the extent Cox developed evidence on what was material to the charging decision, Windham's statement in the police file was not considered. (*See* Docket Entry No. 215-7 at 155:12–14).

No. 219-2 (police narratives), *with* (Docket Entry Nos. 218-5, 218-6, 218-7, 218-8, 218-9 (transcripts of interview recordings)).  As a result, the charging decision—whether proper or improper—rested on the prosecutor, not the investigating officers.  The officers turned the evidence over to Florick to decide whether to initiate the criminal prosecution.  *Howard*, 25 F.4th at 907; (*see* Docket Entry No. 219-2 at 28, 30, 34, 38, 42, 44, 45, 59, 64 (showing that the officers consistently forwarded their information to the DAs and timely added information to the case file)).  That the prosecution did not spot the alleged inconsistencies or falsehoods that Cox raised and did not ask the officers "to go out and do other things" before charging Cox does not overcome the presumption that the prosecutors made an independent charging decision.  (Docket Entry No. 235-3 at 192:3–19).

Cox's § 1983 claim based on the initiation of the criminal prosecution fails.

### v.    The Continuation of the Prosecution

There is no evidence in the record that Atkinson, Smith, or the County influenced the prosecutors' decision to continue prosecuting Cox.  Florick continued to review the evidence that the investigators gathered, including by attending interviews and reviewing text messages on Harris's phone.  (Docket Entry No. 219-2 at 24–29; Docket Entry No. 235-15 at 107:1–11; Docket Entry No. 235-13 at 2–9).  The police continued to transfer the information they gathered during their investigation to the prosecutors.  (*See generally* Docket Entry No. 219-2).  In February 2016, Florick amended the criminal complaint to include five additional charges.  (Docket Entry No. 215-14; *see* Docket Entry No. 215-7 at 166:12–18).  Florick eventually left the DA's office, and Cooke assigned the case to a rotating cast of prosecutors.  (Docket Entry No. 235-3 at 32:22–37:22, 87:9–25).  Several of them expressed concern about Harris's credibility.  (*See id.*).  Cooke reassigned those prosecutors who stated that they no longer wanted to prosecute Cox's case.  (*See*

*id.*).  Smith eventually also began to doubt Harris's credibility.  (*See* Docket Entry No. 219-2 at 60; Docket Entry No. 235-15 at 158:7–161:2).  Cooke continued the prosecution because he still thought Harris had been sexually assaulted.  He explained that "in a case involving sexual assault and trauma in terms of physical violence, it's not uncommon for people to misstate the sequence of events, remember things over a period of time," or "have no memory of things that happened." (Docket Entry No. 235-3 at 36:16–25).

After Harris testified in a workers-compensation proceeding that she was not the victim of violent crime or sexual or physical abuse, (Docket Entry No. 208-14 at 117:20–118:1), Cooke decided to drop the case against Cox, (Docket Entry No. 215-7 at 149:19–25, 200:6–18).  Cooke did not think he "could prove [the alleged crimes] beyond a reasonable doubt, because [Harris's] credibility was really in question."  (*Id.* at 149:19–25; *see id.* at 105:4–25).  After all the evidence had emerged, Cooke still believed that Cox sexually assaulted Harris.  (*Id.* at 105:4–106:7).  The evidence shows that Cooke was in charge of the decision to prosecute Cox; that he consistently evaluated the case, including after deputy prosecutors raised their concerns about the strength of the evidence that the officers were collecting and reporting; and that he exercised his independent judgment to drop the case after reaching the conclusion that he could not convince twelve jurors of Cox's guilt beyond a reasonable doubt.

The decision to continue to prosecute the case was Cooke's, not the officers' or the County's.  The § 1983 claim based on the continuation of the prosecution fails.

### 2.    The Civil Case: Searches and Receivership Proceedings

Cox's claims based on the civil proceedings against him fail.  The County had probable cause to inspect Cox's property.  Cox's claims arising out of the subsequent proceedings fail because *Heck* bars them and because they are issue precluded.[23]

### i.    The Inspection Warrant

In October 2016, County officials applied for a warrant to inspect the property for violations of California's health and safety Code.  The warrant stated, in pertinent part, that any "agent of the County" could inspect "all areas of the interior and exterior of all buildings, structures, homes, houses, rooms, barn, garages, vehicles, basements, attics, sheds, units, open fields, yards, storage facilities, compartments, drawers, cabinets, papers, and electronic files located on the Subject Property." (Docket Entry No. 25 at 80).  The warrant did not require Cox's prior consent to search the property.  (*See id.*).  The warrant was based on declarations of the Mariposa County Planning Director, Sarah Williams; the Mariposa County Building Director, Michael Kinslow; the Mariposa County Director of Environmental Health, David Conway; and the Mariposa County Treasurer, Tax Collector, and County Clerk, Keith Williams.

The Sarah Williams declaration recounted inspections of the property on June 3, 2008; August 12, 2008; August 25, 2008; October 25, 2011; November 9, 2011; January 27, 2012; January 31, 2012; February 2, 2012; and September 1, 2015.  (Docket Entry No. 208-5 at 9–13).

---

[23] The County Defendants argue that *Rooker-Feldman* bars the plaintiffs' claims.  (Docket Entry No. 218 at 16–18).  This raises a jurisdictional question the court must address.  *Rooker-Feldman* does not deprive the court of subject-matter jurisdiction over Cox's claims.  The doctrine does not bar Cox's procedural-due-process claim because he attacks the receivership proceedings, properly applied, as a violation of the Due Process Clause.  *See Mothershed v. Justs. of Supreme Ct.*, 410 F.3d 602, 608 (9th Cir. 2005) (holding that *Rooker-Feldman* does not bar "general constitutional attack[s]" on state procedures or requirements).  The doctrine does not bar Cox's arguments that the County won the receivership proceedings through fraudulent or suppressed evidence because he "seek[s] relief that would ameliorate the effects of an adverse state court judgment."  *Miroth v. County of Trinity*, 136 F.4th 1141, 1154 (9th Cir. 2025); *see, e.g.*, *McCormick v. Braverman*, 451 F.3d 382, 392–93 (6th Cir. 2006).

The inspections conducted from 2008 to 2012 searched for and, according to Williams, found repeated code violations, including violations of zoning regulations, unauthorized transient rental use of the property, and construction deficiencies. (*See id.*). The County on several occasions issued a notice ordering compliance with applicable regulations. (*See id.*). The 2015 inspection was part of a criminal investigation of a damaged power meter. (*See id.* at 12). It allegedly confirmed that a number of violating conditions persisted, including unpermitted construction, electrical hazards, land-use and zoning violations, and unlawful transient occupancy. (*Id.*). Based on these facts, Williams believed that Code violations continued to exist on the property. (*See id.* at 12–13). She requested that the court issue the inspection warrant without requiring Cox's prior consent because she also believed Cox would obstruct or impede Code-enforcement efforts, based on his "extremely erratic, volatile and threatening behavior" in past interactions. (*Id.* at 13).

The Kinslow declaration recounted the searches on August 12, 2008; August 25, 2008; and January 27, 2012. (*Id.* at 15–16). Kinslow affirmed that the August 2008 searches determined that certain buildings were not properly constructed in accordance with Code specifications and that agricultural storage buildings were improperly used for human occupancy. (*Id.*). Kinslow personally conducted the January 27, 2012, inspection, observing the "[u]npermitted construction of a barn, gazebo, deck and a metal agricultural storage facility," as well as "[u]nlawful occupancy of a designated agricultural storage facility." (*Id.* at 16). Kinslow "reviewed the County's building permit records and determined that no permits have been issued for any of the[] [relevant] structures on the Subject Property." (*Id.*). He added, "based upon [his] professional experience," that the "violations are indicative of additional and perhaps more severe defects." (*Id.*). Kinslow repeated Williams's concern that Cox had acted erratically in past conversations and would likely interfere with their inspection. (*Id.* at 17–18).

The Conway declaration recounts the January 27, 2012, inspection with Kinslow.  Conway "observed that a transient rental occupancy business was operating on the" property.  (*Id.* at 20).  Conway also stated that "[o]n March 19, 2015, the Health Department received a written complaint confirming that food was continuing to be served to guests on the" property and that "[b]ased on online advertisements and reviews about the" property, he "believe[d] that an unpermitted food facility [was] [ ] being operated on the [ ] Property in conjunction with the transient rental occupancy . . . ."  (*Id.* at 20–21).

Keith Williams stated in his declaration that, although he was aware that the property was being marketed for transient rental occupancy, the records showed that no Transient Occupancy Registration Certificate had been issued for the property and that no taxes had been paid on rental income for the property.  (*See id.* at 6–7).

These affidavits establish probable cause to search the property for Code violations and other violations of California law.  Judge Walton so ruled after considering the evidence, (*id.* at 3–4), and deference is usually given to an issuing judge's finding that probable cause supports a warrant, *see United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015).  Testimony that County officials had repeatedly inspected the property and continued to find violations of California law, ranging from the unauthorized use of property for tourist and rental purposes to construction and structural issues, provided ample basis for concluding that there was a "fair probability that contraband or evidence of a crime will be in a particular place." *Gates*, 462 U.S. at 238.  Although the County's history of inspecting the property traces back to 2008, well before the issuance of the inspection warrant, the affidavits include affirmations of more recent and continuing violations, such as evidence that Cox continued to advertise and use the property as a rental and tourist

destination without authorization.  These affidavits supported an inference that the property was maintained and used in violation of California law, warranting inspection.

Cox argues that the affidavits were falsified and that probable cause did not exist.  *See Butler*, 281 F.3d at 1024.   In Cox's briefs and various other submissions, he appears to allege that three parts of the affidavits supporting the inspection warrant were false or based on improper evidence: (1) that the Sarah Williams affidavit falsely stated that Deputy Wesley Smith confirmed that the property continued to suffer various health and safety violations in 2015, (Docket Entry No. 236 at 8); (2) that the affidavits falsely stated that Cox was erratic and volatile and would have taken steps to obstruct the search, when he had cooperated with the County in the past, (Docket Entry No. 209 at 5–6); and (3) that the affidavits relied on an illegal October 26, 2011, helicopter search, (Docket Entry No. 210 at 18).

Cox is correct that Smith did not confirm the existence of Code violations at the property and that the Sarah Williams affidavit falsely represented that he had.  The defendants concede that Smith did not inspect the property or observe Code violations.  Instead, Smith went to the property to investigate a complaint that the electric meter had been tampered with so as to not register electricity usage.  (*See* Docket Entry No. 256 at 7; Docket Entry No. 257-1 at 8 (Tr. at 43:13– 19)).[24]   The other asserted issues are disputed, either factually or legally.   Sarah Williams's deposition, for example, includes testimony that Cox could have altered the property, removed records, or asked people to leave by the time of the search, (Docket Entry No. 257-1 at 15–16 (Tr. at 128:20–129:7)), and that, even if he was not erratic or dangerous and had cooperated initially, he became increasingly uncooperative with the County starting in 2013, (Docket Entry No. 208-

---

[24] Cox heavily disputes that he damaged the power meter, claiming that he repeatedly reported the damage to the electric company.  (Docket Entry No. 236 at 8 n.8).  The validity of the claims based on the meter are not material to summary judgment.

10 at 236:7–23).  The County also disputes that the October 2011 helicopter search was illegal. (*See* Docket Entry No. 240 at 30–31).

Cox's arguments are insufficient to preclude summary judgment for the defendants because the arguments are immaterial to probable cause.  First, Cox's argument that the affidavits allowed an impermissible search of the property without consent does not affect the validity of the warrant under the Fourth Amendment.  A valid warrant eliminates the need for the government to obtain consent to search a property.  *See Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528–29 (1967) (explaining that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant"); *I.N.S. v. Delgado*, 466 U.S. 210, 217 n.5 (1984) (noting that the "officers were lawfully present pursuant to consent or a warrant"); *Soldal v. Cook County*, 506 U.S. 56, 66 (1992) (explaining that more Fourth Amendment questions arise "in the absence of consent or a warrant permitting the seizure of the items in question").

Second, the three misrepresentations Cox cites were not material to the probable cause determination.  The affidavits each spoke to Code issues with Cox's property dating back to 2008. Some of these included permitting issues.  A contemporaneous search for permits on the property did not reveal them, suggesting that many of the long-running issues remained.  Cox disputes the permitting issues, but the list of permits he offers as evidence shows only four permits at the time of the search—a May 2001 electrical permit; a February 2002 septic permit; an October 2002 dwelling permit; and a February 2012 electrical permit.  (Docket Entry No. 212-1 at 38).  Most of the permits were granted in August 2018, after the inspection.  (*Id.*).  The affidavits also include evidence that Cox had continued to host guests at his property and rent it out to people.  Although Cox's declaration includes statements that he tried to limit his advertising to agritourism and that

73

he did not rent his property to guests, he concedes that "in 2014 vacationrentals.com merged and shared [his] advertising with other sites such as VRBO, which made it appear that [he] was advertising [his] ranch to the public as a vacation rental." (Docket Entry No. 213 at 3). This reasonably suggested to officials at the time of the inspection warrant that long-running issues had not been abated.

The County and its agents had probable cause to search the property in October 2016.[25]

### ii.        The *Heck* Bar

*Heck* bars Cox's claims arising out of the receivership proceedings. The civil receivership proceedings did not terminate in Cox's favor. The trial court ruled that appointing a receiver was appropriate because "the violations were clear, as indicated by the county's experts, and defendant had failed to remedy them," *JDC Land Co.*, 2020 WL 5015561, at \*6; the court of appeals affirmed based in part on its ruling that "sufficient evidence from county's experts about the substandard and dangerous conditions on the Property . . . support[ed] the appointment of a receiver," *id.* at \*21; and the order discharging the receiver found that the sale and receivership was properly conducted, (Docket Entry No. 150-1 at 5–8). The receivership saga concluded, and Cox did not prevail. Absent some decision showing that these orders appointing the receiver and confirming the sale of the property have been "reversed on direct appeal" or "declared invalid by a state tribunal authorized to make such determination," Cox cannot state a claim under § 1983 because it has not yet accrued. *Heck*, 512 U.S. at 486–87 (footnote and citations omitted).

---

[25] Although Cox mentions that the search warrant was incredibly broad, (Docket Entry No. 236 at 11), he does not appear to advance claims for damages based on the breadth of the warrant relative to the probable cause the affidavits supported. Nor does he argue that the County's civil action was based on evidence that should not have been collected because the warrant was overbroad. Cox's arguments are more all-or-nothing: the inspection was facially improper, so the entire civil action was impermissible. (*See* Docket Entry No. 210 at 22–24).

iii.        Preclusion

The County defendants argue that the final orders in the receivership proceeding bar the plaintiffs' procedural-due-process claim and their malicious-prosecution claims.  (Docket Entry No. 218 at 14–16).  The court agrees.

Claim preclusion prevents the litigation of issues that could have and should have been raised in a dispute between parties.  *See DKN Holdings*, 61 Cal. 4th at 824.  Issue preclusion prevents "relitigation of issues argued and decided in prior proceedings."  *Lucido v. Superior Ct.*, 51 Cal. 3d 335, 341 (1990).  A party seeking to preclude the relitigation of issues must establish five elements:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Id.*  In addition, the previous decision must be consistent with the Constitution's Due Process Clause, *see Kremer*, 456 U.S. at 481, and California's guarantee of due process and its public policy, *see Kulchar v. Kulchar*, 1 Cal. 3d 467, 470–74 (1969) (Traynor, C.J.).  Under these principles, the receivership orders preclude the plaintiffs' procedural-due-process and malicious-prosecution claims.  Cox received due process; the receivership was conducted appropriately; and the County had probable cause to sue for the Code violations and move for the receiver.

a.        **Procedural Due Process**

The state-court Code and receivership proceedings resolved the procedural-due-process claim that JDC Land now brings.  JDC Land argues that it did not receive "an opportunity to be heard" in the "code enforcement action."  (Docket Entry No. 236 at 21).  JDC Land complains that "the County issued an N&O ordering Cox to fix all 101 violations within 30 days (including

75

Christmas and New Year's Day)," (*id.* at 23); that the County denied additional time to correct the alleged deficiencies, (*id.*); and that the "entire receivership action was decided on declarations, with no opportunity to examine witness[es], little opportunity for discovery, no trial and no evidentiary hearing," (*id.* at 20).  Together, JDC Land alleges due process was violated because the County "improperly sought the appointment of a receiver (an extraordinary remedy) instead of giving Plaintiffs an opportunity to address the code violations after the criminal case, and failed to give Cox and JDC adequate time to address the disputed code violations over the holidays, which resulted in summary and unnecessary expedited procedure without affording Cox the opportunity and time to present live witnesses, testimony and rebuttal evidence to the exaggerated 101 health and safety code violations."  (Docket Entry No. 169 ¶ 177).

The California state court addressed and rejected this complaint and its many sub-parts. The court of appeals held that JDC Land forfeited the issues by failing to raise them before the trial court. *JDC Land Co.*, 2020 WL 5015561, at \*12.  The appellate court then held that, "forfeited or not, the due process argument is not meritorious."  *Id.*  The court rejected the argument that due process required a full evidentiary hearing and cross-examination of witnesses.  *See id.* at \*12–13. The court held that JDC Land had received adequate "notice of the alleged substandard building violations and sufficient time to abate the violations."  *Id.* at \*13. The court held that JDC Land received a sufficient opportunity to marshal its own evidence and investigate the County's, because it "had not attempted any of the procedural options to secure additional time to marshal evidence or to seek the presentation of live testimony."  *Id.*  Finally, the court held, based on a complete *Mathews v. Eldridge*, 424 U.S. 319 (1976), analysis, that the receivership statutory scheme was consistent with due process.  *See id.* at \*16–19.  The court of appeals addressed and rejected the allegations that the criminal case was impermissibly intertwined with and interfered with the

receivership proceedings, explaining that the trial court "expressly stated it was not considering anything related to Cox's criminal proceeding" and that JDC both forfeited and failed to substantiate its claims of judicial bias. *See id.* at *20–21.

There is little doubt, after the extensive analysis by the California court of appeals, that the plaintiffs' procedural-due-process claims are "identical" to those presented in the state-court proceeding, were "actually litigated," and were "necessarily decided." *Lucido*, 51 Cal. 3d at 341. The California Supreme Court expressly permits appellate courts to, in their discretion, address and affirm issues litigated in a trial court to ensure issue-preclusive effects in subsequent litigation. *See Samara v. Matar*, 5 Cal. 5th 322, 336 (2018) ("Appellate courts can affirm on multiple grounds where appropriate."); *Zevnik v. Superior Ct.*, 159 Cal. App. 4th 76, 85 (Cal. Ct. App. 2008) ("If an appellate court is aware of or anticipates collateral litigation and believes that to establish collateral estoppel on an alternative ground would be beneficial, the court may affirm the trial court judgment on more than one ground.").

Nor is there a question as to whether these rulings were "final and on the merits" and against the same party in this litigation, JDC Land Company, and one in privity to that party, Cox. *Lucido*, 51 Cal. 3d at 341. "The doctrine of collateral estoppel includes such final orders, despite the absence of a final judgment resolving the entire litigation." *Churchfield v. Wilson*, No. B146845, 2002 WL 358778, at *4 (Cal. Ct. App. Mar. 7, 2002) (class-certification ruling). The doctrine "requires only a final adjudication of the issue sought to be precluded in the second action." *Rymer v. Hagler*, 211 Cal. App. 3d 1171, 1180 (Cal. Ct. App. 1989); *see, e.g.*, *Beverly v. Riverside Cnty. Pub. Adm'r*, No. E077038, 2022 WL 713401, at *11 (Cal. Ct. App. Mar. 10, 2022) (appointment of an administrator in probate proceedings). The California Supreme Court denied review of JDC Land's appeal from the order appointing a receiver, *see County of Mariposa v. JDC*

77

*Land Co.*, No. S264800 (Cal. Dec. 10, 2020), a California appeals court dismissed the appeal of the order confirming the property sale, (Docket Entry No. 137-5); and the discharge order found that the sale and receivership was properly conducted, (Docket Entry No. 150-1). California courts hold that such receivership rulings are final decisions with preclusive effect. *See Aviation Brake Sys., Ltd. v. Voorhis*, 133 Cal. App. 3d 230, 234 (Cal. Ct. App. 1982) (claim preclusion); *Norrie v. Lane*, No. B196062, 2009 WL 1522558, at *5 (Cal. Ct. App. June 2, 2009) (issue preclusion); *City of La Habra Heights v. McAlister Invs., Inc.*, No. B227308, 2012 WL 274828, at *6 (Cal. Ct. App. Jan. 30, 2012) (issue preclusion).

This final ruling is enforceable against both JDC Land and Cox because JDC Land "is closely held" by Cox, "he actively participated in the action on behalf of the corporation," and his interests are not "so different that he should have an opportunity to relitigate his claims." *Gottlieb v. Kest*, 141 Cal. App. 4th 110, 151 (Cal. Ct. App. 2006) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 59(3)(a)); *see, e.g.*, *Amelco Indus., Inc. v. Automated Switching & Controls, Inc.*, No. A109274, 2007 WL 80973, at *7 (Cal. Ct. App. Jan. 12, 2007) (applying the Restatement); *Aetna Cas. & Sur. Co. of Hartford, Conn. v. Kerr-McGee Chem. Corp.*, 875 F.2d 1252, 1259 (7th Cir. 1989) (same); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253–54 (Fed. Cir. 2000) (same). Cox is the "100% owner" of JDC Land and admitted that it is a "closely held single proprietorship." (Docket Entry No. 68 at 14). Cox actively participated in the receivership proceedings on behalf of JDC Land; he "attended all of the receivership hearings and read all the papers filed in that proceeding." (Docket Entry No. 231 ¶ 23). And Cox's interests do not diverge from JDC Land's. Cox was fully invested in the state-court litigation because he is "the beneficial owner of the subject property with the right to engage in . . . proceeding[s] to protect his interest in it." (Docket Entry No. 68 at 14). In the appeal of the sale order, JDC Land argued that the appeal was not moot

because the sale order evicted Cox.  JDC Land Co.'s Supplemental Brief, *County of Mariposa v. JDC Land Co., LLC*, 2020 WL 937821, at *5–7 (Cal. Ct. App. Feb. 21, 2020).  JDC Land argued that the appeal should be heard on the merits because "JDC and Cox have been treated totally unjustly in th[e] case."  *Id.* at *6.  The receivership proceedings were as much against Cox as they were against JDC Land.  The receivership orders are final and bind both Cox and JDC Land.

The California court's procedural-due-process decision would not apply only if Cox and JDC lacked a full-and-fair opportunity to litigate the procedural-due-process issue in the California courts.  If a judgment-debtor raises a due process issue in the initial proceeding, then the judgment-debtor's due-process rights are "protected not by collateral review, but by the [trial] court initially, and thereafter by appeal within the state system and by direct review in the United States Supreme Court."  *Epstein v. MCA, Inc. (Epstein III)*, 179 F.3d 641, 648 (9th Cir. 1999); *Janik v. Rudy, Exelrod & Zieff*, 119 Cal. App. 4th 930, 946 (2004) (applying *Epstein III*); *Coe v. James Hardie Bldg. Prods., Inc.*, No. H040160, 2015 WL 4575925, at *9 (Cal. Ct. App. July 30, 2015) (applying *Epstein III*).  "Limited collateral review" of the California court's assessment of the procedural-due-process issue is available only "to consider whether the procedures in the prior litigation afforded the party against whom the earlier judgment is asserted a 'full and fair opportunity' to litigate the claim or issue."  *Epstein III*, 179 F.3d at 649 (quoting *Kremer*, 456 U.S. at 482).  Cox and JDC Land do not argue that they could not adequately raise the due-process issue in the state proceedings.  Nor could they; the California court of appeals's extensive discussion of their arguments and the issue is sufficient to apply issue preclusion in this case.

#### b.    Receivership Management

A similar analysis applies to Cox's claims that the receiver improperly managed the property and arranged its sale, maliciously evicted him, and inappropriately accrued costs.

Cox argues that the false affidavits in support of the motion to appoint the receiver resulted in his eviction.  He argues, for example, that the affidavits in support of the receivership actions that mentioned "dangerous violations" and his criminal case caused the receiver to evict him from the property.  (Docket Entry No. 236 at 7–8).  As a result, he claims, he could not even "go onto the property at all to maintain buildings, roads, vegetation and care for my remaining livestock, including horse, chickens, goats and pig."  (Docket Entry No. 212 at 10).  He argues that, based on these representations, the receiver retained expensive bodyguards that increased the costs of the receivership and forced the sale of his property to a third party.  (*See id.* at 10–11).

Cox also argues that receivership was badly mismanaged and did not rectify any code violations.  He claims the bodyguards did not protect the property but instead "fed [his] horses moldy hay which could have sickened or killed them, [] drove [his] ATVs around the ranch, and allowed their children to come onto the ranch for recreation."  (*Id.* at 10).  He claims that the property violations were non-existent or easy to remedy.  (*See id.* at 12–17).  He argues that he "obtained several estimates" on the repairs costs needed to bring the property up to Code, ranging "from about $8,000 to about $13,000."  (*Id.* at 11–12).  Cox argues that although the receiver was allowed take out a loan of up to $25,000, well above the amount he alleged was needed to remedy the alleged violations, it did not use those funds "on repairs, property taxes, utilities, or other BCR bills which remained unpaid."  (*Id.* at 12).  When the court allowed Cox to return to the property in February 2019, he claims the property was in disrepair, heavily damaged, trashed, and infested. (*Id.* at 15–16).

These issues could and should have been raised in the course of the receivership proceedings.  *Aviation Brake Systems* is instructive.  In that case, Aviation Brake Systems sued a receiver that had been relieved of his duties overseeing the corporation for mismanagement.  The

mismanagement included accounting the corporation's inventory based on representations it knew were false, permitting the diversion of resources for personal use, failing to pay rent and other debts, and paying excess consulting fees that resulted in no benefit to the company. *Aviation Brake Sys.*, 133 Cal. App. 3d at 231–32, 233 n.2. When the receivership concluded, the court considered the initial receiver's final report and request for fees, overruled objections, and approved the final report and the fee request. *See id.* at 232–33. Aviation Brake Systems later sued the receiver for failing to faithfully discharge his duties and sought damages based on the receiver's mismanagement. *See id.* at 233–34. The court ruled that claim preclusion barred the action, holding that "the matters sought to be litigated in the present action were, could have been, or should have been litigated at the time the receiver's final report and account was approved." *Id.* at 234. Questions "about the propriety of various expenditures and the adequacy of the inventory of property [in the accounting] could and should have been raised as objections to the receiver's final report and account." *Id.* at 235.

This case is similar. Cox complains that the receiver spent large sums to remediate nonexistent Code violations, to hire unneeded security guards, and left the property in worse shape after than before the receivership. These issues, as in *Aviation Brake Systems*, could have and should have been raised before the receiver was discharged. Under California law, "[b]efore the court rules on the final accounting, the parties may question, and the court must consider, issues such as whether the receiver exceeded his or her authority, caused injury to others, or acted negligently in operating the receivership estate." *S. Cal. Sunbelt Devs., Inc. v. Banyan Ltd. P'ship*, 8 Cal. App. 5th 910, 926 (Cal. Ct. App. 2017). Yet the record reveals that neither Cox nor JDC Land "requested the court to conduct any audit or to require the Receiver to explain or provide proof of the propriety of any specific actions or expenditures." (Docket Entry No. 219-16 at 4).

81

The court surmised that they did not do so because there were "no assets available as remedies should the Receiver be found to have breached its duty." (*Id.*). But that does not prevent claim preclusion from applying to this action.[26] The discharge order includes necessary findings that "billings on the part of the Receiver were substantially appropriate," and it discharged "any and all claims and/or causes of action which may arise from this receivership matter" against the receiver. (*Id.* at 5). The court further found "that the sale [of the property] itself was properly conducted, and that the sale price was reasonably commensurate with the value of the property as determined by the level of interest therein shown by potential buyers." (*Id.* at 5–6).

Cox cannot pursue claims against the County for the actions of the receiver under these conditions and on this record. The court held that the discharge order was "binding on all parties to th[e] lawsuit, as well as all others with notice of the discharge hearing." (*Id.* at 8). The order added that "[a]ny nonparty with lawful notice of the discharge hearing and such parties as might have an interest in the property or might be impacted by" it "were required to be heard at the discharge hearing." (*Id.*). "[T]he questions now sought to be raised about the propriety of various expenditures and the adequacy of the inventory of property could and should have been raised as

---

[26] Issue preclusion may not apply if there "is a clear and convincing need for a new determination of the issue . . . because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." RESTATEMENT (SECOND) OF JUDGMENTS § 28(5); *see also Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971). But *Aviation Brake*'s "could and should have" language sounds more in claim preclusion than issue preclusion, making this principle inapposite. In any event, there is no "clear and convincing need" to apply this exception to issue preclusion. Cox had an adequate incentive to adjudicate the issue in state court because this litigation was pending at the time of the discharge order. Even if he could not recover from the receiver directly, he had an incentive to litigate in state court to ensure he could assert fully his claims against the County in this federal case. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332 (1979) (the "foreseeability of subsequent [] suits" provides a strong incentive to litigate the first suit); WRIGHT & MILLER, FEDERAL PRAC. & PROC. § 4424 (3rd ed. 2026) (discussing the view that it is "fair to force the parties to litigate the issue in the first litigation in proportion to the full value of all foreseeable future litigation"); *cf.* RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. i ("[P]reclusion should not operate . . . if it was unforeseeable when the first action was litigated that the issue would arise in the context of the second action, and if that lack of foreseeability may have contributed to the losing party's failure to litigate the issue fully.").

objections to the receiver's final report and account." *Aviation Brake Sys.*, 133 Cal. App. 3d at 235. Cox cannot press them in this case.

Cox does not allege sufficient "circumstances . . . to show the kind of extrinsic fraud which justifies setting aside a final order or judgment." *Id.* Under California law, to set aside a final order, such as a final accounting of a receivership, the party seeking relief must show that he lacked "notice" or had "been prevented from participating" in the action. *Kulchar*, 1 Cal. 3d at 472. Intrinsic fraud, by false evidence or perjured testimony, is insufficient to set aside a final order or judgment. *See Pico v. Cohn*, 91 Cal. 129, 133 (1891) ("[I]t is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony."); *Caldwell v. Taylor*, 218 Cal. 471, 475–77 (1933) (same); *Kulchar*, 1 Cal. 3d at 472 n.2 (same). "The public policy underlying the principle of res judicata that there must be an end to litigation requires that the issues involved in a case be set at rest by a final judgment, even though a party has persuaded the court or the jury by false allegations supported by perjured testimony." *Jorgensen v. Jorgensen*, 32 Cal. 2d 13, 18 (1948). Cox's main argument that the receivership was founded on perjured testimony and an incompetent receiver is an argument based on intrinsic fraud. The discharge order stands and has preclusive effect in this litigation under California law.

The Constitution does not require a different result. The Fourteenth Amendment's Due Process Clause demands at a minimum "those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 277 (1855). California's intrinsic-fraud rule satisfies *Murray's Lessee*'s standard.

The Supreme Court adopted it long ago, after surveying English common law and American jurisprudence through the passage of the Fourteenth Amendment. *See United States v. Throckmorton*, 98 U.S. (8 Otto) 61, 62–69 (1878). California's rule followed from the common law's recognition "[t]hat the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases." *Id.* at 68–69.

The state court discharged the receiver in February 2022, well after this litigation was underway. (*See* Docket Entry Nos. 219-16). Cox heavily litigated the receivership proceedings, including the appointment of the receiver and the sale order. (*See* Docket Entry Nos. 219-10, 219-12, 219-13, 219-14, 219-15, 219-16, 219-17, 220-2). Cox knew how the receiver managed the property well before the state court entered the discharge order. (Docket Entry No. 213 at 8–17). Cox was allowed back on the property in 2019 and was a first-hand witness to much of the alleged misbehavior. (*See id.* at 15 ("I was allowed to do so by court order in mid-February 2019.")). This "is not a case where the alleged misconduct could not have been discovered until after the settling of the account." *Aviation Brake Sys.*, 133 Cal. App. 3d at 235. Cox's claims arising out of the management of the receivership are precluded.

### c.    Civil Action and Motion for a Receiver

Cox argues that the County did not have probable cause to sue him for 101 Code violations and to move for a receiver. He argues that there were no material Code violations, as evidenced by the receiver's own expert, (Docket Entry No. 209 at 4, 9); that he made good-faith efforts to remedy the alleged violations but that the County refused to give him reasonable time to do so,

84

(Docket Entry No. 213 at 8–9; Docket Entry No. 209 at 15–16); and that the County was able to procure a receiver only because it relied on perjured evidence and on procedures that violated due process, (Docket Entry No. 209 at 5–8).

The state-court rulings preclude Cox's argument that the County lacked probable cause to move for a receivership. The County alleged six causes of action against JDC Land: violations of the "State Housing Law" (Health & Saf. Code, § 17910 et seq.); public nuisance (Civ. Code, §§ 3479, 3480, 3491); public nuisance per se (Mariposa County Code, § 17.144.050); transient occupancy tax violations (Mariposa County Code, § 3.36 et seq.); breach of contract; and the "Unfair Competition Law" (Bus. & Prof. Code, § 17203; UCL). (Docket Entry No. 219-11 at 5–11). The complaint asserted a right to the appointment of a provisional receiver under Section 17980.7. (*See id.* at 11–12). The County moved to appoint a receiver in June 2017. (*See* Docket Entry No. 219-18). A court may appoint a receiver "if a building owner fails to correct conditions in a substandard building following notice and a reasonable time for compliance." *JDC Land Co.*, 2020 WL 5015561, at *8.

The trial court found many substandard property violations. As the court of appeals pointed out, uncontroverted evidence established that:

> the office/residential unit had damaged supports that caused the floor to sag and created a risk of partial or total collapse; the roof supports of the upper residential unit had split, which sacrificed the structural integrity of the roof and created a risk of collapse; the deck of the lower storage building/residential unit was supported by jack posts, which were insufficient to support the weight of the deck, creating unsafe walkways and the risk of collapse; the walls of the lower storage building/residential unit were made of wood that suffered extensive rot and decay, undermining the structural integrity of the load-bearing walls; and the outside and interior stairways of the office/residential unit were inadequately supported and improperly built, making them unsafe.

*Id.* The trial court "found the violations were clear" and unremedied, even after a seven-month opportunity to cure them. *Id.* at *6. The court of appeals, reviewing for substantial evidence,

affirmed the trial court's findings.   It explained that the County's evidence was largely uncontroverted.   *See id.* at \*8–9.   Cox's counter arguments were not persuasive because his declaration that these issues were "'fixed'" or 'repaired' d[id] not address whether the fixes or repairs (about which no details were offered) rendered the various buildings/structures sound from a structural integrity standpoint."   *Id.*   The court added that "[e]ven assuming all factual disputes relevant to permits were resolved in defendant's favor, and that violations such as trash accumulation and missing smoke and carbon monoxide detectors had been remedied, there remained substantial evidence of substandard building violations sufficient to support the trial court's appointment of a receiver."   *Id.*; *see also id.* at \*21 n.19 ("[E]ven to the extent the alleged violations were contradicted by Cox's declaration, there was evidence to support the trial court's determination of substandard and dangerous conditions on the Property that defendant failed to remedy.").

These findings preclude Cox's argument that the County lacked probable cause to move for a receivership.   Two issue-preclusion standards could apply under California law.   The first is the usual standard.   The "findings of the receivership order" on issues such as "the existence of a nuisance on the property" are "binding" on parties or those in privity to the parties in receivership proceedings.   *McAlister Invs., Inc.*, 2012 WL 274828, at \*6.   The entry of the discharge order ratified and made final the court's initial findings that a nuisance existed, because the receiver properly expended funds to remedy the substandard conditions on the property.   *See id.* at \*4, \*6 (holding that the successor-in-interest charged with the costs of the receivership in the receiver's final report and account could not collaterally attack the existence of a nuisance); *cf. Smith*, 237 Cal. App. 2d at 387 (explaining that the trial court, at the final-accounting stage, "found properly that the receivership was unnecessary and wrongfully obtained").   The existence of substandard

property conditions and the viability of a nuisance were "vigorously" litigated in the receivership proceedings. *JDC Land Co.*, 2020 WL 5015561, at *20 n.18. Under the usual issue-preclusion standard, the court's order granting the County's requested relief precludes relitigation of whether the County had probable cause to request the ruling in the first place, even if the County used fraudulent evidence to procure it.

The second is a modified issue-preclusion rule that California law applies in malicious-prosecution cases in which a party obtained interim, but not final, relief. "[I]ssuance of [a] preliminary injunction conclusively establishes that [the] entire [previous] action was brought with probable cause." *Fleishman v. Superior Ct.*, 102 Cal. App. 4th 350, 353 (Cal. Ct. App. 2002); *accord Paiva v. Nichols*, 168 Cal. App. 4th 1007, 1022 (Cal. Ct. App. 2008). Because the entry of a preliminary injunction requires a determination of the likelihood that the movant will succeed on the merits, that ruling compels the conclusion that the party who secured the preliminary injunction had probable cause to bring the suit in the first place. *Fleishman*, 102 Cal. App. 4th at 355–56. This rule holds even if the preliminary relief was awarded based on affidavit and argument, as opposed to a full merits hearing. *See id.* at 357 (finding probable cause because the court entered a preliminary injunction based on "the verified complaint and a declaration by an officer of Sunterra that substantiated legally cognizable claims"). But, unlike with the traditional issue-preclusion rule, the modified one does not apply if the preliminary relief was "obtained by fraud or perjury." *Id.*

This modified rule may apply instead of the usual issue-preclusion rule. The appellate court order affirming the appointment of the receiver styled the receivership "as a provisional and auxiliary remedy . . . similar to a preliminary injunction." *JDC Land Co., LLC*, 2020 WL 5015561, at *10. The County did not try the underlying causes of action to a final judgment. As a result,

87

the order appointing the receiver is comparable to a preliminary injunction that is vacated after a full trial on the merits. But there are reasons why a receivership action is not comparable to a preliminary injunction in this posture. California law recognizes that preliminary relief can preclude future litigation if it "appears that the court intended a final adjudication of the issue involved." *Bomberger v. McKelvey*, 35 Cal. 2d 607, 612 (1950); *see also Dep't of Fair Emp. & Hous. v. Superior Ct.*, 54 Cal. App. 5th 356, 380–81 (Cal. Ct. App. 2020); *Camp v. Bd. of Supervisors*, 123 Cal. App. 3d 334, 354–58 (Cal. Ct. App. 1981). In an order entered after discharging the receiver, the trial court recognized that the civil claims were "moot, at least in any conceivably practical sense," because it chose to place the property into receivership. (Docket Entry No. 220-1 at 3). In addition, the discharge order finally resolved the receivership proceedings and is not open to relitigation on whether the receiver's actions to abate the substandard property conditions were necessary. *See Aviation Brake Sys.*, 133 Cal. App. 3d at 235; *McAlister Invs., Inc.*, 2012 WL 274828, at \*6; *see also JDC Land Co., LLC*, 2020 WL 5015561, at \*17 (explaining that "if the property is *not* substandard by degree or even substandard at all, the receiver would inform the trial court"). The final order discharging the receiver finally resolves the issue of probable cause, even if it does not determine Cox's civil liability by a preponderance of the evidence. (*See* Docket Entry No. 220-1 at 2–3 (denying summary judgment on the underlying civil claims after the receivership concluded)).

Although the court leans heavily towards the conclusion that the usual and complete issue-preclusion standard applies, it need not resolve that question to rule that there was probable cause to bring the civil action and move for a receiver under the modified standard.

Cox argues that the declarations in support of the receivership were false and perjurious for five reasons: (1) Sarah Williams's declaration included false statements that she personally

88

observed and verified the 101 Code violations when she did not do so, (Docket Entry No. 209 at 6); (2) the affidavits testified that Cox was dangerous and erratic, based in part on the criminal charges, even though Cox had never shown an inclination for violence against or threatened County officials,[27] (*id.* at 6–8); (3) the affidavits suggested that Cox had been noncompliant for eight years, even though the officials knew Cox had been cooperative over that time; (4) the County officials knew that not all the Code violations existed, that some were immaterial, and that others were remediated by the time of the receivership motion, (*see id.* at 9–10, 16); and (5) the affidavits represented that Cox had sufficient time to correct his property, even though they knew he did not have such time and actively prevented him from doing so, (*see id.* at 16; Docket Entry No. 213 at 10).

None of these allegedly false statements are sufficient to conclude that the County lacked probable cause. First, the declarations that Cox was dangerous did not influence the appointment of the receiver. The opinion affirming the appointment of the receiver rejected the argument that Cox's criminal proceedings influenced the trial court's decision. *JDC Land Co.*, 2020 WL 5015561, at *20–21. "The trial court expressly stated it was not considering anything related to Cox's criminal proceeding" and that "[r]eferences to that criminal case . . . were therefore not admitted into evidence and expressly were not considered in deciding the motion." *Id.* at *20. The appellate court then affirmed because there was "sufficient evidence from county's experts about the substandard and dangerous conditions on the Property to support the appointment of a receiver." *Id.* at *21. The record does not support Cox's argument that the receivership "was

---

[27] The affidavits included misleading declarations that the County had to install security measures in response to Cox's erratic behavior. (*See* Docket Entry No. 208-1 at 147:2–149:10 (Williams admitting the security measures were not installed in response to Cox)).

obtained on the basis of [the] misrepresentations" about his dangerousness. *Paiva*, 168 Cal. App. 4th at 1026.

Second, the state courts heard and considered evidence that Cox had complied with the County's requests in the eight years before the Code-enforcement action. The appellate court commented that the "parties vigorously dispute[d] the nature of the violations dating back to 2008." *JDC Land Co.*, 2020 WL 5015561, at *20 n.18. Cox argued that the County had not been "seeking compliance of all of the alleged violations since 2008 or even prior to October 2016." *Id.* The court considered the argument and focused instead on the fact that "some violations were noticed years before but were not timely corrected." *Id.* The court explained that there was "evidence to support such a finding, including letters sent to defendant in 2012 and 2013 about unpermitted structures on the Property and certain permits that could not be issued without payment, as well as unpermitted uses of the Property." *Id.* The court also addressed evidence that Cox had submitted permits in compliance with County requests, pointing to Kinslow's affidavit statements that the County denied some of Cox's permits as incomplete. *Id.* at *6. Issues "raised in . . . opposition in the prior suit . . . cannot have served as a fraudulent inducement for the issuance of the preliminary injunction." *Paiva*, 168 Cal. App. 4th at 1027.

Third, the state courts heard and considered evidence that Cox did not have adequate time to remedy the alleged violations. The appellate court did not rely on the affidavits' representations that Cox had sufficient time to remedy the violations. It considered Cox's side of the story, as argued on appeal. *See JDC Land Co.*, 2020 WL 5015561, at *20 n.18. It affirmed the trial court's ruling that the seven months between its decision to appoint the receiver in July 2017 and the notice and order in December 2016 was "sufficient to warrant appointment of a receiver." *Id.* at *7, *13 (alterations adopted). The court reached that conclusion without relying on the relevant

affidavits.  The appellate court also considered Cox's arguments that the receivership was too drastic a remedy and was entered too soon, explaining that the evidence indicated "an injunctive remedy would not be sufficient." *Id.* at \*20.  The court considered the fact that previous stipulated injunctions had been entered into by Cox or JDC Land and that the injunctions had not been followed.  *Id.*  The court addressed the argument that the injunction related to property that Cox and the defendant did not own.  *See id.* at \*20 n.17.  Cox raised and lost the arguments that he did not have sufficient time to remedy the alleged violations and that injunctive relief that would have given him time to remedy the alleged violations should have been entered.  *Id.*  Issues previously litigated "cannot have served as a fraudulent inducement for the issuance of the preliminary injunction." *Paiva*, 168 Cal. App. 4th at 1027.

Fourth, Sarah Williams's affidavit stating that she personally observed the 101 Code violations was not material to the appointment of the receiver and does not undermine the County's probable cause to have moved for one.  The affidavit includes a misstatement: although Williams personally observed some, but not all, of the 101 Code violations, other County officials observed and reported the violations that she did not personally observe.  (Docket Entry No. 208-10 at 242:6–21, 246:3–16, 249:13–250:6).  This misstatement no doubt undermines part of Williams's affidavit.  But it does not establish that the misstatement was material to the decision to appoint a receiver.  The County submitted declarations from Kinslow; Brian Hodge, the Senior Supervising Registered Environmental Health Specialist; and Curtis Jackson, the Deputy Fire Chief.  (*See* Docket Entry No. 219-18).  The appellate court noted that many of the violations established by these affidavits were uncontroverted and independently supported the appointment of a receiver. *JDC Land Co.*, 2020 WL 5015561, at \*8, \*17 n.16 ("[T]here remained substantial evidence of substandard building violations sufficient to support the trial court's appointment of a receiver.").

Nor is the misstatement in Williams's affidavit one that undermines probable cause.    That misstatement shows only that the County should have supplied an affidavit based on personal knowledge rather than one based on hearsay.  The error in Williams's affidavit does not tend to prove that the Code violations did not exist or that the County lacked probable cause to move for a receiver at all.

Fifth, and finally, Cox's argument that the affidavit's allegations about the Code violations were just plain wrong, as proven by the receiver's expert, do not defeat probable cause.  The fact that later-developed evidence might eventually disprove some or most of the factual basis on which the preliminary relief rests does not establish that relief was procured through fraud.[28]  *See Fleishman*, 102 Cal. App. 4th at 355 n.1 (rejecting reliance on "depositions taken after the injunction issued to show that the first cause of action was without factual basis" because "events subsequent to a hearing on the merits are inapposite").  The appellate court relied heavily on Kinslow's assessment of the safety of the property.  *See JDC Land Co.*, 2020 WL 5015561, at *8–9, *17 n.16.  These were largely "uncontroverted." *Id.* at *8.  The appellate tribunal even accepted Cox's representations that he had remedied the alleged deficiencies but found that they were insufficient to rebut the County's affidavits.  "Cox did not opine whether the fixed items no longer posed a risk of structural collapse or that load-bearing walls were no longer compromised, for example"; nor did Cox's proposed expert appear able "to create a disputed issue of fact on any of

---

[28] The report does not support each of the County's allegations, but it does not undermine probable cause. The report is limited to "architectural (health and safety) and engineering violations."  (Docket Entry No. 208-8 at 1).  Remaining types of violations were "reviewed by others."  (*Id.*).  The receiver discovered that some alleged violations were not as serious as predicted.  For example, the report concluded that alleged splitting in roof supports on the exterior of an upper residential building did not show signs of roof failure, as forewarned by the notice and order.  (*Id.* at 6; *see also id.* at 8, 14).  But the report also catalogued many unpermitted buildings, unlawful conversion of buildings into residential dwellings, and some structural hazards.  (*See id.* at 4, 6, 9, 10, 13, 14).  The report also did not comment on several structures for which the County had alleged violations because the structures were to be "demolished and hauled away."  (*Id.* at 17).

these violations." *Id.* at *17 n.16.  Even now, Cox does not rely on or present evidence that Kinslow's assessment of the alleged violations were knowingly false.  (*See generally* Docket Entry No. 209, 213).  He offers no testimony that Kinslow offered perjurious opinions about the state of the property and that the state courts granted the receivership based on them.

Nor does Cox do so for the other affidavits that supported the County's motion, such as those of Hodge and Jackson, or the photos of the property from the inspection that were submitted with the affidavits.  (*See generally* Docket Entry No. 219-18).  Cox contested this evidence at the hearing and on appeal.  He proffered, for example, "a copy of a notice of defensible space inspection dated June 7, 2017, by the California Department of Forestry and Fire Protection indicating no violations."  *See JDC Land Co.*, 2020 WL 5015561, at *5.  He also proffered at oral argument on appeal "video evidence . . . corroborating that substandard building violations on the Property had been cured."  *Id.* at *14 n.13.  The courts did not find these arguments persuasive. The "fact that [Cox] presented opposing evidence in an unsuccessful effort to resist the granting of the" receivership "does not give rise to an inference that [the County] obtained the interim equitable relief through fraud."  *Paiva*, 168 Cal. App. 4th at 1027.

"The granting of the" receivership "established probable cause for the initiation of the prior suit" and to move for a receiver.  *Id.* (citing *Fleishman*, 102 Cal. App. 4th at 357).  "There is no basis for concluding that the [receivership] was procured through fraud."  *Id.*  As a result, "there was probable cause to initiate the prior suit" and to move for preliminary relief in it.  *Id.*

\*      \*      \*

For these reasons, the County's motion for summary judgment, (Docket Entry No. 218), is granted.  Cox's claims arising out of the receivership proceedings fail.  The County had probable cause to inspect the property in October 2016.  *Heck* bars Cox's claims arising out of the ancillary

receivership proceedings in the Code enforcement actions because they did not terminate in his favor.  And the receivership orders preclude Cox's attempt to relitigate issues that were decided or should have been decided in the state courts.

## IV.    Conclusion

The court grants the defendants' motions for summary judgment, (Docket Entry Nos. 215, 217), and denies Cox's motions for summary judgment, (Docket Entry Nos. 210, 211).  By June 12, 2026, Cox must show cause why this court should not enter final judgment by identifying aspects of his complaint that he claims survive this court's rulings.

SIGNED on June 1, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge